# 22-1431

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

RITA FLYNN,

*Plaintiff-Appellant,*

—against—

MICHAEL BLOOMINGDALE, individually and in his official capacity for the New York State Department of Corrections and Community Supervision, JOHN A. SHIPLEY, individually and in his official capacity for the New York State Department of Corrections and Community Supervision, DANIEL OLIVER, individually and in his official capacity for the New York State Department of Corrections and Community Supervision,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

## JOINT APPENDIX

BENJAMIN W. HILL
CAPEZZA HILL, LLP
30 South Pearl Street
Albany, New York 12207
(518) 478-6065

*Attorneys for Defendants-Appellees*

MICHAEL B. RANIS
MICHAEL B. RANIS, ATTORNEY AT LAW
Co-Lab Goshen, 45 Saint John Street
Goshen, New York 10924
(914) 584-6445

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Decision of the District Court in New York State Department of
    Corrections and Community Services, Mary Kopp Adams,
    and Frank Gemmati, 17-CV-02864 (SDNY) (VB),
    dated March 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

Amended Complaint, in Federal Action, No. 7:17-cv-02864
    (S.D.N.Y), dated August 18, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26

Third Amended Complaint, in Matthew Bloomingdale,
    John A. Shipley, and Donald Oliver, 20-CV-09381 (PMH),
    dated July 27, 2021 (refiled July 29, 2021, Docket No. 30-1) . . . . . . . . A-54

    Exhibit A to Third Amended Complaint in 20-CV-09381-
    Amended Complaint in *Flynn v. DOCCS*, Index No.
    EF006948-2018 Supreme Court of New York, Orange County,
    dated July 27, 2021, (Docket No. 31) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-85

Draft Settlement Agreement in Arbitration between Rita Flynn and
    DOCCS, AAA Case 01-19-0002-5971 (and Exhibit C to
    Opposition to Summary Judgment in Index No.
    EF006948-2018), dated February 24, 2020 . . . . . . . . . . . . . . . . . . . . . . . A-119

Notice of Appeal, dated July 5, 2022, (Docket No. 49) . . . . . . . . . . . . . . . . A-123

**A-1**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/10/2020 | | ***NOTICE TO ATTORNEY TO FILE CIVIL INITIAL PLEADING. Notice to Attorney Michael Bruce Ranis to electronically file the initial pleading in this case. Failure to file the initial pleading may result in the dismissal of the case pursuant to Amended Standing Order 15-mc-00131. Initial Pleading due by 11/16/2020. (dnh)** (Entered: 11/10/2020) |
| 11/10/2020 | 1 | COMPLAINT against Michael Bloomingdale. (Filing Fee $ 400.00, Receipt Number ANYSDC-22522324)Document filed by RITA FLYNN..(Ranis, Michael) Modified on 11/12/2020 (dnh). Modified on 11/13/2020 (jgo). (Entered: 11/10/2020) |
| 11/10/2020 | 2 | CIVIL COVER SHEET filed..(Ranis, Michael) (Entered: 11/10/2020) |
| 11/12/2020 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Michael Bruce Ranis. The party information for the following party/parties has been modified: Parole Off. (Former) RITA FLYNN ; Associate Director Michael Bloomingdale. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party name was entered in all caps; party text was omitted. (dnh)** (Entered: 11/12/2020) |
| 11/12/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis to RE-FILE re: Document No. 1 Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; add party Matthew Bloomingdale in his second capacity with corresponding party text. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents.. (dnh)** Modified on 11/13/2020 (jgo). (Entered: 11/12/2020) |
| 11/12/2020 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Michael Bruce Ranis. The following case opening statistical information was erroneously selected/entered: Fee Status code due (due). The following correction(s) have been made to your case entry: the Fee Status code has been modified to pd (paid). (dnh)** (Entered: 11/12/2020) |
| 11/12/2020 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Philip M. Halpern. Please download |

A-2

| | | |
|---|---|---|
| | | and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(dnh) (Entered: 11/12/2020) |
| 11/12/2020 | | Magistrate Judge Paul E. Davison is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (dnh) (Entered: 11/12/2020) |
| 11/12/2020 | | Case Designated ECF. (dnh) (Entered: 11/12/2020) |
| 11/13/2020 | | ADD PARTY FOR PLEADING. Defendants/Respondents Michael Bloomingdale added. Party added pursuant to 1 Complaint.Document filed by Rita Flynn. Related document: 1 Complaint..(Ranis, Michael) (Entered: 11/13/2020) |
| 11/13/2020 | | ADD PARTY FOR PLEADING. Defendants/Respondents Matthew Bloomingdale added. Party added pursuant to 1 Complaint.Document filed by Rita Flynn. Related document: 1 Complaint..(Ranis, Michael) (Entered: 11/13/2020) |
| 11/13/2020 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Matthew Bloomingdale, re: 1 Complaint. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 11/13/2020) |
| 11/16/2020 | | ***NOTICE TO ATTORNEY REGARDING REMOVAL OF PARTY. Notice to attorney Michael Bruce Ranis. The following party/parties has been removed from this case: Michael Bloomingdale in his individual and official capacities as an official for the New York State Department of Corrections and Community Supervision. The party was added to the case in error. (jgo) (Entered: 11/16/2020) |
| 11/16/2020 | 4 | ELECTRONIC SUMMONS ISSUED as to Matthew Bloomingdale..(dnh) (Entered: 11/16/2020) |
| 12/14/2020 | 5 | FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR FIRST AMENDED COMPLAINT amending 1 Complaint against John A. Shipley with JURY DEMAND.Document filed by Rita Flynn. Related document: 1 Complaint. (Attachments: # 1 Exhibit State Ct complaint |

| | | |
|---|---|---|
| | | referenced).(Ranis, Michael) Modified on 12/15/2020 (sj). (Entered: 12/14/2020) |
| 12/15/2020 | 6 | REQUEST FOR ISSUANCE OF AMENDED SUMMONS as to Matthew Bloomingdale, re: 5 Amended Complaint. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 12/15/2020) |
| 12/15/2020 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to John A. Shipley, re: 5 Amended Complaint. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 12/15/2020) |
| 12/15/2020 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Michael Bruce Ranis. The party information for the following party/parties has been modified: John A. Shipley. The information for the party/parties has been modified for the following reason/reasons: party text contained a typographical error. (sj)** (Entered: 12/15/2020) |
| 12/15/2020 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis re: Document No. 5 Amended Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; John A. Shipley must be added again in his official capacity. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents. (sj)** (Entered: 12/15/2020) |
| 12/15/2020 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis to RE-FILE Document No. 5 Amended Complaint. The filing is deficient for the following reason(s): the wrong party/parties whom the pleading is against were selected. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (sj)** (Entered: 12/15/2020) |
| 12/15/2020 | | ADD PARTY FOR PLEADING. Defendants/Respondents John A. Shipley added. Party added pursuant to 5 Amended Complaint,.Document filed by Rita Flynn. Related document: 5 Amended Complaint,..(Ranis, Michael) (Entered: 12/15/2020) |
| 12/16/2020 | 8 | ELECTRONIC AMENDED SUMMONS ISSUED as to Matthew Bloomingdale, Matthew Bloomingdale..(pc) (Entered: 12/16/2020) |

**A-4**

| 12/16/2020 | 9 | ELECTRONIC SUMMONS ISSUED as to John A. Shipley, John A. Shipley..(pc) (Entered: 12/16/2020) |
|---|---|---|
| 12/16/2020 | 10 | FIRST AMENDED COMPLAINT amending 1 Complaint, 5 Amended Complaint, against Matthew Bloomingdale, John A. Shipley with JURY DEMAND.Document filed by Rita Flynn. Related document: 1 Complaint, 5 Amended Complaint,. (Attachments: # 1 Exhibit State Court Complt referenced).(Ranis, Michael) (Entered: 12/16/2020) |
| 02/01/2021 | 11 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. John A. Shipley served on 1/13/2021, answer due 2/3/2021. Service was accepted by Associate Counsel Kevin Cartwright. Service was made by Mail Also. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 02/01/2021) |
| 02/01/2021 | 12 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. Matthew Bloomingdale served on 1/13/2021, answer due 2/3/2021. Service was accepted by Associate Counsel Kevin Cartright. Service was made by Mail Also. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 02/01/2021) |
| 02/01/2021 | 13 | LETTER MOTION for Extension of Time *to Respond to the Amended Complaint* addressed to Judge Philip M. Halpern from Julinda Dawkins and Ian Ramage dated February 1, 2021. Document filed by New York State Office of the Attorney General..(Dawkins, Julinda) (Entered: 02/01/2021) |
| 02/02/2021 | 14 | ORDER granting 13 Letter Motion for Extension of Time. Application granted. The time for defendants to answer or otherwise move with respect to the amended complaint is extended to 4/1/2021. SO ORDERED.. (Signed by Judge Philip M. Halpern on 2/2/2021) (ks) (Entered: 02/02/2021) |
| 02/02/2021 | | Set/Reset Deadlines: Matthew Bloomingdale answer due 4/1/2021; Matthew Bloomingdale answer due 4/1/2021; John A. Shipley answer due 4/1/2021; John A. Shipley answer due 4/1/2021. (ks) (Entered: 02/02/2021) |
| 03/29/2021 | 15 | LETTER MOTION for Extension of Time *to Respond to the Amended Complaint* addressed to Judge Philip M. Halpern. Document filed by New York State Office of the Attorney General..(Ramage, Ian) (Entered: 03/29/2021) |
| 03/30/2021 | 16 | ORDER granting 15 Letter Motion for Extension of Time. Application granted. The time for defendants to answer or otherwise move with respect to the amended complaint is extended to 6/1/2021. SO |

**A-5**

| | | |
|---|---|---|
| | | ORDERED.. (Signed by Judge Philip M. Halpern on 3/30/2021) (ks) (Entered: 03/30/2021) |
| 03/30/2021 | | Set/Reset Deadlines: Matthew Bloomingdale answer due 6/1/2021; Matthew Bloomingdale answer due 6/1/2021; John A. Shipley answer due 6/1/2021; John A. Shipley answer due 6/1/2021. (ks) (Entered: 03/30/2021) |
| 05/11/2021 | 17 | NOTICE OF APPEARANCE by Benjamin W. Hill on behalf of Matthew Bloomingdale, John A. Shipley..(Hill, Benjamin) (Entered: 05/11/2021) |
| 05/22/2021 | 18 | FIRST LETTER MOTION for Leave to File Second Amended Complaint addressed to Judge Philip M. Halpern from Michael Ranis dated 5/22/2021. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 05/22/2021) |
| 05/22/2021 | 19 | LETTER RESPONSE to Motion addressed to Judge Philip M. Halpern from Benjamin W. Hill dated 5/22/2021 re: 18 FIRST LETTER MOTION for Leave to File Second Amended Complaint addressed to Judge Philip M. Halpern from Michael Ranis dated 5/22/2021. . Document filed by Matthew Bloomingdale, John A. Shipley..(Hill, Benjamin) (Entered: 05/22/2021) |
| 05/24/2021 | 20 | ORDER granting 18 Letter Motion for Leave to File Document. Application for leave to file Second Amended Complaint granted. Plaintiff's pleading shall be filed by 5/28/2021. The time for defendants Bloomingdale and Shipley to answer, or otherwise seek permission to make a motion pursuant to the Court's rules, shall be governed by Federal Rule of Civil Procedure 15(a)(3). SO ORDERED.. (Signed by Judge Philip M. Halpern on 5/24/2021) (nb) (Entered: 05/24/2021) |
| 05/24/2021 | | Set/Reset Deadlines: Amended Pleadings due by 5/28/2021. (nb) (Entered: 05/24/2021) |
| 05/28/2021 | 21 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR** SECOND AMENDED COMPLAINT amending 1 Complaint, 10 Amended Complaint against Daniel Oliver with JURY DEMAND.Document filed by Rita Flynn. Related document: 1 Complaint, 10 Amended Complaint. (Attachments: # 1 Exhibit Supreme Ct Am Complaint).(Ranis, Michael) Modified on 6/1/2021 (sj). (Entered: 05/28/2021) |
| 06/01/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis to RE-FILE Document No. 21 Amended Complaint. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the** |

**A-6**

| | | |
|---|---|---|
| | | **pleading is not correct; Remove the numbers and X next to filing court; the wrong party/parties whom the pleading is against were selected; The amended pleading was filed incorrectly on the due date set by the court, therefore Court's leave or consent from opposing parties will be required before re-filing the Amended Complaint.. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (sj)** (Entered: 06/01/2021) |
| 06/15/2021 | 22 | SECOND AMENDED COMPLAINT amending 21 Amended Complaint, 1 Complaint against Matthew Bloomingdale, Matthew Bloomingdale, New York State Office of the Attorney General, Daniel Oliver, John A. Shipley, John A. Shipley, Daniel Oliver with JURY DEMAND.Document filed by Rita Flynn. Related document: 21 Amended Complaint, 1 Complaint. (Attachments: # 1 Exhibit Ex. A, State Law Complaint, # 2 Supplement Consent by Defend. to File).(Ranis, Michael) (Entered: 06/15/2021) |
| 06/28/2021 | 23 | LETTER addressed to Judge Philip M. Halpern from Benjamin W. Hill dated June 28, 2021 re: Pre-Motion Conference. Document filed by Matthew Bloomingdale, John A. Shipley..(Hill, Benjamin) (Entered: 06/28/2021) |
| 07/06/2021 | 24 | LETTER RESPONSE in Opposition to Motion addressed to Judge Philip M. Halpern from Michael Ranis dated 7/6/2021 re: 18 FIRST LETTER MOTION for Leave to File Second Amended Complaint addressed to Judge Philip M. Halpern from Michael Ranis dated 5/22/2021. *Response to Def. Ltr. of June 28, Motion to Dismiss.* Document filed by Rita Flynn..(Ranis, Michael) (Entered: 07/06/2021) |
| 07/07/2021 | 25 | MEMO ENDORSEMENT re: 23 Letter filed by John A. Shipley, Matthew Bloomingdale. ENDORSEMENT: Application granted. A pre-motion telephone conference has been scheduled for 8/11/2021 at 10:30 a.m. At the time of the scheduled conference, all parties shall call the following number: (888) 398-2342; access code 3456831., (Telephone Conference set for 8/11/2021 at 10:30 AM before Judge Philip M. Halpern.) (Signed by Judge Philip M. Halpern on 7/7/2021) (nb) (Entered: 07/07/2021) |
| 07/09/2021 | 26 | LETTER MOTION to Adjourn Conference *regarding Motion to Dismiss* addressed to Judge Philip M. Halpern from Benjamin W. Hill dated July 9, 2021. Document filed by Matthew Bloomingdale..(Hill, Benjamin) (Entered: 07/09/2021) |

**A-7**

| 07/09/2021 | 27 | ORDER granting 26 Letter Motion to Adjourn Conference. Application granted. Due to the congestion of the Court's calendar, however, the pre-motion telephone conference will be adjourned to 10/6/2021 at 2:00 p.m. Telephone Conference set for 10/6/2021 at 02:00 PM before Judge Philip M. Halpern.. (Signed by Judge Philip M. Halpern on 7/9/2021) (nb) (Entered: 07/09/2021) |
|---|---|---|
| 07/26/2021 | 28 | FIRST LETTER MOTION for Leave to File Third Amended Complaint *to Change First Name of Defendant* addressed to Judge Philip M. Halpern from Michael Ranis dated 7/26/2021. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 07/26/2021) |
| 07/27/2021 | 29 | ORDER granting 28 Letter Motion for Leave to File Document. Application granted. Plaintiff's request to file a third amended complaint to correct the error in the name of defendant Oliver, and no other amendments is granted pursuant to Federal Rule of Civil Procedure 15(a)(2). Plaintiff shall file her Third Amended Complaint by 7/30/2021. So Ordered. (Signed by Judge Philip M. Halpern on 7/27/2021) (js) (Entered: 07/27/2021) |
| 07/27/2021 | | Set/Reset Deadlines: Amended Pleadings due by 7/30/2021. (js) (Entered: 07/27/2021) |
| 07/27/2021 | 30 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR** THIRD AMENDED COMPLAINT amending 22 Amended Complaint, against Donald Oliver with JURY DEMAND.Document filed by Rita Flynn. Related document: 22 Amended Complaint. (Attachments: # 1 Exhibit Ex. A, State Law Complaint).(Ranis, Michael) Modified on 7/28/2021 (sj). (Entered: 07/27/2021) |
| 07/28/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis to RE-FILE Document No. 30 Amended Complaint. The filing is deficient for the following reason(s): not all the parties whom the pleading is against were selected. Re-file the pleading using the event type Third Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (sj) (Entered: 07/28/2021)** |
| 07/29/2021 | 31 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR** THIRD AMENDED COMPLAINT amending 30 Amended Complaint, against Matthew Bloomingdale, Matthew Bloomingdale, New York State Office of the Attorney General, Daniel Oliver(in his individual capacity), Daniel Oliver(Daniel Oliver, in |

| | | |
|---|---|---|
| | | his official capacity), Donald Oliver, John A. Shipley, John A. Shipley with JURY DEMAND.Document filed by Rita Flynn. Related document: 30 Amended Complaint. (Attachments: # 1 Exhibit Ex. A, State Law Complaint).(Ranis, Michael) Modified on 7/30/2021 (sj). (Entered: 07/29/2021) |
| 07/30/2021 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Michael Bruce Ranis to RE-FILE re: Document No. 31 Amended Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; Donald Oliver must be added again with party text 'in his official capacity'; the wrong party/parties whom the pleading is against were selected (Daniel Oliver is not listed on PDF and should not be selected). Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents.. Re-file the pleading using the event type Third Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (sj) (Entered: 07/30/2021)** |
| 07/30/2021 | | ADD PARTY FOR PLEADING. Defendants/Respondents Donald Oliver added. Party added pursuant to 31 Amended Complaint,,..Document filed by Rita Flynn. Related document: 31 Amended Complaint,,..(Ranis, Michael) (Entered: 07/30/2021) |
| 08/24/2021 | 32 | **FILING ERROR - SUMMONS REQUEST PDF ERROR** - REQUEST FOR ISSUANCE OF SUMMONS as to Donald Oliver, re: 22 Amended Complaint,. Document filed by Rita Flynn..(Ranis, Michael) Modified on 8/25/2021 (jgo). (Entered: 08/24/2021) |
| 08/25/2021 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Michael Bruce Ranis to RE-FILE Document No. 32 Request for Issuance of Summons. The filing is deficient for the following reason(s): summons request is linked to a pleading which does not include the party whom the summons is being requested for; the pleading which names the party has not been accepted by the Court and must be refiled with Court's leave or opposing counsel consent. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (jgo)** (Entered: 08/25/2021) |

| 08/30/2021 | [33](#) | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILED AGAINST PARTY ERROR -** THIRD AMENDED COMPLAINT amending [30](#) Amended Complaint, [31](#) Amended Complaint,, against Matthew Bloomingdale, Matthew Bloomingdale, New York State Office of the Attorney General, Daniel Oliver(in his individual capacity), Daniel Oliver(Daniel Oliver, in his official capacity), Donald Oliver, Donald Oliver, John A. Shipley, John A. Shipley with JURY DEMAND.Document filed by Rita Flynn. Related document: [30](#) Amended Complaint, [31](#) Amended Complaint,,. (Attachments: # [1](#) Exhibit Ex. A, State Law Complaint).(Ranis, Michael) Modified on 8/31/2021 (gp). (Entered: 08/30/2021) |
|---|---|---|
| 08/31/2021 | [34](#) | THIRD AMENDED COMPLAINT amending [22](#) Amended Complaint, against Matthew Bloomingdale, Matthew Bloomingdale, Donald Oliver, Donald Oliver, John A. Shipley, John A. Shipley with JURY DEMAND.Document filed by Rita Flynn. Related document: [22](#) Amended Complaint,. (Attachments: # [1](#) Exhibit Ex. A, State Law Complaint).(Ranis, Michael) (Entered: 08/31/2021) |
| 09/01/2021 | [35](#) | **FILING ERROR - DEFICIENT - SUMMONS REQUESTED** - REQUEST FOR ISSUANCE OF SUMMONS as to Donald Oliver, re: [34](#) Amended Complaint,. Document filed by Rita Flynn..(Ranis, Michael) Modified on 9/2/2021 (vf). (Entered: 09/01/2021) |
| 09/02/2021 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Michael Bruce Ranis to RE-FILE Document No. [35](#) Request for Issuance of Summons. The filing is deficient for the following reason(s): defendant party name error, party name must correspond to pleading caption. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (vf)** (Entered: 09/02/2021) |
| 09/09/2021 | [36](#) | REQUEST FOR ISSUANCE OF SUMMONS as to Donald Oliver, re: [34](#) Amended Complaint,. Document filed by Rita Flynn..(Ranis, Michael) (Entered: 09/09/2021) |
| 09/10/2021 | [37](#) | ELECTRONIC SUMMONS ISSUED as to Donald Oliver, Donald Oliver..(jgo) (Entered: 09/10/2021) |
| 09/24/2021 | [38](#) | LETTER MOTION for Extension of Time *for Defendant Oliver to answer or move* addressed to Judge Philip M. Halpern. Document filed by New York State Office of the Attorney General..(Ramage, Ian) (Entered: 09/24/2021) |

| | | |
|---|---|---|
| 09/27/2021 | 39 | ORDER granting 38 LETTER MOTION for Extension of Time for Defendant Oliver to answer or move. Application granted. Defendant Oliver's time to answer or otherwise move with respect to the Third Amended Complaint is extended to 12/6/2021. SO ORDERED. (Signed by Judge Philip M. Halpern on 9/27/2021) (jca) (Entered: 09/27/2021) |
| 09/27/2021 | | Set/Reset Deadlines: Donald Oliver answer due 12/6/2021; Donald Oliver answer due 12/6/2021. (jca) (Entered: 09/27/2021) |
| 10/06/2021 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Pre-Motion Telephone Conference held on 10/6/2021. Counsel for plaintiff and defendants Bloomingdale and Shipley appeared by telephone; NYAG appeared by telephone. Court granted leave to move to dismiss and set the following briefing schedule: motion to be served, not filed, by 11/17/2021; opposition to be served, not filed, by 12/10/2021; reply to be served by 12/17/2021; and all papers to be filed on the reply date, 12/17/2021. (sbh) (Entered: 10/06/2021) |
| 11/09/2021 | 40 | NOTICE OF APPEARANCE by Benjamin W. Hill on behalf of Donald Oliver..(Hill, Benjamin) (Entered: 11/09/2021) |
| 12/17/2021 | 41 | FIRST MOTION to Dismiss . Document filed by Matthew Bloomingdale, Daniel Oliver(in his individual capacity), John A. Shipley. Responses due by 12/10/2021 Return Date set for 12/17/2021 at 03:00 PM. (Attachments: # 1 Memorandum of Law).(Hill, Benjamin) (Entered: 12/17/2021) |
| 12/17/2021 | 42 | FIRST MEMORANDUM OF LAW in Opposition re: 41 FIRST MOTION to Dismiss . . Document filed by Rita Flynn..(Ranis, Michael) (Entered: 12/17/2021) |
| 12/17/2021 | 43 | REPLY MEMORANDUM OF LAW in Opposition re: 41 FIRST MOTION to Dismiss . . Document filed by Matthew Bloomingdale, Daniel Oliver(in his individual capacity), John A. Shipley..(Hill, Benjamin) (Entered: 12/17/2021) |
| 05/24/2022 | 44 | ORDER: Oral argument has been scheduled on the pending motion to dismiss. The oral argument will be held on June 8, 2022 at 11:00 a.m. in Courtroom 520 of the courthouse located at 300 Quarropas Street, White Plains, New York 10601. All members of the public, including attorneys, appearing at a Southern District of New York courthouse must complete a questionnaire before being allowed entry into the courthouse. On the day that you are due to arrive at the courthouse, click on the following weblink: https://app.certify.me/SDNYPublic. Follow the instructions and fill out the questionnaire. If your answers meet the requirements for entry, you will be sent a QR code to be used as the SDNY entry device at the courthouse entrance. SO ORDERED. (Oral Argument set for |

| | | |
|---|---|---|
| | | 6/8/2022 at 11:00 AM in Courtroom 520, 300 Quarropas Street, White Plains, NY 10601 before Judge Philip M. Halpern.) (Signed by Judge Philip M. Halpern on 5/24/2022) (jca) (Entered: 05/24/2022) |
| 06/08/2022 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Oral Argument held on 6/8/2022. Counsel for Plaintiff appeared by videoconference and counsel for Defendants appeared in Courtroom 520. See Transcript. Order to follow. (Court Reporter Darby Ginsberg) (fc) (Entered: 06/08/2022) |
| 06/08/2022 | 45 | ORDER granting 41 FIRST MOTION to Dismiss. Counsel for Defendants appeared for oral argument today in person in courtroom 520 and counsel for Plaintiff appeared via video conference. Oral argument was had on the record. For the reasons indicated on the record and law cited therein, the motion to dismiss filed by Defendants Matthew Bloomingdale, John A. Shipley, and Donald Oliver, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 41) is GRANTED. The Third Amended Complaint is dismissed. See transcript. The Clerk of the Court is respectfully directed to terminate the pending motion (Doc. 41) and to close this case. SO ORDERED. (Signed by Judge Philip M. Halpern on 6/8/2022) (jca) Transmission to Orders and Judgments Clerk for processing. (Entered: 06/08/2022) |
| 06/08/2022 | 46 | CLERK'S JUDGMENT re: 45 Order on Motion to Dismiss in favor of Donald Oliver, John A. Shipley, Matthew Bloomingdale against Rita Flynn. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Order dated June 8, 2022, the motion to dismiss filed by Defendants Matthew Bloomingdale, John A. Shipley, and Donald Oliver, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 41) is GRANTED. The Third Amended Complaint is dismissed; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 6/8/2022) (Attachments: # 1 Right to Appeal) (km) (Entered: 06/08/2022) |
| 06/24/2022 | 47 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a bench ruling proceeding held on 06/08/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Ginsberg, Darby) (Entered: 06/24/2022) |
| 06/24/2022 | 48 | TRANSCRIPT of Proceedings re: bench ruling held on 6/8/2022 before Judge Philip M. Halpern. Court Reporter/Transcriber: Darby Ginsberg, (914) 390-4102. Transcript may be viewed at the court public terminal or |

**A-12**

| | | |
|---|---|---|
| | | purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/15/2022. Redacted Transcript Deadline set for 7/25/2022. Release of Transcript Restriction set for 9/22/2022..(Ginsberg, Darby) (Entered: 06/24/2022) |
| 07/05/2022 | 49 | FIRST NOTICE OF APPEAL from 45 Order on Motion to Dismiss,,, 46 Clerk's Judgment,,. Document filed by Rita Flynn. Filing fee $ 505.00, receipt number CNYSDC-26370985. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Ranis, Michael) Modified on 7/6/2022 (nd). (Entered: 07/05/2022) |
| 07/06/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 49 Notice of Appeal,..(nd) (Entered: 07/06/2022) |
| 07/06/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 49 Notice of Appeal, filed by Rita Flynn were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/06/2022) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
RITA FLYNN,                                              :
                                    Plaintiff,          :
                                                        :         **OPINION AND ORDER**
v.                                                      :
                                                        :         17 CV 2864 (VB)
NEW YORK STATE DEPARTMENT OF                            :
CORRECTIONS and COMMUNITY                               :
SUPERVISION, MARY KOPP-ADAMS, and                      :
FRANK GEMMATI,                                          :
                                    Defendants.         :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Rita Flynn brings this action under 42 U.S.C. § 1983, alleging defendants Mary

Kopp-Adams and Frank Gemmati retaliated against her for exercising her First Amendment right

to free speech.  Flynn also alleges defendant New York State Department of Corrections and

Community Supervision ("DOCCS") violated New York whistleblower protections for public

employees under Civil Service Law Section 75-b by retaliating against her for reporting

violations of law and threats to public safety.

      Before the Court is defendants' motion to dismiss the amended complaint under Rule

12(b)(6).  (Doc. #34).

      For the reasons set forth below, defendants' motion is GRANTED.

      The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

      For the purpose of deciding the motion to dismiss, the Court accepts as true all well-

pleaded factual allegations in the amended complaint and draws all reasonable inferences in

plaintiff's favor, as set forth below.[1]

Flynn has been employed as a parole officer for DOCCS since 1979.  From 2007 to October 28, 2016, Flynn worked as a sexual offender parole officer, supervising sex offenders released from prison on parole and "reviewing and enforcing the required regimen of Strict and Intensive Supervision and Treatment ('SIST') for affected parolees."  (Am. Compl. ¶ 19).

Defendant Kopp-Adams is the director of the Sexual Offenders Management Unit ("SOMU") and has statewide supervision of DOCCS' SIST cases.  Defendant Gemmati is DOCCS regional director for the Hudson Valley and is a regional supervisor for the SOMU.

In early September 2016, Flynn learned that DOCCS had proposed a preparatory investigative discharge plan ("discharge plan") for a "John Doe" inmate to be released to Liberty, New York.  Doe is a serial sex offender who has a history of illegal sexual contact with children.  After Flynn "made substantial recommendations to investigate and improve" the discharge plan, it was submitted to the Honorable Mary M. Farley, of the Supreme Court of New York, St. Lawrence County, ahead of the court's order approving Doe's release.  (Am. Compl. ¶ 21).

Kopp-Adams assigned Flynn primary responsibility for arranging Doe's release and coordinating with the New York State Office of Mental Health ("OMH"), as OMH had primary responsibility for arranging Doe's housing and treatment.

In preparation for the court's order approving Doe's release, Flynn participated in meetings and correspondence regarding his proposed discharge plan.  On September 16, 2016,

---

[1]     The Court notes Flynn pleads facts without regard for chronology, clarity, or specificity. The Court summarizes the alleged facts in an order that attempts a logical timeline.  The dates below are not dispositive of the motion, such that any error in construing the order of events is immaterial.

2

Flynn sent an email to DOCCS supervisors and others, in which she identified "significant weaknesses in the proposed supervision and the lack of a true regimen."  (Am. Compl. ¶ 27).

The concerns raised in the September 16, 2016, email and in other communications to Flynn's colleagues were: (i) Sullivan County, where Doe was to be released, would not provide post-release mental health, sex offender, or drug treatment programming for Doe; (ii) OMH referred Doe to Catholic Charities to treat Doe's chronic heroin, ecstasy, and crystal meth addiction, but Catholic Charities does not provide intensive outpatient services; (iii) the location for Doe's "Options Counseling" was in a densely populated residential area far from Doe's residence, requiring Doe to wait for significant lengths of time for public transportation among other offenders while in close proximity to a school (Am. Compl. ¶ 27C); (iv) Doe's plan, as modified by OMH, had him attend drug treatment and aversion therapy in Newburgh, New York, less than fifty feet from the Human Resources Administration office that provides social services to children; (v) the motel where OMH planned to have Doe live housed seven other sex offenders and the motel owner acknowledged that families with children frequently stayed in the motel; (vi) Doe would not cooperate with Flynn's strict supervision; (vii) Flynn warned that absent close collaboration with OMH, Doe's case could "erupt into another media sensation" (Am. Compl. ¶ 27H); (viii) there was a lack of collaboration in creating a plan for Doe that would ensure community safety; and (ix) Doe's developmental disabilities would make independent life in a motel difficult, creating added pressure that would undermine his adjustment back into the community after incarceration.

Sometime in September 2016, Flynn spoke with an OMH liaison about these concerns. One hour after that conversation, SOMU Senior Parole Officer Bill Meyers told Flynn to "stand down" and allow OMH more time to develop a plan.  (Am. Compl. ¶ 28).

On September 29, 2016, Judge Farley ordered DOCCS to plan for Doe's release by October 20, 2016. The court also noted Doe was a sex offender requiring SIST and enumerated ninety-four conditions of his release and supervision pursuant to N.Y.S. Mental Hygiene Law Section 10.11.

On October 13, 2016, Flynn attended a meeting to assess whether Doe's proposed discharge plan complied with definitions of SIST and the court's requirements. On October 14, 2016, Flynn emailed her superiors to reiterate her concern about the location of Doe's Options Counseling. Flynn recommended postponing Doe's release, writing, "At this time, due to the fact that the above captioned has no viable release program in place, we are requesting that the Court consider postponing [Doe's] release." (Am. Compl. ¶ 30). In the same email, and separately to Kopp-Adams verbally, Flynn raised her concern about housing Doe with other sex offenders because it could exacerbate his sexual impulses, particularly his sexual desire toward children.

On October 24, 2016, Flynn forwarded her October 14, 2016, email to DOCCS Deputy Commissioner Ana Enright. Flynn wrote that the forwarded email was relevant to Flynn's prior complaint that OMH had failed to create an integrated plan for Doe's release. A few days prior to forwarding the email to Enright, Flynn also forwarded the email to Orange County Forensic Coordinator for the Department of Mental Health, Meghan Keener, to warn her about the danger Doe posed, as he would be using services in Orange County.

On October 20, 2016, Flynn attended a meeting about Doe's release. At the meeting, Flynn voiced concern about the motel where Doe was to live, and stated Doe's developmental impairment made that living arrangement "inhumane." (Am. Compl. ¶ 38). At the meeting, "OMH's statewide Director of Office of Mental Hygiene's Sex Offender Program, Julie

Pasquini, objected and derided Flynn's concerns, stating that Flynn had impeded and interfered with Doe's release." (Id.).

After the October 20, 2016, meeting, Kopp-Adams telephoned Flynn and said "she had angered OMH in speaking out about the lack of an effective treatment plan for Doe." (Am. Compl. ¶ 39). Kopp-Adams added that Flynn's comments calling Doe's discharge plan "inhumane" were not appreciated. (Id.).

Sometime after his release from DOCCS custody, Doe encountered a crying baby while at the Sullivan County Department of Social Services. Doe "admitted," though it is unclear to whom, that he fantasized about sexually abusing the baby. (Am. Compl. ¶ 36). Flynn told Peekskill Bureau Chief Paul Pacheco about this incident.

On October 24, 2016, Flynn told an OMH official that the Newburgh program sites assigned for Doe's discharge plan were dangerously close to children. In response, the OMH official "reprimanded Flynn for her concerns and explained that Doe wasn't a severe predator that 'snatched' children off the street." (Am. Compl. ¶ 37). Flynn reiterated to the OMH official concerns about Doe's high risk of recidivism and community safety in light of the locations of Doe's treatment.

On or about October 25, 2016, Flynn notified Pacheco and Kopp-Adams that Doe was not using the correct stimulant as part of his court-ordered aversion therapy. Flynn told Kopp-Adams the "used stimulant" contained alcohol, which affected the court-ordered alcohol monitoring. (Am. Compl. ¶ 42). The same day, Flynn notified her superiors and Kopp-Adams of "Doe's repeated sexual arousal." (Am. Compl. ¶ 36). Flynn also told Kopp-Adams that Doe had not signed the OMH release plan, as required by law.

Also on October 25, 2016, the Newburgh Mental Health and Catholic Charities Director,

5

Meg Duffy, telephoned Flynn to express concerns that Doe had reported following a thirteen-year-old girl around a supermarket.  Flynn then requested assistance providing Doe with a more structured and supportive arrangement.

On October 26, 2016, Dr. Tabassum Khan of the Newburgh Mental Health Clinic telephoned Flynn and described Doe as a "ticking time bomb" and "very dangerous."  (Am. Compl. ¶ 44).  Flynn repeated Khan's statements to Pacheco, who said he would "speak with Albany," but told Flynn not to put Khan's statements in writing.  (Am. Compl. ¶ 45).  Later that day Flynn sent Pacheco, Gemmati, Enright, and other DOCCS officials an email including Khan's statements.

On the morning of October 28, 2016, Flynn had a meeting with Pacheco, Gemmati, and supervisor Jenny Armstrong.  Gemmati told Flynn she would be relieved from her special assignment in the SOMU.  Gemmati stated Flynn was not collaborative with other SIST team members, and did not "play nicely in the sandbox."  (Am. Compl. ¶ 54).

During the afternoon of October 28, 2016, Khan telephoned Flynn to relay a violent, sexual fantasy Doe reported having about a crying four-year-old.  (Am. Compl. ¶¶ 49, 55).  Khan told Flynn that Doe was too dangerous to remain in the community and that Khan would alert DOCCS.

Despite Flynn's removal from the SOMU, Pacheco nevertheless asked Flynn to draft a memorandum summarizing the risks Doe posed to the community and the parole violations Flynn had observed.  Flynn prepared a draft on October 30, 2016.  On November 1, 2016, DOCCS submitted an edited version of the memorandum to Judge Farley and Doe was reincarcerated that day.

Flynn now complains that Kopp-Adams and Gemmati retaliated against her for the exercise of her First Amendment rights, causing her to lose the overtime pay she typically earned in her SOMU special assignment as well as severe emotional distress.  Flynn also claims her treatment by DOCCS constitutes a violation of New York whistleblower protections for public employees.

**DISCUSSION**

I.   Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiffs' legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

In considering a motion to dismiss, "a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). The court may nevertheless consider a document not incorporated by reference if the complaint "'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). However, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d at 134).

II.     First Amendment Claim

Defendants argue Flynn has not plausibly alleged a Section 1983 claim for First Amendment retaliation because she was not speaking as a private citizen when she expressed concerns about Doe's discharge plan.

The Court agrees.

To state a First Amendment retaliation claim, a plaintiff must plausibly allege "(i) he has an interest protected by the First Amendment; (ii) defendants' actions were motivated or substantially caused by his exercise of that right; and (iii) defendants' actions effectively chilled the exercise of his First Amendment right." Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010) (citation omitted).

However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S.

410, 421 (2006).  To determine whether a public employee's speech is protected, the Court must

determine "(1) whether the subject of the employee's speech was a matter of public concern and

(2) whether the employee spoke 'as a citizen' rather than solely as an employee."  Matthews v.

City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Jackler v. Byrne, 658 F.3d 225,

235 (2d Cir. 2011)).  "If the answer to either question is no, that is the end of the matter."  Id.

      Here, the question is not whether Flynn's speech addressed a matter of public concern—

undeniably it did.  Instead, the question is whether Flynn was speaking as a citizen rather than as

an employee when she raised concerns about Doe's discharge plan.  The Court concludes Flynn

has not plausibly alleged she was speaking as a citizen in this context.

      To determine whether a public employee speaks as a citizen, the Court must consider two

things: (i) whether the speech "fall[s] outside of the employee's official responsibilities," and

(ii) whether there is a "civilian analogue" to the method of speaking.  Matthews v. City of N.Y.,

779 F.3d at 173 (citation omitted).

      "The inquiry into whether a public employee spoke pursuant to his or her official duties

is 'a practical one.'"  Montero v. City of Yonkers, N.Y., 224 F. Supp. 3d 257, 265 (S.D.N.Y.

2016) (quoting Weintraub v. Bd. of Educ., 593 F.3d 196, 202 (2d Cir. 2010)).  "In making this

determination, courts in the Second Circuit 'focus[] on the subject, manner, and context of the

speech to determine whether it relates to topics that are indispensable prerequisites to effective

performance of the speaker's primary employment responsibility, and thus not entitled to First

Amendment protection.'"  Id. at 265–66 (quoting Dillon v. Suffolk Cty. Dep't of Health Servs.,

917 F. Supp. 2d 196, 208–09 (E.D.N.Y. 2013)) (alteration in original).

      "Speech has a 'relevant civilian analogue' if it is made through 'channels available to

citizens generally.'"  Matthews v. City of New York, 779 F.3d at 175 (quoting Jackler v. Byrne,

658 F.3d at 238).  "[A] form or channel of discourse available to non-employee citizens"

includes methods like "a letter to the editor or a complaint to an elected representative or

inspector general."  Weintraub v. Bd. of Educ., 593 F.3d at 204.

Here, all of the statements Flynn made were related to her supervision of Doe, and

therefore pursuant to her official duties.  Flynn's position as a sexual offender parole officer

included the following duties: "supervising the release of sex-offenders into the community-at-

large" (Am. Compl. ¶ 3), "administering strict and intensive supervision of sex offenders

released from prison on parole . . . closely monitoring sex offenders and protecting . . . children

and citizens in the community from sexual offenders . . . [and] reviewing behavioral warning

signs, and clinical and safety issues regarding those offenders."  (Id. at ¶ 17).  Flynn's duties also

required coordination with "clinical treaters and local law enforcement" (id. at ¶ 18), as well as

with OMH.[2]

Flynn's speech at issue unquestionably involved the job responsibilities described above.

Therefore, her speech "owes its existence to [Flynn's] professional responsibilities" as a public

employee and is not protected.  Garcetti v. Ceballos, 547 U.S. at 421.  Flynn argues the emails

sent to Enright on October 24 and 26, 2016, were not part of her regular duties; however, the

content of those emails pertained to supervising Doe's release, considering the impact of Doe's

discharge plan on community safety, and working with treatment providers and OMH to ensure

Doe's safe release, all of which were part of her regular duties.

---

[2]    Flynn argues additional discovery is appropriate to determine the exact contours of her
job duties.  That argument is plainly without merit.  Drawing all inferences in plaintiff's favor,
the Court construes Flynn's job duties narrowly, as required under Fed. R. Civ. P. 12(b)(6), and
applies the law to the facts as pleaded in Flynn's complaint.

Flynn argues her speech referred to larger structural issues.  The structural issues Flynn identified cannot be analyzed in isolation.  Flynn's statements link communications issues at OMH to specific problems with Doe's individual treatment.  Flynn conveyed her worry about a media firestorm as a potential consequence of Doe's inadequate discharge plan.  Tellingly, Flynn's "State Grievance Form," in which she summarizes her speech and alleged retaliation, makes no mention of any broader policy concerns.  (Ranis Aff. Ex. A).  Rather, Flynn alleges her removal from SOMU was due to "professional concerns, based on [her] detailed investigation of the case, regarding the release plans for a dangerous, serial sex offender proposed by OMH personnel."  (Id. at 4).[3]

Moreover, Flynn's communications to supervisors and colleagues have no civilian analogue.  A plaintiff's statements do not have a civilian analogue where the employee "acquired all of the information she relayed . . . in the ordinary course of performing her work."  Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012).  Here, Flynn was privy to information about Doe because of her position with DOCCS.  But for Flynn's position as a sex offender parole officer, she would not have known about Khan's confidential medical concerns conveyed on October 26 and 28, 2016, or any of the other information used to determine Doe's discharge plan.

Flynn complained to supervisors at DOCCS and to colleagues at OMH and in the community in which Flynn worked as part of her supervision of Doe.  Unlike the plaintiff in Matthews, Flynn did not complain to "an independent state agency responsible for entertaining

---

[3]     Flynn goes on to summarize her duty to question an inadequate discharge plan: "I do not believe that being a team player negates my duty and responsibility to question and, if necessary challenge, recommendations that I, from my years of experience and in planning and supervising dangerous sex offenders, consider those recommendations to be a threat to the community, insufficient to meet the needs of the parolee, and that would place children in the community in harm's way of a serial predatory sex offender."  (Ranis Aff. Ex A at 5).

complaints by any citizen . . . regardless of his status as a public employee."  779 F.3d at 175

(internal quotation marks omitted).  Rather, Flynn's statements in meetings, emails, and in a draft

report were made as part of the tasks she was paid to perform as a parole officer.  See Harisch v.

Goldberg, 2016 WL 1181711, at *10 (S.D.N.Y. 2016).  Flynn argues her communications to

Enright were outside the chain of command because Enright was several levels above Flynn at

DOCCS.  This argument fails, however, because Enright is not an official who entertains

complaints from private citizens.  Flynn's access to Enright stemmed solely from Flynn's

employment at DOCCS.

Lastly, although Flynn alleges her complaints were expressly forbidden by her

supervisors, that factor alone does not render her speech protected.  "When a government

employee concededly engages in speech pursuant to his official duties, the fact that he persists in

such speech after a supervisor has told him to stop does not, without more, transform his speech

into protected speech made as a private citizen."  Anemone v. Metro. Transp. Auth., 629 F.3d 97,

116 (2d Cir. 2011).  Here, Flynn's supervisors allegedly told her to "stand down" (Compl. ¶ 28),

and not to put Khan's concerns about Doe in writing.  Although Flynn did neither, because her

speech was within her job duties and did not have a public analogue, insubordination alone does

not render the speech protected.

Accordingly, Flynn's speech was not protected by the First Amendment and her Section

1983 claim must be dismissed.

III.     State Law Claim

Having dismissed the only federal claim in this case, the Court does not have original

jurisdiction over Flynn's state law claim.

"A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c)(3).

The Court declines to exercise supplemental jurisdiction over the remaining state law claim.

## CONCLUSION

The motion to dismiss is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #34) and close this case.

Dated: April 30, 2018
       White Plains, NY

SO ORDERED:

_____

Vincent L. Briccetti
United States District Judge

A-26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

RITA FLYNN,                                                    Civ. No. 7:17-cv-02864

                                    Plaintiff,          **AMENDED COMPLAINT**

        -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS and COMMUNITY SUPERVISION,
MARY KOPP-ADAMS, and FRANK GEMMATI,

                                    Defendants.
_____

        Plaintiff, Rita Flynn, by her attorneys, Foulke Law Firm, as and for her Complaint

against defendants, alleges as follows:

### Jury Demand

    1.   Plaintiff demands a trial by jury of all issues in this action.

### Nature of the Action and Preliminary Statement

    2.   This is an action under Civil Service Law §75-b, and as a whistleblower

action, alleging that defendant DOCCSs , and individual defendants Sexual Offenders

Management Unit Director Mary Kopp-Adams, and Regional Director Frank Gemmati demoted

plaintiff Rita Flynn from her Special Assignment supervising released sex-offenders in

retaliation for her multiple complaints about violations of law and a court Order – complaints

about serious safety risks posed to the public at large and grave deficiencies in the supervised

release of a paroled SIST sex offender.

    3.   In performing her job duties as a parole officer supervising the release of sex-

offenders into the community-at-large, Flynn complained to her superiors – including several of

the Governor of New York, Andrew Cuomo's political appointees, including, upon information

1

and belief, to the DOCCS Commissioner -- about violations that allowed a newly released convicted pedophile and sexual offender to pose serious risks to young girls and children in Orange and Sullivan counties.

4.    As executed in the plan for his release, "John Doe" or "Doe" was to make frequent visits from Sullivan to Orange County for treatment visits after his release from prison – and to areas where there was a high risk of contact with elementary school children and families with young children – while receiving what Flynn had identified as grossly inadequate and partial treatment and supervision.  Flynn complained about major gaps in supervision and treatment of this developmentally disabled sex offender, a planned negligence and lack of monitoring of his activities, and later about Doe's violations of his parole, following his actual release into the community.

5.    Flynn alerted defendants about the substantial violations and deficiencies by defendants of treatment requirements under the Mental Hygiene Law, and violations by Doe of the Court Order that conditioned Doe's release.  Such complaints constituted violations of the Mental Hygiene Law's regulations on strict supervision, and identified serious safety risk factors that this sexual predator posed to the community's children.  Rather than acting promptly on Flynn's series of warnings and encouraging a swift and safe resolution by the State Agencies, defendants instead removed and stripped Flynn of the Special Assignment monitoring parolee sexual offenders, and harmed her livelihood and professional reputation by prohibiting her from earning substantial overtime payments while working in her area of professional expertise.

6.    Flynn brings this action to remedy such unlawful conduct and to reclaim her lost salary and benefits, as well as to claim attorneys' fees under the Whistleblower Law.

7.    Flynn spoke out on a matter of public concern to those not in her regular line

of reporting at work.  Director of Sex Offenders Management Unit Mary Kopp-Adams and

Regional Director Frank Gemmati violated her constitutional rights under the First Amendment

to the Constitution of the United States.  Those two individual defendants retaliated against

Flynn for speaking out on a matter of public concern by removing her from her position and

adversely affecting her livelihood and career opportunities.  As such, plaintiff also brings this

action under 42 U.S.C. §1983 and the First Amendment to the Constitution against those

individual defendants.

<u>**The Parties**</u>

8.   At the time of the acts complained herein, plaintiff Rita Flynn ("Flynn") was

and is a resident of Chester, New York, County of Orange, New York.

9.   Defendant State of New York, Department of Corrections and Community

Supervision ("DOCCS"), is an agency of the State of New York that administers the State's

prisons, and release of eligible parolees (including sex offenders) into the community at-large.

10. Director of Sexual Offenders Management Unit ("SOMU") Mary Kopp-

Adams ("Kopp-Adams") is an officer of DOCCS appointed by the Governor of New York, and

has statewide supervision of DOCCS' strict and intensive supervision cases governed by Article

10 of the Mental Hygiene Law.  She also has primary responsibility for communicating and

interacting with New York State's Office of Mental Health ("OMH") on issues that intersect

with parole release, such as provision of mental health treatment and programming to released

parolees.  DOCCS and OMH are the "State Agencies."  Upon information and belief, she is a

resident of Albany County.

11. Regional Director Frank Gemmati ("Gemmati") is DOCCS' Regional

Director for the Hudson Valley, and is a regional supervisor for DOCCS' SOMU, as well as for

**A-29**

general parole department supervision and policies in the region.  As part of his region

assignments, he has overall supervision responsibilities for release of prisoners to parole in

Orange, Sullivan, Dutchess, and Westchester Counties.  He is a resident of Orange County.

12. At the time of the events complained herein, plaintiff Rita Flynn was a Parole

Officer ("PO") employed by DOCCS on Special Assignment working with released sex

offenders, as a provider of strict and intensive supervision.   Flynn's immediate DOCCS

supervisor worked in Peekskill, New York, and Flynn worked out of DOCCS' offices in Orange

and Sullivan Counties.  During that same time, she has and continues to reside in the County of

Orange, State of New York.  Flynn has been employed by DOCCS since 1979.

<div align="center">

**Jurisdiction and Venue**

</div>

13. Jurisdiction is invoked pursuant to Article III of the U.S. Constitution, 28

U.S.C. §§ 1331, and 1343 (a)(3).  Plaintiff brings this action under the First Amendment of the

Constitution of the United States and 42 U.S.C. §1983, and there is federal question jurisdiction.

The Court has authority to grant injunctive relief under the federal courts' inherent equitable

powers.

14. Plaintiff seeks to recover money damages against the individual defendants

Kopp-Adams and Gemmati acting under color of legal authority and state law, and against those

state employees in their individual capacities (the "individual defendants") under Bivens v. Six

Unknown Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 28 L. Ed. 2d 619 (1971).

15. As referred to in the Preliminary Statement, Plaintiff also brings a state law

Civil Service "Whistleblower" Law claim:  the exercise of pendent jurisdiction over these state

law claims is appropriate and useful, pursuant to 28 U.S.C. §1367(a).  The facts are so closely

related, and the claims brought under 42 U.S.C. §1983 against the individual defendants Kopp-

<div align="center">

4

</div>

Adams and Gemmati are so closely related to the same "nucleus of operative fact" and a pattern of retaliatory conduct, such that judicial economy favors trial in one judicial proceeding. Further, plaintiff has properly filed a timely Notice of Claim as a prerequisite.

16. Venue is proper in this jurisdiction based on 28 U.S.C. §1391(e). A substantial portion of the actions complained about occurred in Westchester and Orange Counties, State of New York, and venue is appropriate here. Plaintiff resides in Orange County.

<u>**Statement of Facts**</u>

**Background and Flynn's Employment**

17. Flynn has been employed as a parole officer ("PO") for the State of New York since 1979. Earlier in approximately 2000, and most recently from 2007 until October 28, 2016, she has worked in a more specialized Special Assignment PO capacity as a Sexual Offender Parole Officer, as part of a team administering strict and intensive supervision of sex offenders released from prison on parole. In that role, she has become expert in the area of closely monitoring sex offenders and protecting of children and citizens in the community from sexual offenders -- and extremely knowledgeable about daily living, functioning, reviewing behavioral warning signs, and clinical and safety issues regarding those offenders.

18. Given the immediacy of issues regarding sexual offender parolees and the need for intensive supervision and treatment, attendance at off-hours residences and treatment offices facilities, and Flynn's overall skill and diligence in working with clinical treaters and local law enforcement, Flynn earned substantial overtime as part of her total annual compensation. Indeed, by calendar years 2013-2015, Flynn's overtime earnings from substantial overtime hours worked accrued to be almost as large as her base salary.

19. Indeed, Flynn's willingness and ability to work substantial overtime hours is a

requirement of her responsibilities as a Sexual Offender/SIST Parole Officer ("SOPO") on

Special Assignment, reviewing and enforcing the required regimen of Strict and Intensive

Supervision and Treatment ("SIST") for affected parolees. (A regimen of specific SIST

conditions is a legal requirement pursuant to Mental Hygiene Law §10.11 (a) (2) prior to and

during the release of sexual offenders, as discussed below). In fact, most PO's are not interested

nor motivated to do such work, because of the high stress and long hours, despite the substantial

available overtime earnings.

20. Flynn's performance appraisal for the year ending September 30, 2016 – just a

month before her removal from her Special Assignment -- noted that Flynn's performance

"exceeds the performance standards" and emphasized that Flynn was "a team player."

21. In early September 2016, Flynn learned from supervisor Kopp-Adams that

DOCCS had proposed a prepratory investigative discharge plan for a John Doe ("Doe") to be

released to the Liberty, New York area. Flynn made substantial recommendations to investigate

and improve that plan, before submission for approval by a State Court Judge. Kopp-Adams

assigned Flynn primary responsibility for arranging Doe's release and coordination with OMH –

OMH had primary responsibility for arranging residence and treatment plans and planning for

his release.

22. Indeed, as part of her regular duties in her Special Assignment, Flynn also has

regularly worked with OMH's Division of Forensic Services, which administers SIST. It was

standard practice for a DOCCS SIST Parole Officer to work with OMH in the planning and

delivery of SIST to those sex-offenders released to the community.

**The Court Order and the Statutory Framework**

23. On September 29, 2016, Hon. Mary M. Farley of the St. Lawrence Supreme

Court ordered DOCCS to plan for the release of Doe by October 20, 2016. The Court Ordered, pursuant to M.H.L. §§ 10.03 (r) and 10.11, that Doe "is a sex offender requiring strict and intensive supervision [SIST]." In its Conclusions of Law, it held that "Respondent shall be released to a regimen of SIST" and be subject to supervision requirements contained in the attached Conditions of Strict and Intensive Supervision and Treatment.

24. In those attached Conditions, the Court ordered and required ninety-four (94) specific mandatory conditions applied to Doe as conditions of release and supervision pursuant to M.H.L. §10.11: Such constituted an Order of the Court subjecting Doe "to the lawful conditions set by this Court"….and "a regimen of strict and intensive supervision and treatment pursuant to Article 10 of the N.Y.S. Mental Hygiene Law…."

25. That statute, M.H.L. § 10.11, is entitled "Regimen of strict and intensive supervision and treatment." M.H.L §10.11 (a) (2) states in relevant part that before issuing an Order containing the conditions of an offender's release, it will consider "submissions by the respondent and the attorney general concerning the proposed conditions of the regimen of strict and intensive supervision and treatment." M.H.L §10.11 (a) (2) goes on to specify:

> The court shall issue an order specifying the conditions of the regimen of strict and intensive supervision and treatment, which shall include specified supervision requirements and compliance with a specified course of treatment. A written statement of the conditions of the regimen of strict and intensive supervision and treatment shall be given to the respondent and to his or her counsel, any designated service providers or treating professionals, the commissioner, the attorney general and the supervising parole officer….

> The court shall require the department of corrections and community supervision to take appropriate actions to implement the supervision plan and *assure compliance with the conditions of the regimen of strict and intensive supervision* and treatment.

7

§ 10.11 (c) reads in relevant part: "A person ordered to undergo a regimen of strict and intensive supervision and treatment pursuant to this article is subject to lawful conditions set by the court and the department of corrections and community supervision".

26. In addition, M.H.L. § 10.11 (d) (1) notes circumstances for revoking the release and intensive supervision:

> A person's regimen of strict and intensive supervision and treatment may be revoked if such a person violates a condition of strict and intensive supervision. If a parole officer has reasonable cause to believe that the person has violated a condition of the regimen of strict and intensive supervision and treatment or, if there is an oral or written evaluation or report by a treating professional indicating that the person may be a dangerous sex offender requiring confinement…. may take them into custody.

27. In preparation for the Court's implementation of this order, Flynn participated in meetings and correspondence regarding the proposed SIST plan, even before the Court entered its Order of September 29, 2016.   That included email correspondence on September 16, 2016 that Flynn sent to DOCCS supervisors and other emails where Flynn detailed significant weaknesses in the proposed supervision and the lack of a true regimen:

> A.  Flynn learned from OMH in early September that Sullivan County had refused to provide mental health, sex offenders or drug treatment programming for Doe, even though he was a lifelong resident.

> B.  OMH referred Doe to Catholic Charities in Newburgh for opioid use disorder, ecstasy and alcohol use disorder, among other issues.  Doe described himself as a chronic heroin, ecstasy, and crystal meth addict.  Flynn noted that Catholic Charities did not provide intensive outpatient services.  Further, other programs had rejected him for treatment.

> C.  OMH's SIST liaison referred Doe to Options Counseling in Newburgh for sex offender treatment related to his diagnosis of pedophiliac disorder and schizoaffective disorder.  Flynn noted her "grave concern" that the treatment was located in a densely populated residential area, and that Doe would have to wait for substantial periods to get a ride to travel 60 miles between Sullivan

8

and Orange Counties.  In her September 16 and October 14 emails, Flynn also observed that offenders disperse and stroll, or congregate and mill around the road waiting for medical transport drivers to pick them up after their appointments.  Flynn informed the OMH SIST liaison that a local school was in close proximity to the Options location.  In an October 12 follow-up email to her superiors, Flynn reminded them about the location challenges presented by the Options Counseling location and noted that several "concerns noted in the SIST report have yet to be addressed."  This case will require intensive supervision as Doe presents *as the highest risk offender* I have been assigned to supervise."

D.  Further, in her September 23, 2016 draft report to the Court Flynn noted that there "is concern" about Doe attending sex offender counseling at the Options Counseling in Newburgh as "it is located in an area densely populated with families and children."

E.  Further, OMH modified the plan for Doe to attend drug treatment in Newburgh, New York, as well as aversive therapy treatment at the same location in Newburgh.  Throughout September, Flynn complained to OMH and her boss that this was a faulty plan, because the entrance to the drug treatment center and the mental health center was in the same building and less than fifty feet away from the Human Resources Administration office that provides social services to children at 280 Broadway in Newburgh, New York.

F.  OMH planned to release Doe to a motel in Liberty, Sullivan County, New York.  Flynn notified DOCCS officers that she had visited the XXX motel in Liberty, and learned that Sullivan County was paying the motel's owner to lodge seven sex offenders, and the owner acknowledged that he frequently rented rooms to travelers with children.

G.  In her September 23 draft report to the Court, Flynn also sounded the alarm about Doe's willingness to cooperate with strict supervision and wrote, "It is significant to highlight that just about four months ago, on 5/27/16 Doe REFUSED to participate in the Forensic Evaluation that is required for this upcoming SIST hearing."  In a later October 16 email, she noted that Doe "does not appear amenable to supervision as he indicated he will have problems if it is too restrictive."

H.  In all, in an email of September 16, 2016, Flynn warned that it "takes team effort and close collaboration with OMH to avoid the pitfalls whereby this case can erupt into another media sensation...."  On October 17, she warned that Doe's "case requires a collaborative effort by all agencies to formulate a

cohesive release plan to meet the specific needs Doe presents." The day before, she had written her supervisors that this "was not a case where all agencies worked in a collaborative manner to develop a cohesive program for Doe that would best……ensure the community at large was protected."

I. Flynn also noted that Doe faced additional problems in being assigned to living in a motel because he is a moderately developmentally disabled individual and managing daily activity skills, shopping, looking, and transportation posed great challenges. Such added duties and pressures undermined a more comfortable adjustment to living in the community after incarceration.

28.     Within an hour of Flynn's conversation with an OMH liaison about Doe's treatment plan and discussing many of these concerns, Senior Parole Officer Bill Meyers from DOCCS' Sexual Offender Management Unit, telephoned and told her to "stand down" and allow OMH more time to develop a plan.

**Events in October 2016 and the Request to Delay the Release of Doe**

29. After the Court ordered a specific regimen of intensive supervision on September 29, 2016, Flynn attended a meeting on October 13, 2016 to review the court-ordered regimen and make sure the regimen was indeed sufficiently "strict" and "intensive" as required by the Court's requirements and M.H.L §10.11 (a) (2)'s strictures.

30. In an October 14 email to her superiors regarding that October 13 meeting, Flynn wrote: "I mentioned in my SIST Investigation *grave concerns regarding community safety issues* as the sex offender treatment program at Options Counseling that [Doe] has been referred to is located in a densely populated residential area…." Further, her email started: "At this time, due to the fact that the above captioned *has no viable release program in place*, we are requesting that the Court consider postponing [Doe's} release" scheduled for next week (*emphasis supplied*)."

31. Further, Flynn also complained verbally and in that same email to Kopp-

Adams and her supervisors about this plan, stating that surrounding Doe with other sex-offenders at the Liberty motel location would exacerbate his sexual impulses and desire to repeat sexual behavior to children.

32. She explained that there was "no viable release program in place" as follows:

> He [Doe] is receiving mental health services from RPC, to include monthly injections to address his hyper sexuality. There are serious community safety issues surrounding the release of the predicate felony sexual predator of children to the community that has a well-established history of non-compliance with supervision and treatment mandates. There are also ethical issues that arise by releasing this significantly intellectually impaired individual that has faced a lifetime of chronic mental health issues and substance abuser problems without benefit of case management services to help him with the most mundane daily activity skills to include managing finances, shopping for food, cooking meals ect…[sic]

33. These statements, among others, referenced a lack of compliance with M.H.L §10.11 (a) (2)'s strictures and the Court's requiring (through its Order) the "department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment." Flynn also clearly referred to community safety issues impacting the health and safety of the general public.

34. Further, ten days later, on October 24, 2016, Flynn forwarded the above email to DOCCS' Deputy Commissioner Ana Enright ("Enright"), and noted it as "[r]elevant to complaint" – referring to her complaint about OMH's lack of an integrated plan for Doe's release and a dispute with OMH. She received no immediate response. A few days before, Flynn also forwarded the October 14 email to Orange County's Forensic Coordinator for Orange County's Department of Mental Health Meghan Keener ("Keener"), in order to alert her about the specific plans for Doe's planned use of services and release into the Newburgh community.

Flynn did so because she believed that Orange County's responsible administrators required that information to best protect their public, and they had not received reasonable notice about the plan.

35. Accordingly, and in light of these issues raised again with her supervisors at DOCCS, OMH, and Orange County Department of Social Services, on or about October 14, 2016, Flynn requested that DOCCS petition the court for a brief postponement of Doe's planned release six days later. DOCCS did not make such a request.

**Doe's Release and the Complaints About the Dangers He Posed**

36. On October 20, 2016, Flynn supervised Doe's release in Sullivan County. Flynn informed Supervisor Paul Pacheco ("Pacheco") that shortly after his release from St. Lawrence Psychiatric Facility, Doe encountered a crying baby at Sullivan County Department of Social Services. He admitted to fantasizing about forcibly, sexually abusing the small child. Flynn notified her superiors and also notified Kopp-Adams of Doe's repeated sexual arousal on October 25.

37. Further, on October 24, 2016, Flynn wrote and complained that OMH's top liaison Director had dismissed Flynn's safety concerns about the location of the Newburgh program sites and the proximity to children (during a meeting several days earlier on October 20). The OMH official reprimanded Flynn for her concerns and explained that Doe wasn't a severe predator that "snatched" children off the street. Flynn reiterated in the email that Doe was "an extremely high risk candidate to recidivate….and that she was not confident "that the community at large is safe under any circumstances." Flynn again noted that referrals for Doe's treatment at the 280 Broadway site location in Newburgh

> were problematic, as this is the main county building used in the City of Newburgh by the Department of Social Services. All agencies located at this site, primarily cater to the needs of families

12

> with children.  Of further concern, a local elementary school is
> located less than 500 feet away from this county building, and the
> *local law enforcement agency voiced community safety issues* that
> this high risk out-of-county resident presented.

Flynn noted an additional developing concern regarding securing treatment: "The release plan

continued to unravel, as OMH discovered that no bus or train service were available to transport

Doe the 60 miles he would have to travel to attend programming in Orange County."

       38. At the October 20 meeting and in the October 24 email again, Flynn voiced

concern about Doe's ability to function at a motel with other sex offenders and without

appropriate support.  OMH objected that "the subject could manage quite well until his food

stamp award was activated, because he was in possession of a $100 in cash and had a $600

check."  Given his significant developmental disabilities and the significant stressors and

obstacles adversely affecting his functioning, Flynn believed it was inhumane to release him

without more guidance and support.  OMH's statewide Director of Office of Mental Hygiene's

Sex Offender Program, Julie Pasquini, objected and derided Flynn's concerns, stating that Flynn

had impeded and interfered with Doe's release.

       39. After the October 20 meeting, Flynn received a telephone call from Mary

Kopp-Adams, Director of the Sexual Offender Management Unit ("SOMU") for DOCCS.

Kopp-Adams told Flynn that she had angered OMH in speaking out about the lack of an

effective treatment plan for Doe.  She also informed Flynn that no one appreciated her

expressing concern that the treatment of Doe was "inhumane."

       40. Upon information and belief, Flynn on or about October 25, Flynn also

Informed Pacheco and Kopp-Adams that Doe had consciously avoided using the more affective

ammonia stimulant as part of his aversive therapy, because of its alcohol.  Such increased risk

behavior by Doe was non-compliant with the Court's order.

41. On October 25, 2016, Flynn also informed Kopp-Adams that the OMH release plan did not contain Doe's signature, where he attests and agrees to actively participate in the treatment that is identified in his plan. That signature is required pursuant to the Mental Hygiene Law §11.1, in order to assure effective and meaningful treatment and protection of the public.

42. Further, Flynn informed Kopp-Adams that there were difficulties implementing Aversive Therapy because of the presence of alcohol in the used stimulant and its effect on monitoring. Doe needed that stimulant when he became stressed multiple times a day with thoughts of having sex with children and babies he met in the community.

43. On October 25, 2016, the Newburgh Mental Health and Catholic Charities Clinic Director Meg Duffy telephoned Flynn and explained that she had concerns about Doe because of the way he had described following a 13 year-old girl around a Shop-Rite. Flynn then wrote that the treatment providers "are of the opinion that the subject would greatly benefit, if he was afforded *a more structured and supportive arrangement*." She requested "assistance" in addressing the problem.

44. After meeting Doe again the next day, the warnings became more dire. The treating psychiatrist, Dr. Tabassum Khan ("Khan") of the Newburgh Mental Health Clinic, telephoned Flynn and described Doe as a "ticking time bomb" and that it wasn't a matter of "if" but "when" he reoffends. She also told Flynn that Doe was "euphoric" on his release, and that the current situation was "very dangerous." She asked Flynn's assistance and also mentioned that she had heard that Flynn was an "excellent" PO.

45. That day, Flynn drove to the Peekskill Office and spoke with Pacheco, and

told him about Khan's statement.  Pacheco countered that he would speak with Albany, but that

Flynn should *not put in writing* Khan's concern that Doe was a "ticking time bomb" or very

dangerous.  Pacheco told Flynn to have Khan write a letter with her concerns.

46. Flynn nevertheless precisely did put those "time bomb" concerns in writing

that same day (Oct. 26), in an email to Pacheco, Gemmati, and other DOCCS officials in Albany.

Notably, she again included Enright, whom was not part of Flynn's normal reporting protocol.

Flynn reported that Khan **"**evaluated Doe as a *high risk to sexually reoffend* at this time" and

noted that he is very "hyper-sexualized" and stimulated by violence.   Flynn also reported an

incident Khan had mentioned where Doe had followed a 13-year-old girl around a Shop-Rite

store, that he was fixated on her because she had a "beautiful ass," and that his aversive therapy

protocol had not helped him.  And Flynn reported Khan's conclusion that the current situation

was "very dangerous."

47. Further, Flynn reported Khan's view that Doe had had "actually been set up

to fail."  Khan's view was that Doe "does *not currently have an adequate community release*

*plan* in place that *meets his needs on any level*."  By contrast, Flynn reported that Khan had told

her that it was "'critical'" that Doe be "afforded a *higher level* of supportive housing and more

intensive programming."  Flynn reported Khan's view that the case "require[ed] the highest level

of intensive supervision and treatment."  Thus, Flynn again reported a failure to comply with

M.H.L. §10.11 (a) (2) and its strictures on intensive supervision, as well as grave effects on

public safety, and did so after being instructed not to do so in writing.

48. Indeed, a few days later on October 28, Khan herself wrote and confirmed to

DOCCS that Doe was living in a motel "with insufficient residential and group services for his

continuous sexual urges.  He has very little structure during the day."

15

49. Further, Flynn reported on the afternoon of October 28, that the treaters at Newburgh Mental Health Clinic were alarmed when they learned of "more descriptive and disturbing details" that Doe was having that morning about a crying 4-year old. Khan told Flynn that Doe was "too dangerous" to remain in the community, and that she would take immediate action to further alert DOCCS. A few days later Khan reiterated in writing Doe's sexual fantasies in arousal, and pursuits of young girls. Khan also reported to DOCCS Doe's confessed thoughts of putting his hands on the crying child's mouth, raping her, and giving her "something to cry about."

**Defendants' Retaliatory Removal of Flynn from her Special Assignment Position**

50. Flynn's complaints about safety regarding the place of treatment, residence, and travel, as referred to in ¶¶ 21, 27, and 30-47, referred to violations of the Mental Hygiene Law, as well as of Judge Farley's Order. Specifically, Mental Hygiene Law Section refers to the requirement for "a regimen of strict and intensive supervision" of a designated sexual offender: Everything about the treatment, residence, travel, aversive therapy implementation and proximity to young children violated that provision, and Flynn over and over addressed those violations.

51. In addition, Doe also violated the Court's Order: that Order required Doe's participation in the treatment, proper use of aversive therapy, a regimen of strict and intensive supervision ("SIST") and monitoring of Doe's functioning, in order to assure the public's safety.

52. The complaints Flynn made about residence, places of treatment, and travel all presented serious dangers to the public safety and well-being of minors (especially young girls) residing in Newburgh and Liberty, New York. Her complaints by email on October 24, 25, and 26, 2016 were particularly sharp regarding the complete lack of required SIST.

53. Instead of adhering and considering Flynn's complaining about essential

safety, court-ordered, and statutory requirements affecting the public's safety, DOCCS instead

punished Flynn.  On the early morning of October 28, 2016, Peekskill Bureau Chief Pacheco

telephoned and told Flynn to appear for a 9 a.m. meeting with him only a few hours later.  There,

Gemmati, in the presence of Pacheco and Supervisor Jenny Armstrong, announced that  DOCCS

was relieving Flynn from her Special Assignment in the Sex Offenders' Unit, and that she was to

have no further responsibility for sex offenders as of that moment.  Gemmati handed her a memo

titled "Transfer" stating she had been "*released* from your Special Assignment case load" and

was returning to a "non-specialized caseload in Peekskill" effective immediately.  Gemmati also

directed that going forward, she was no longer to work with sex offenders in any capacity.

54. When Flynn asked the reason for her removal, Gemmati only explained that

she had not "maintained a collaborative relationship" with SIST team members, and elaborated:

"you don't play nicely in the sandbox".  Flynn was shocked and left.

55. Later that same day, Khan telephoned Flynn and told her that Doe had again

confessed to her about currently wanting to put his hands over a child's mouth, and then assault

her: Khan believed that Doe was "too dangerous" to be in the community and at imminent risk of

engaging in sexual conduct with a child and violating his parole.

56. Flynn was no longer assigned to the Sex Offenders' Unit when Khan

reported such to her.  Indeed, Kopp-Adams informed Khan that Flynn could not respond to any

more treatment issues, because Flynn was now "confined" to her office.  Pacheco nevertheless

asked Flynn to draft a memo regarding the risks Doe posed, and the violations of his parole that

she had observed.   She did so, preparing a draft on Sunday, October 30, 2016 for submission.

57. Upon information and belief, Kopp-Adams was one of the ultimate

17

Decision makers in retaliating against plaintiff, and removing her from her SIST position, as communicated by Gemmati at the meeting of October 28, 2016. In addition, to her knowledge of the complaints set forth at ¶¶ 21, 27, and 30-47, and as further detailed in the facts set forth in ¶¶58-65 below, Kopp-Adams also had significant involvement in review and drafting of the reports submitted about Doe, which were all related to the decision and execution of the removal of plaintiff from her position by Kopp-Adams, Gemmati, and (upon information and belief), other DOCCS officers acting under color and authority of state law.

58. On information and belief, only several days later on November 1, 2016, DOCCS, through Kopp-Adams and other DOCCS officers, submitted a much edited and altered report to Judge Farley reporting the incarceration of Doe due to his hyper-sexuality and the danger he posed to the community. However, DOCCS did not follow the accepted process requiring Flynn to review and swear to the statement's accuracy in an Affidavit submitted to the Office of the Attorney General: instead, DOCCS submitted its own edited version signed by others. (Such was further supported by information submitted by Drs. Khan and Mayer documenting Doe's repeated fantasies about raping the 13-year-old with a "beautiful ass" that he met at Shop-Rite and other girls he met in previous days).

59. Flynn's draft memo resulted in a substantially edited and limited final report submitted by DOCCS administrators (such as Kopp-Adams and a PO co-worker) to the Judge Farley of the Supreme Court regarding Doe's violations of parole and the potential danger he posed to the public. On or about November 1, 2016, DOCCS reported the incarceration of Doe.

60. Much of the draft (but not the final) incident report memo to the Court referred to Doe's violations of specific rules entered by the Court as conditions of Strict Intensive Supervision for Doe's release. For example, Doe violated rule #13 of the Court Order

in reporting being aroused in response to a "baby crying" and the resultant excitement and thoughts of violence jeopardized and threatened the safety and well-being of children present at the Sullivan County DSS building in Liberty. Doe violated rule #67 of the Order in refusing to use the ammonia capsules and most effective Aversive therapy, when aroused. Doe's recounting of similar arousal and failure to use the most effective Aversive therapy when he encountered and fantasized about a teenage girl at Shop-Rite violated these same rules in the Court Order.

61. Flynn's verbal and written warnings between mid-September and October 26, 2016 had also warned her supervisors about other violations of the Court Order's explicit conditions for strict supervision, such as complying with psychiatric exams (#3), not residing with or having contact with other sex offenders (#4), and having sustained interaction with a young girl at Shop-Rite who he described as having a "beautiful ass." (#37). Flynn had alerted her superiors about these issue and violations of the Court's Order, and the danger posed to the general public.

62. Ultimately, however, DOCCS omitted many of these charges from the final Incident Report submitted to the Court. In fact, DOCCS engaged in a course of action to ignore most of the violations previously raised by Flynn – part of the group of concerns Flynn repeated had raised that motivated DOCCS' removal of her from the Special Assignment position.

63. In essence, DOCCS's final report excised completely Flynn's involvement in the case before October 28, 2016 – deleting reference to any violations that took place while she was the responsible PO and then removing her and another PO as the submitting authors. DOCCS chose to "delete" Flynn completely from the true and full events – all at the risk of undermining the factual support necessary to sustain Doe's incarceration.

64. Further, upon information and belief, the removal of these significant

violations from Flynn's draft resulted in the Court's eventual decision to release Doe back to the community on approximately April 3, 2017: DOCCS could not substantially support Doe's incarceration once it chose limited, watered-down, and edited charges and violations.

65. Thus, DOCCS persisted in a course of conduct that may fundamentally harm the public's safety – all to "double down" on its course of ignoring and minimizing the nature of Flynn's complaints and her identification of violations, after its retaliation against Flynn. None of that, however, has stopped Flynn from attempting to preserve her career and livelihood. Flynn filed a grievance with DOCCS regarding her removal from the Special Assignment and the resulting loss of overtime income. She also has complained about being precluded from any temporary assignments to transport sex-offenders when that work becomes available, as a means of earning some additional overtime.

66. As described above at ¶¶ 21, 27, and 30-47**,** Flynn had complained of numerous deficiencies in DOCCS' treatment plan to Kopp-Adams, Gemmati and other DOCCS officers, and violations of the requirement under § 10.13(a)(2) that the Court will "require the department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment **…..**" DOCCS and OMH had failed to take "appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision…." and Flynn had complained to her supervisors about these deficiencies. Similarly, §10.11(c) specifies that a person "ordered to undergo a regimen of strict and intensive supervision and treatment….is subject to lawful conditions set by the court and the department of corrections and community supervision." Flynn identified violations by Doe of the SIST conditions – as mandated by statute – and of the specifics of the

**A-46**

Court's "specified supervision requirements and compliance with a   specified course of

treatment." She thus complained about violations of state law and a court order threatening and

posing a hazard to the health and safety of the public-at-large in Orange and Sullivan counties

**Summary of Retaliatory Action and the Threat to Public Safety**

       67.     DOCCS', Kopp-Adams', and Gemmati's action in removing Flynn from

her Special Assignment working with sex-offenders has harmed the health and safety of the

public in the surrounding counties, including Orange, Sullivan, and Duchess Counties.  Indeed,

Daniel Cameron, the Chief of Police for the City of Newburgh, wrote Pacheco and commended

Flynn's work with "our sex offender population."  He explained the "significant assistance" that

Flynn had provided in updating the City's procedures in consultation with Flynn and DOCCS,

and explained that to "succeed we need to successfully collaborate together.  I feel that the

removal of Officer Flynn has directly affected that collaborative effort." He asked for an

opportunity to further express his "concern over the personnel change."

       68. Similarly, treaters of sexual offenders in the community wrote and praised

Flynn's input and efforts in participating in clinical functions and development of treatment

plans.  Maria Messerschmitt of Cornerstone Family Healthcare in Newburgh stated that Flynn's

"input is very valuable to our staff."  She expressed her "great disappointment" that Flynn was

no longer overseeing the sex-offender population, and noted that Flynn "has always made herself

available to our team no matter what time of the day it was."  She complimented Flynn's concern

and effort for her clients and summarized: "Honestly, I don't think Rita ever slept a full night

worrying about the needs of her clients."

       69. Defendants' entire course of conduct -- their instructions to Flynn in

September to "stand down" when she expressed concern about the inadequacy of Doe's

treatment plan, the telephone call she received from Kopp-Adams after October 20 stating that

21

Flynn had angered OMH and shouldn't have spoken about the treatment plan being "inhumane", their warning that Flynn should not put information about Doe's imminent danger in writing, and their ultimate conclusion that she didn't "play nice in the sandbox" -- demonstrates their concerted effort to silence and stop Flynn: every step of the way, defendants sought to silence Flynn's advocacy about imminent safety concerns and treatment deficiencies. In doing so, and in then removing her from the Special Assignment, defendants retaliated against Flynn for complaining about breaking laws and regulations integral to protecting the public's safety, as well as the safety and civil rights of the released sex offender.

70. Specifically, when Flynn reported in writing (over DOCCS' objection and instruction) that OMH and DOCCS must afford a higher level of supportive housing and intensive programming, when Flynn reported that the proposed treatment locations and local schools, when she reported about the dangers of residing without supervision in the Liberty motel, when she discussed the risks of travel and roaming the streets of Newburgh, Flynn complained of violations of §10.11 and of the Court's September 29, 2016 Order. The inadequacy of those services and their failure in detail and operation to comply with the strict and intensive supervision necessary for the public's safety – as raised repeatedly by Flynn -- violated the Court's Order and the Mental Hygiene Law.

71. Further, Flynn reported violations of §10.11 when she reported the inability and unwillingness of Doe to use the most effective tools of Aversive Therapy. She reported Doe's failure even to agree in writing to a course of cooperative treatment conduct, as required by the Court's Order. Most essentially, Flynn reported his repeated fantasies about engaging in sexual contact with young children and the repeated triggers and impulses he experienced when seeing or thinking of young children.

22

WHEREFORE, plaintiff RITA FLYNN avers the following causes of action against the defendants, and requests the foregoing relief, as follows:

## FIRST CAUSE OF ACTION

**(FIRST AMENDMENT Violation, Speaking on a Matter of Public Concern and §1983 Action against individual defendants Kopp-Adams and Gemmati)**

72. Plaintiff repeats and realleges paragraphs 1 through 71 of this Complaint as if set forth herein.

73. Plaintiff claims that defendant violated the First Amendment of the

74. Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 71 of this Complaint as if set forth herein.  Further, plaintiff alleges that the individual defendants acted under the color of state law in taking retaliatory action against plaintiff and interfering with her exercise of free speech.

75. The First Amendment to the Constitution guarantees the right to free speech and the right to petition the government for redress of grievances.  Government officials may not interfere with those rights directly, punish an individual or employee for the free exercise of such rights, or engage in retaliatory action aimed at chilling the future exercise of those rights.

76. Flynn engaged in a course of conduct of continued complaints about the failure to enforce and implement conditions of the regimen of strict and intensive supervision and treatment, as required under § 10.11(a)(2).

77. These complaints by Flynn directly related to protecting the public's health and safety, and she spoke out on a matter of public concern.  Doe posed a serious risk to the health and safety of children, and Flynn spoke out repeatedly to advocate preemptive action to

23

avoid great risk of harm to the public.

78. After several weeks of Flynn's complaints to her supervisors and DOCCS, and only days after her emails of October 24 and 26, 2016 to Deputy Commissioner Enright and speaking out on this matter of public concern and safety, defendants declared that she did not "play nice" in her complaints about the lack of treatment, and the serious potential harm on the public's health and safety. Accordingly, defendants demoted Flynn and stripped her of her Special Assignment position and overtime compensation after she complained about lack of compliance with the law, and about the significant risk of harm to the public.

79. Defendants sought to retaliate and punish Flynn for the exercise of her First Amendment rights, acting under the color of legal authority and state law. Through this retaliatory behavior, defendants sought to chill Flynn's further exercise of those rights. In retaliating against Flynn for her complaints about the potential for serious harm to the health and safety of the public from Doe if he was permitted to roam at large and be present near an elementary school and an often child-visited motel, defendant DOCCS violated her First Amendment right to speak on a matter of public concern.

80. As a result of defendants' actions, Flynn is suffering financial hardship and a loss of back pay, from the substantial overtime she has typically earned in her Special Assignment position. Further, defendants' unlawful retaliation has caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement community.

81. By reason of the foregoing, defendants Kopp-Adams and Gemmati (the "individual defendants") are liable to Flynn for damages, including compensatory damages, costs

and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above. Plaintiff seeks to recover money damages against the individual defendants acting under color of legal authority and state law, and against those state employees in their individual capacities under <u>Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388, 28 L. Ed. 2d 619 (1971). Plaintiff repeats and realleges paragraphs 1 through 65 of this Complaint as if set forth herein.

82. Further, plaintiff requests injunctive and declaratory relief from the individual defendants in their individual and official capacities, pursuant to <u>Bivens v. United States</u>, requiring those individual defendants to place Flynn back in her Special Assignment position, in the Sexual Offenders' Unit, where she has worked most of her career in the last fifteen years, and to grant her the overtime pay that had become part and parcel of that position for the last few years.

## <u>SECOND CAUSE OF ACTION</u>

### (Civil Service Law §75-b against defendant DOCCS)

83. Plaintiff repeats and realleges paragraphs 1 through 82 of this Complaint as if set forth herein.

84. Flynn engaged in a course of conduct of continued complaints about the failure to enforce and implement conditions of the regimen of strict and intensive supervision as required under §10.11(a)(2).

85. These complaints by Flynn about the failure to comply with the Mental Hygiene Law directly related to protecting the public's health and safety – since, as specified in the Court's Order and by treatment professionals, without the appropriate conditions and implementation of supervision, Doe posed a serious risk to the health and safety of children.

Further, as specified by Flynn, defendants' actions and lack of serious treatment and implementation posed a serious risk of harm to Doe himself.  As Flynn quoted Khan two days before defendants demoted Flynn, Doe was a "ticking time bomb" that could explode and seriously harm members of the public:  Flynn spoke out repeatedly to advocate preemptive action to avoid such an explosion.

86. In the alternative and in light of all of the safety issues posed and raised by Flynn, even if her complaints did not constitute a clear violation of §10.11(a)(2), Flynn had a good faith belief that DOCCS had violated the SIST statute – which is the only showing required by §725(b).

87. After several weeks of Flynn's complaints to her supervisors and DOCCS, and only days after her emails of October 24, 25, and 26, 2016, defendants declared that she did not "play nice" in her complaints about the lack of treatment, and the serious potential harm on the public's health and safety.  Accordingly, defendants demoted Flynn and stripped her of her Special Assignment position and overtime compensation after she complained about lack of compliance with the law, and about the significant risk of harm to the public.

88. In retaliating against Flynn for her complaints about the potential for serious harm to the health and safety of the public from Doe if he was permitted to roam at large and be present near an elementary school, defendant DOCCS violated Labor Law §75-b (the "Civil Service Law").

89. As a result of defendants' actions, Flynn is suffering financial hardship and a loss of substantial back pay earnings, from the substantial overtime she has typically earned in her Special Assignment position.  Further, she requests injunctive and declaratory relief from defendant DOCCS, requiring that such defendant Flynn back in her Special Assignment position,

in the Sexual Offenders' Unit, where she has worked most of her career in the last fifteen years, and grant her the typical overtime pay that had been part and parcel of that position for many years.

90. Further, defendants' unlawful retaliation has caused Flynn to suffer severe emotional harm, and greatly aggravated her anxiety and worry as to her livelihood and support and professional standing in the law enforcement community.

91. By reason of the foregoing, defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees. Plaintiff repeats and realleges paragraphs 1through 90 of this Complaint as if set forth herein.

**WHEREFORE**, Plaintiff, Rita Flynn, demands judgment against Defendants as follows:

(a) on the First Cause of Action, an award of statutory damages, the exact amount to be proven at trial against defendants Kopp-Adams and Gemmati; including, but not limited to, attorneys' fees, costs and disbursements incurred in connection with this action; and

(b) on the Second Cause of Action, an award of statutory damages the exact amount to be proven at trial, and attorneys' fees, costs and disbursements incurred in connection with this action;

(c) on both causes of action, attorneys' fees, costs and disbursements in connection with this action, together with such other and further injunctive relief as the Court may deem just, proper, and equitable, including reinstatement to her Special Assignment in the Sexual Offenders' Unit and the reinstatement of overtime compensation that comes with that position.

Dated: Goshen, New York
       August 18, 2017

                                     FOULKE LAW FIRM

                                     By: _*s/Michael Ranis, Esq.*_
                                       Michael Ranis, Esq.
                                    Attorneys for Plaintiff
                                    55 Main Street, 2nd Floor
                                    Goshen, NY 10924
                                    845-294-4308 (MBR #3757)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

RITA FLYNN,                                          No. 20-cv-9381

                              Plaintiff,           **THIRD AMENDED
                                                   COMPLAINT_____**

          -against-

MATTHEW BLOOMINGDALE, in
his individual and official capacities, and
JOHN A. SHIPLEY, in his individual and
official capacities, DONALD OLIVER, in
his individual and official capacities,
all officers of the NEW YORK STATE
DEPARTMENT OF CORRECTIONS                          **JURY TRIAL DEMANDED**
AND COMMUNITY SUPERVISION,

                              Defendants.
_____

          Plaintiff, Rita Flynn, by her attorney, Michael Ranis, Attorney at Law, as and for her

Complaint against defendants, alleges as follows:

                    **Nature of the Action and Preliminary Statement**

          This is an action under §1983 of the Civil Rights Act of 1866 and to correct unlawful

activity in violation of the First and Fourteenth Amendments to the Constitution of the United

States.  In sum and substance, plaintiff Rita Flynn spoke out on a matter of public concern about

the threats to the public's safety posed by improper treatment of a sexual offenders in Orange

and Sullivan counties.  She did so by filing several public lawsuits.  Plaintiff Flynn claims that

defendants Matthew Bloomingdale,  John A. Shipley, and Donald Oliver then retaliated against

her and violated her constitutional rights by relying on manufactured misconduct, threatening her

with criminal prosecution at an arbitration hearing if she did not abandon her Parole Officer

position – and intentionally even mischaracterized and exaggerated the severity of the supposed

criminal charges.  Plaintiff asserts that this proposed exchange based on the threat of criminal

prosecution not only constitutes a criminal misdemeanor, but violates plaintiff's rights to free

speech and fair procedural due process.

This action is related to a prior lawsuit Flynn filed in federal Court, *Rita Flynn v. DOCCS*

*et. al*., Civ. 7:17-cv-02864, and dismissed on April 30, 2018.

### Jury Demand

Plaintiff demands a trial by jury of her claims.

### The Parties

1.      At the time of the acts complained herein, plaintiff Rita Flynn ("Flynn")

was and is a resident of Chester, New York, County of Orange, New York.

2.      At the time of the events complained herein, plaintiff Rita Flynn ("Flynn")

was a Parole Officer ("PO") employed by defendant Department of Corrections and Community

Service ("DOCCS"), but DOCCS had suspended her employment.  Flynn's proposed termination

was the subject of an arbitration between her union and DOCCS.  Flynn had been employed as a

Parole Officer since the start of November 2016 - originally starting her employment with

DOCCS in 1979.  Before November 2016 -- and for a period of approximately eight years after

2008 -- DOCCS' employed Flynn as a Parole Officer working on Special Assignment working

with released sex offenders, as a provider of strict and intensive supervision in the Sexual

Offenders Management Unit ("SOMU"). Whether on Special Assignment in the SOMU or later

as a general Parole Officer at the time of the alleged violations, Flynn worked out of DOCCS'

offices in Westchester and Dutchess Counties, and the arbitration at issue occurred in Dutchess

County

3.      DOCCS is the agency of the State of New York that administers the

State's prisons, and release of eligible parolees (including sex offenders) into the community at-

large, and Flynn's former employer, as discussed above.

4.      Defendant Matthew Bloomingdale ("Bloomingdale") is the Associate

Director HR 2 Labor Relations for DOCCS in the Area 2 and has ultimate responsibility for

Labor matters in the geographical area where Flynn worked before Labor Relations discharged

her.  As Director HR 2, Bloomingdale has the primary responsibility to direct and supervise all

Labor and personnel matters concerning the discipline and supervision of employees for DOCCS

in that geographical Area. As a manager and decision-maker for DOCCS, he is in regular

communication with DOCCS' supervisors and state-wide and Regional administrators who

determine and recommend such discipline, including the Deputy Commissioner of DOCCS, and

other administrators with supervisory and personnel responsibilities.  As the top Labor Relations

manager responsible the adjudication and defense of disciplinary actions by DOCCS in Area 2,

he acted under color of state law in reviewing and implementing the discipline of plaintiff at

issue in this case, as well as being the main representative of DOCCS at an arbitration to uphold

the proposed discharge of plaintiff.

5.      Defendant John A. Shipley ("Shipley") is the statewide Director of Labor

Relations for DOCCS and has ultimate responsibility for Labor matters for DOCCS, upon

information and belief, in the entire State of New York.   As the Director, Shipley has the

primary responsibility to direct and supervise all Labor and personnel matters concerning the

discipline and supervision of employees for DOCCS throughout the state. As Director and a

decision-maker for DOCCS in charge of its Labor Relations functions, he is in regular

communication with DOCCS' supervisors and state-wide and Regional administrators who

determine and recommend such discipline, including the Deputy Commissioner of DOCCS, and other administrators with supervisory and personnel responsibilities.  As the top Labor Relations manager responsible the adjudication and defense of disciplinary actions by DOCCS, he acted under color of state law in reviewing and implementing the discipline of plaintiff at issue in this case, as well as being the ultimate authority for DOCCS at an arbitration to uphold the proposed discharge of plaintiff, and, upon information and belief, DOCCS' highest ranking official at the arbitration and DOCCS' ultimate signatory to the Agreement effectuating Flynn's coerced resignation.

6.      Donald Oliver ("Oliver") is upon information and belief, the Deputy Commissioner of defendant's Office of Special Investigations ("OSI"), an entity within DOCCS that upon information and belief, investigates internal disciplinary actions and treatment of officers and officials of DOCCS

## Jurisdiction and Venue

7.      Jurisdiction is invoked pursuant to Article III of the U.S. Constitution, 28 U.S.C. §§ 1331, and 1343 (a)(3).  Plaintiff brings this action under the First and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983, and there is federal question jurisdiction.  The Court has authority to grant injunctive relief under the federal courts' inherent equitable powers.

8.      Plaintiff seeks to recover money damages against the individual defendants Bloomingdale, Shipley, and Oliver under color of legal authority and state law, and against the state employees in their individual and official capacities.  They acted based on established state procedures.

9.      Venue is proper in this jurisdiction based on 28 U.S.C. §1391(e).  Most of the claims arose while the parties met physically in Dutchess County during an arbitration there, and the overall supervision of plaintiff by defendant and DOCCS occurred in Dutchess, Orange, Westchester, and Sullivan Counties in the State of New York.  Venue is appropriate here in the White Plains branch of this federal court.  Plaintiff resides in Orange County.

10.     This is a related case to *Rita Flynn v. DOCCS et. al., Civ. 7:17-cv-02864*, previously filed in this court and dismissed on April 30, 2018.

**Statement of Facts**

**Speaking Out about Matters of Public Concern Through the Predicate Lawsuits**

11.     Flynn has brought lawsuits in both this Court and State Supreme Court reviewing her actions as a Special Assignment Parole Officer and alleging that she spoke out on a matter of public concern and matters of health and safety to DOCCS.

12.     To first describe the relevant litigations briefly, in 2017, Flynn filed a federal lawsuit, *Rita Flynn v. DOCCS et. al., Civ. 7:17-cv-02864*, a dismissed and related lawsuit in this Court alleging violations of the First Amendment right to freedom from retaliation after the exercise of her First Amendments right to complain about a matter of public concern and alleging retaliation in violation of Civil Service Law §75-b.

13.     This Court ruled that although the Complaint may have stated matters of public concern, such did not amount to constitutionally protected speech protected under the First Amendment to the Constitution.

14.     Flynn's filing of the publicly available claims against DOCCS and its officers did not stop there.  Following dismissal of the federal claims in this court, in September 2018 plaintiff filed an action in Orange County Supreme Court of the State of New York, alleging only retaliation in violation of the Civil Service Law §75-b.  She also filed an Amended

5

Complaint in September 2018, alleging additional acts of retaliation under the Civil Service Law,

including DOCCS' acts in failing to assure the physical safety of Flynn during and after a

physical assault by a parolee, resulting in Flynn suffering a concussion.

15.     As described in those lawsuits, DOCCS released Doe released as a sexual

offender, and Flynn had multiple complaints about the treatment plan, and the health and safety

of the offender, given the lack of services to be provided and the substantial unsupervised travel

that would be required.  In September and October 2016, Flynn made multiple complaints to the

Assistant Commissioner and others regarding the health and safety effects of releasing the

parolee John Doe into the community after his release from state hospital.

16.     In the Amended Complaint brought under the state law (as in the prior

dismissed federal lawsuit), Flynn through her public allegations brought a matter of widespread

public concern to the State's attention, complaining about the dangers posed by a released sexual

offender and the State's failure to act with care and diligence in supervising and treating a sexual

offender.  She charged that the sexual offender was inadequately supervised, and would be living

and commuting to areas where he would be often exposed to young children.

17.     In state court, Flynn repeated her allegations that she had spoken out on a

matter of public concern, and had spoken out on a matter of health and safety under the Civil

Service Law, and that DOCCS, as the defendant in that action, had violated that law by

retaliating against her.  By asserting these claims again in State court and publicizing them in

public Complaints (as well as the earlier one in federal court), she continued to speak out on a

matter of public concern about the safety threats posed to the public.

18.     To wit, in the filed state court action alleging violations of the Civil

Service Act §75-b, she again repeated at length the endangerment to the public and the parolee

resulting from DOCCS' and other officers acts (as well as the retaliatory treatment afforded to

Flynn herself).  Those included statements criticizing the actions at that time of Deputy

Commissioner Ana Enright and defendant Regional Director Frank Gemmati and their alleged

tolerance about the sexual offender and the risk he posed to the general public.

19.     Both the publicly filed federal and state lawsuits repeated allegations

against DOCCS and state officers alleging serious threats of health and safety to the public and

DOCCS and officers' failure to properly treat and supervise a recently released sex-offender

parolee, criticized the very mission and effectiveness of the Sexual Offenders Management Unit.

In detail, the Amended state law complaint detailed the failure to protect the public from

potential harm to its safety, quoting extensively from Flynn's warnings about the significant

probability that Doe would repeat as a sexual offender with a minor and the potential risk to Doe

himself because of inadequate treatment that he received.  (Exhibit A to this Amended

Complaint (Amended Complaint, Index No. EF006948-2018, ¶¶20, 26, and 29-47).

20.     In the complaints, Flynn also referred repeatedly to her having recorded

and documented the numerous ways in which DOCCS and the Office of Mental Health failed to

provide appropriate supervision and treatment of Doe – including failing to provide him an

appropriate residence by placing him in a motel with frequent travelers in Liberty, New York.

The Complaints also detailed DOCCS' lack of an appropriate plan for Doe's visits to therapy and

drug treatment facilities far away in Newburgh, New York in a location with visiting children

and close to an elementary school.  (Those allegations as appearing in the Amended Complaint

in state court are reported in the attached Exhibit at ¶¶20, 26, and 29-47).

21.     Through plaintiff's continued litigation of the state law whistleblower

action, including depositions of multiple officers, and opposition to multiple motions of

dismissal and an appeal, plaintiff has continued to speak out about DOCCS practices and failure to properly protect the public and implement effective and humane treatment for a parolee.

**DOCCS's Harassment of Flynn and Its Manufacturing of Unfounded Criticisms**

22.    DOCCS engaged in multiple incidents of retaliation against Flynn because of her persistence in her use of the litigation system and speaking out through the court filings and litigation process.  This occurred in several additional ways in late 2018 and 2019.  Some of these constitute background information and do not form the basis of the claims against the three defendants here.

23.    First, and most dangerously, DOCCS permitted one of its officers to ignore violence against Flynn by a parolee, when that parolee crashed her knee into Flynn's head while Flynn had attempted to detain her.  The attack occurred less than 10 feet away from the supervising officer while she failed to provide any assistance, and the officer failed to even file a written report of the incident for several days.  Nor did the officer accompany Flynn or assist her in transport when Flynn needed to visit the hospital to treat the resulting concussion.

24.    That failure to accompany an officer physically attacked in the line of duty, and the failure to immediately submit a written report regarding the attack on an officer, departed from Department requirements.

25.    Second and on a continuing basis, DOCCS and its supervisors disciplined Flynn by implementing and delivering to Flynn multiple Notices of Discipline for alleged performance errors, as permitted under the Collective Bargaining Agreement between DOCCS and the New York State Public Employees Federation ("PEF").

26.    The citations in the Notices of Discipline delivered in 2019 varied from alleged errors in being allegedly abrasive with a co-worker in an administrative office when

A-62

Case 7:20-cv-09381-PMH   Document 31   Filed 07/29/21   Page 9 of 31

receiving an assignment from the office, to Flynn's alleged failure to submit appropriate time sheets and then overtime sheets in a timely manner, to her alleged failure to complete an assignment regarding a client while on vacation and sick leave, and then having to complete it with overtime work on her return 7 weeks later.  Some also disciplined her for actions such as reentering the computer system to properly indicate accurate information regarding a parolee, such as one example where she corrected a DOCCS omission and added an entry with the proper indication regarding the status of a Level 3 pedophile.

27.     DOCCS manufactured these disciplines, as they relied on mistakes or actions by DOCCS itself, Flynn's correction of or cleaning up such actions, or were simply untrue.  These Notices of Discipline began to mount, totaling five by mid-2019.

28.     But Shipley and Bloomingdale triggered some of the violations claimed here based on their participation and authorship of many alleged incidence of violations contained in a sixth August 5, 2019 Notice of Discipline ("NOD") pursuant to the CBA. Shipley, Bloomingdale, and DOCCS's sought plaintiff's termination of employment in connection with her providing information regarding an investigation conducted by DOCCS' OSI in 2018 to 2019, and Flynn having sent emails to her attorney and Oliver, in his capacity as the OSI Deputy Commissioner.

29.     That investigation, plaintiff's actions in providing information for that investigation, and Shipley's and Bloomingdale's actions in seeking to enforce and effectuate the termination of Flynn's employment, form the gravamen of Flynn's complaint that defendant violated her constitutional rights.

**The OSI Investigation and Defendants' Acts to Discharge Flynn**

30.     Upon information and belief, OSI began an investigation in 2018 regarding the series of grievances filed by Flynn and whether DOCCS had adhered to the internal standards for fair evaluation in its treatment of Flynn.  On November 30, 2018, OSI's Deputy Commissioner Donald Oliver conducted a transcribed interview of Flynn regarding multiple complaints and grievances she had made about her treatment by DOCCS following the filing of Flynn's multiple lawsuits.  OSI conducted the deposition over a period of many hours, and the subject of it was about incidents where Flynn was alleging retaliation against her by officers that she worked with, or misconduct that had occurred but which she often received some blame.

31.     Upon information and belief, the investigation and the inquiries on November 30, 2018 did not concern any wrongdoing by Flynn, nor any unauthorized disclosure of any confidential information.  Flynn and her counsel had every reason to believe that Oliver's investigation was focused on retaliation, and the acts of other DOCCS' employees against her.

32.     Not all of the information supporting retaliation against Flynn could be provided in one long session deposing Flynn about the multiple allegations and examples of retaliation.  Accordingly, as part of its investigation of retaliation against Flynn, Oliver welcomed and *asked Flynn to supply* any updated and additional information from Flynn as to any additional information she could provide about the examples of retaliation, as well as any further retaliation.

33.     Oliver also had some interaction with Flynn's counsel during this period and was aware that she was represented in the state court action.  Oliver made clear to counsel that his inquiry had nothing to do with any allegations in the state court complaint and that he had nothing to do with that ongoing litigation.

*34.*      But Oliver did inform this attorney, as Flynn's counsel, about the plans for deposing Flynn, as well as confirming in December 2018 that Flynn should send him any materials relevant to her allegations of retaliation against Flynn, and that he *had told Flynn that such could assist the investigation and that she could do so.*

35.      This Flynn did, sending further details by email and in a hard copy package of different investigations and workplace occurrences when Flynn had been upbraided for performing her job duties in a responsible manner and in the protection of public safety. These included communications with Oliver about the workplace issues also included her counsel, where she provided information with respect to issues involving retaliation at the workplace in her administration of Parole cases and the performance of her duties.

36.      In describing and identifying workplace issues and incidents in her communications with Oliver, Flynn often referred to particular parolees or individuals with whom she and other staff came into contact or were the subject of the incidents.

37.      Oliver clearly had knowledge that the instant counsel for Flynn had also received many of these materials from Flynn, as counsel's law firm email address appeared on almost all of the emails sent by Flynn during December 2018 and January 2019.  Oliver of course also knew that there was an attorney-client relationship between Flynn and this counsel, and that he was representing Flynn.

38.      Oliver never informed Flynn, nor this counsel, about any impropriety in her sharing her communications about workplace issues nor in identifying any of the individual parolees.

39.      In these examples, Flynn often addressed problematic interventions where DOCCS had failed to act properly, but for which DOCCS had blamed her in some way for

11

having taken action or making a report that she believed was required.  Flynn emailed Oliver

(with a copy to counsel) on almost a dozen times occasions after December 1, 2018 up until at

least February 27, 2019**,** providing examples of particular cases of DOCCS retribution against

her after she engaged in safe practices and required reporting.

       40.     The workplace information sent to OSI and Flynn's attorney described

workplace events where Flynn had faced some type of workplace retribution from DOCCS,

sometimes referring to physical threats.  Those included examples such as (1) when DOCCS sent

Flynn into a gang member's home who was believed to be armed; (2) when another gang

member threatened Flynn's life when she came to the aid of a man lying unconscious in the

street; and (3) when DOCCS reprimanded her for referring a case to Child Protective Services

involving a then non-Parolee.

       41.     One example related to retaliation against Flynn because of her entry of

information in the computer system about a parolee that was at large and with a gang; another

about her entry of information for a parolee who had violated the terms of his parole; another

discipline because of her new October 2018 entry marked "INDICATED" showing the correct

Child Protective Services determination regarding a Level 3 pedophile – even when she reported

to the Albany hotline the pedophile's documented (in a photograph) contact with an at-risk 2-

year old, and even after the 2-year old was found to have rectal bleeding.  Flynn reported to

Oliver that she was told "to mind your own business" and that she would never receive any

additional overtime.  Another example Flynn communicated to Oliver was about a CPS report

she made to the Albany hotline to remove an infant from the home of an ex-parolee, with reason

to believe that she was actively taking heroin.  Flynn communicated with Oliver about how she

had been disciplined by DOCCS for making the report, even though the ex-parolee was on the

"most wanted" list two weeks later and even though Orange County Child Protective Services had thanked Flynn for her vigilance in protecting the newborn.

42.      All of the parolees and individuals identified, except for one, were not Sexual Offenders or individuals who had been so identified in the past.

43.      In all, when Flynn provided Oliver with the examples of DOCCS' retribution, Flynn routinely also copied her counsel representing her on the earlier claims of retaliation under the Civil Service Law §75-b being litigated in the state court action.  Flynn kept her attorney abreast of the examples she submitted by also providing him with the identical examples that she sent to Oliver.  She maintained this communication with her attorney so as to assist him in any claims pending with the state court, and as part of her seeking effective counsel in that action, as well as in her seeking redress through the OSI investigation of DOCCS' treatment of her.

44.      Later, in early 2019 another OSI Officer visited Flynn and others at her work location to conduct interviews.  He told Flynn that he thought that she should keep working to clear her name.

45.      Upon information and belief, by sometime in the late winter or early spring of 2019, the OSI investigation radically changed focus.  Oliver and OSI apparently launched an investigation of Flynn and the propriety of including her counsel in her communications with Oliver that had also included her counsel.

46.      Oliver launched this investigation even though he had generally encouraged Flynn and his attorney to provide any information that they believed would be relevant to his investigation.  He did so even though he had never alerted Flynn or her attorney to including counsel or to stop sending any material.

13

47.     Neither Oliver nor anyone else from OSI or DOCCS' regional administration ever warned or admonished Flynn for sending such information, or ever informed this attorney that Flynn should stop doing so because of the confidential nature of the material. No such warning was ever given, despite several telephone communications between this counsel and Oliver.

48.     In reality, sometime in early 2019 (and upon information and belief), Oliver had ceased to conduct any investigation of retaliation against Flynn – if it had indeed ever existed.  Rather, by then the only investigation by Oliver concerned Flynn's communications with this counsel regarding information provided by Flynn as *part of her assistance to the investigation of the retaliation against her by others.*  Flynn became the target of the investigation.  In doing so, he acted based on established state procedures

49.     By now making such communications about her assisting an investigation the basis and *centerpiece of a new investigation against her*,  Oliver and DOCCS engaged in a Kafka-esque process.  Providing information simultaneously to her attorney and the investigator now became the new misconduct, crime and the subject of a newly created investigation.  A new investigation that only occurred because of Flynn's participation in the earlier investigation conducted by defendant Oliver.

50.     Further, Oliver participated in investigating and interfering with Flynn's right to seek the assistance of counsel and the involvement of counsel in any investigation concerning Flynn's employment.  In effect, Oliver punished Flynn for consulting with and informing her counsel about the information provided when he then proceeded to charge Flynn for wrongdoing.

14

51.     On approximately May 3, 2019, Oliver did inform counsel that the large volume of material and information that Flynn had continued to provide was no longer particularly helpful.  Oliver explained that OSI had limited resources - only 18 investigators in his staff - to review every incident referred to by Flynn or to review that volume of information, and that a constant stream of more submissions could delay the completion of its investigation.

52.     As directed, Flynn then ceased to send any more materials to Oliver.

53.     Despite the lack of warning provided about the emails Flynn sent to Oliver and also received by counsel in the period after December 1, 2018, DOCCS did stop some communications.  DOCCS informed Flynn, with Shipley's knowledge on January 10, 2019, that she should "cease and desist" from communicating by email about internal DOCCS matters (not of a confidential nature) with Deputy Commissioner Ana Enright.  DOCCS was fully able of ordering Flynn to "cease and desist" from less sensitive communications with the state-wide Commissioners.

54.     Flynn later received the August 5, 2019 NOD alleging that her alleged disclosure of confidential information to her personal email and counsel (and often also sent to Oliver) violated restrictions on protecting correspondence regarding parolees and their identities. Shipley signed the NOD as the Director of the Bureau of Labor Relations.

55.     Upon information and belief, in bringing the NOD and then enforcing it in the first place later in 2019, defendants Bloomingdale, Shipley and non-defendant DOCCS relied upon the investigation conducted by defendant OSI Deputy Commissioner Donald Oliver.  In doing so, Bloomingdale and Shipley also interfered with Flynn's right to consult counsel in the ongoing civil matter and his ability to keep abreast of facts relevant to that lawsuit.

56.     The approved NOD and its prosecution by defendants Bloomingdale and Shipley sought extreme discipline against Flynn for keeping her attorney informed of the ongoing workplace harassment and retribution – retribution for her efforts in seeking appropriate supervision of parolees and notation of accurate safety information.

57.     Nor had OSI or Oliver ever alleged that Flynn or her counsel had, in the process of imparting information regarding her complaints and alleged retaliation, ever shared any information regarding parolees with anyone else outside the Parole system - and least of all in any public forum.  In her original 2017 and 2018 complaints regarding "John Doe," she and her attorney had never disclosed the identity of that parolee or any other confidential information.

58.     Through this NOD, Bloomingdale, Shipley, and DOCCS proposed that Flynn's employment with DOCCS - dating from 1979 - be terminated.  They gave notice of this proposed termination, despite the fact that OSI had been in receipt and fully aware of all such communications for many months between December 1, 2018 and May 2019, and aware that Flynn had emailed all such communications to her counsel.

59.     Upon information and belief, they were also aware, contrary to the NOD, that Flynn had utilized her personal email for sending work information for many years.  Indeed, even on the last day of her employment before suspension, her supervisor ordered her to send a subpoena via her personal phone.

60.     Bloomingdale, Shipley, and DOCCS sought Flynn's termination despite her over cumulative seventeen years of devoted work as a Parole Officer on Special assignment with SOMU --and despite her considerable expertise with sexually offending parolees and understanding the issues about working with parolees, and treatment and residential facilities.

61.     After Bloomingdale, Shipley, and DOCCS sought her termination through the NOD, Flynn invoked the provisions of the Collective Bargaining Agreement between the PEF and DOCCS, exercising her right to file a grievance regarding her discipline for having shared information with counsel.

62.     It was defendant Bloomingdale from DOCC's Human Resources office that DOCCS assigned to manage and uphold its proposed discharge of Flynn, and to represent DOCCS at the arbitration hearing seeking Flynn's ouster.   Upon information and belief, Shipley also participated.

63.     DOCCS, through defendants Bloomingdale and Shipley, and PEF proceeded to adjudicate only the termination Notice of Discipline after proceeding through numerous steps in the CBA grievance process.  On February 24, 2020, DOCCS and PEF held an arbitration of Flynn's challenge to the termination action, attended by Bloomingdale representing DOCCS, and supervised in some manner by Shipley.

**The Arbitration and Defendant's Violations of Flynn's Constitutional Rights**

64.     At that arbitration, PEF's counsel represented Flynn in her challenge to DOCCS's proposed termination, and to do so by defending the charges against her.  Flynn planned to present evidence and witnesses regarding her very satisfactory performance, and important character references regarding her exemplary performance as a Parole Officer for DOCCS during the preceding 40 years -- as well as evidence that DOCCS' actions retaliated against her for having filed the state court action.  She planned to argue that the discipline was not in itself justifiable nor in good faith.

65.     Flynn, however, never had an opportunity to defend her actions nor to present evidence that DOCCS' proposed termination was in fact a pretext for its own retaliation

against her.  Instead, at the outset of the arbitration, DOCCS' human resources manager Matthew Bloomingdale proposed a settlement to PEF's attorney representing Flynn:

66.     If Flynn did not withdraw her grievance and voluntarily resign her employment and retire from DOCCS, Bloomingdale, Shipley, and DOCCS would *refer Flynn to law enforcement for prosecution on approximately 40 counts* of Class B misdemeanor violations, with a *minimum jail time of two years*.

67.     This injected an essentially new issue and broad attack, where Flynn had earlier heard about one potential count from PEF counsel. Flynn understood she was there to defend her actions and challenge the termination of her employment as an arbitration matter – and not to adjudicate a slew of 40 criminal counts nor make decisions about a threat to her very freedom.

68.     Presumably, in referring to 40 criminal counts, defendants were referring to alleged violations of the Sexual Offenders Registration Act.  But in all of the communications, *only one* concerned an individual who had been supervised by SOMU.

69.     Defendants nevertheless concocted a threatened criminal sanction that did not match nor was supported by their own written Notice of Discipline.  Defendants knowingly exaggerated and overstated the potential criminal sanction when characterizing her of engaging in 40 incidences of releasing *confidential information about Sexual Offenders.*  But in their own itemized naming of the individuals at issue, *only one* of the individuals appearing in her emails referred to an individual who was in fact a Sexual Offender.  Defendants based the threat of the incarceration and 40 counts of Class B violations on supposed disclosures about Sexual Offenders – where the disclosures *did not even relate* to Sexual Offenders (in 39 out of the 40 incidences).

18

70.     Defendants thus weaponized the disclosure allegations and came down on Flynn with a ton of bricks, concocted into a much heavier and more threatening weight of facing 40 counts of criminal conduct.  Facing such a constructed heavy burden as a layperson, it was all the more essential for Flynn to consult with a criminal attorney before making vital decisions about her future and freedom.

71.     Reacting to the severity of the threat and charges communicated – even inaccurately – by defendants, Flynn became alarmed and requested more time in which to consult a criminal attorney to advise her about these serious threats of prosecution.  On further advice, she also requested an adjournment of the arbitration in order for her to seek counsel from a criminal attorney.

72.     Even after Flynn briefly consulted with a criminal attorney by telephone, Bloomingdale and Shipley, upon information and belief, denied Flynn's request for an adjournment.  Following a conversation between Flynn, the criminal attorney and PEF's attorney, the PEF attorney, upon information and belief, sought an adjournment so that Flynn could continue her consultation with criminal defense counsel.

73.     Instead, the PEF attorney  informed Flynn that he had learned from DOCCS (that is, defendants Bloomingdale and Shipley) that even a short one-week adjournment to consult with criminal defense counsel was unavailable.

74.     In proposing that Flynn resign and withdraw her grievance's challenge to her proposed termination, Bloomingdale and Shipley ran roughshod over Flynn's efforts of more than forty years' investment in her work as a Parole Officer with special training and skills, and the importance of that position to her career.  They both brought their power as high-level state

labor officials to bear so as to interfere with her livelihood and property interest in preserving her career and job status.

75.    But while first attempting to preserve her employment and the vital question of her future employment, Bloomingdale and Shipley confronted Flynn with the serious choice of having DOCCS refer her for prosecution on 40 counts of a B Class misdemeanor, if she failed to comply by refusing to resign.  And by injecting the threat of criminal prosecution and communicating such to PEF's attorney, defendants potentially ran afoul of New York Penal Code §135.60 - engaging in the crime of coercion.  Coercion may be committed by compelling the victim to engage in conduct (here, resignation or job abandonment) from which she had the right to abstain by instilling in her a fear that he will cause criminal charges to be brought against her.

76.    No matter.  Bloomingdale and Shipley sought to effectuate their goal of seizing on Flynn's alleged violation and applying maximum pressure – and even by misstating and exaggerating the actual nature of Flynn's alleged criminality.  All apparently done to aggrandize and add heft to the "cudgel" that defendants brought to bear against plaintiff so that she would resign her long-held employment.

77.    That is, Bloomingdale and Shipley overstated the nature of the potential criminal prosecution so as to strip Flynn of her job position – and to punish her exercise of her freedom of speech and perseverance in her litigations against DOCCS and its officers.  A freedom of speech implicating a matter of public concern, and speech made to the public through her pursuit and filing of litigation against DOCCS and its officers.

78.    Further, in doing so, defendants interfered with Flynn's right to counsel by declining to allow her to pursue the issue of retaining and getting advice from a criminal attorney

about her exposure to prosecution, before she made any fateful decision to resign.  Bloomingdale

and Shipley further compounded this denial of counsel by pressuring an immediate decision by

Flynn, and rejecting Flynn's request for an adjournment, even after she spoke with criminal

counsel.

79.    Ultimately, Flynn acted on her alarm and fear:  she resigned her position

on the spot and reviewed the paperwork and Agreement submitted to her by DOCCS and PEF as

necessary for resigning her position and taking retirement.  But she did so under duress.  In

reviewing the Settlement Agreement submitted to her by Bloomingdale and Shipley, Flynn

specifically deleted the language stating that she had *not* entered into the agreement under

duress.

80.    Flynn then signed the Agreement to resign her employment, with that

revision, as did Shipley.  Flynn's striking the absent "duress" condition phrase signified that the

Agreement had indeed been secured under duress given the serious threats made, and the refusal

to permit her to consult with her chosen criminal attorney.

81.    When Flynn received the finalized Agreement, it was Shipley's signature

appearing on the document, as DOCCS' "Director of Labor Relations." Shipley participated in

reviewing Flynn's revision to the Agreement, as secured by Bloomingdale.  Through his

signature and approval at the end of this process, Shipley signaled his agreement, participation,

and even supervision of DOCCS' conduct and its coercion of Flynn so as to secure her

resignation.

82.    More specifically, Flynn resigned as Bloomingdale and Shipley retaliated

against her for having exercised her rights to free speech by threatening her freedom (through

criminal prosecution) and depriving her of her right to counsel when making an all-important

decision about her long investment in her career and her future.  As Flynn had spoken out on a

matter of public concern by prosecuting her two public cases in the years between 2017 and

2019, Bloomingdale and DOCCS now sought to punish and discharge her.

83.     In defendants' and DOCCS' focus on Flynn's having sent alleged

confidential information to OSI and her attorney, defendants seized on manufactured charges as

a pretext, and Bloomingdale and Shipley misrepresented 39 counts as Class level misdemeanors,

and set the stage for their retaliation against Flynn in violation of her First Amendment right to

free speech.  Flynn had had a lawful reason for providing that information, it had even been

requested by OSI in the first place.

84.     Nevertheless, Bloomingdale, Shipley and DOCCS misrepresented those

disclosures as relating to Sexual Offenders when they did not, and wielded a heavy tool of 2

years' incarceration to effectuate their retaliation.

85.     The coupling of Bloomingdale's and Shipley's argument for discharge

with a threat of criminal prosecution and a withholding of attorney advice violated Flynn's

constitutional right to free speech, as well as additional constitutional rights.

86.     For in subjecting plaintiff to making such a vital decision while facing

criminal prosecution, defendants Bloomingdale and Shipley violated plaintiff's 14th Amendment

rights to substantive and procedural due process.  Plaintiff retained a property right and a

reasonable expectation of liberty in her job, yet defendants' threats of criminal prosecution and

interfered with her right to substantive due process.

87.     Defendants Bloomingdale and Shipley stripped Flynn of her right to a fair

process and an ability to make a reasoned and thoughtful decision about her future, while under

22

threat of criminal prosecution. That severe pressure to her very freedom, and brought to bear over a period of an hour to choose, violated procedural due process.

88.     They further denied fair process by refusing an adjournment so that Flynn could consult further with the same criminal defense counsel – even when she had specifically requested such representation and spoken to the attorney.

89.     In doing so, Bloomingdale and Shipley trampled Flynn's rights.  By denying Flynn counsel, wielded a threat to Flynn's freedom and secured Flynn's coerced abandonment of her long career at DOCCS.  And they did so in the context of Flynn specifically refusing to recognize that there had been no duress imposed on her.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (First Amendment, Speaking on a Matter of Public Concern)

90.     Plaintiff claims that defendants violated the First Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 89 of this Complaint as if set forth herein.

91.     The First Amendment to the Constitution guarantees the right to free speech and the right to petition the government for redress of grievances.  Government officials may not interfere with those rights directly, punish an individual or employee for the free exercise of such rights, or engage in retaliatory action aimed at chilling the future exercise of those rights.

92.     Defendants retaliated against plaintiff after she filed repeated lawsuits that spoke out on a matter of public concern violated the First Amendment.

93.     Defendant Oliver's acts in seemingly starting an investigation and deposing Flynn about the retaliation against her, and then turning to an investigation of her,

was retaliatory and violated the First Amendment.  It did so in substantial part because Oliver

seized on Flynn's communications with counsel during the alleged investigation of retaliation,

and used those to now investigate Flynn herself – while interfering with her right to counsel

and consultation with her attorney.

94.     Oliver did so with a retaliatory motive.  Oliver acted under the color of

state law in taking retaliatory action against plaintiff and interfering with her exercise of free

speech – particularly where he himself had requested and welcomed assistance from Flynn in

collecting information and documents relevant to the investigation.

95.     Defendants Bloomingdale and Shipley's threat of criminal prosecution

was falsely represented, without any intrinsic merit, and merely a gambit in order to secure

Flynn's discharge and resignation.  In threatening Flynn with the serious consequence of

criminal charges, defendants sought to chill Flynn and punish her for her exercise of her First

Amendment right to speak out to the public – through her lawsuit – on a matter of public

concern.

96.     Bloomingdale and Shipley, in effectuating DOCCS's design to

accomplish Flynn's forced resignation acted under the color of state law in taking retaliatory

action against plaintiff and interfering with her exercise of free speech.

97.     As a result of those two defendants' retaliatory actions in securing Flynn's

coerced resignation under great duress Flynn is suffering  financial hardship and a loss of

employment.  Such threats and fear of prosecution and loss of employment and a career of 40

years as a parole officer, also caused Flynn to suffer severe emotional harm, adversely affected

her reputation in the law enforcement community, and greatly aggravated her anxiety and worry

as to her future livelihood and support and professional standing in the law enforcement

community.

98.    By reason of the foregoing, all three defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against the individual defendants acting under color of legal authority and in their individual capacities.

99.    Further, plaintiff requests injunctive and declaratory relief from defendants Bloomingdale and Shipley in their individual and official capacities, including requiring defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

## SECOND AND THIRD CAUSES OF ACTION AGAINST
## DEFENDANTS BLOOMINGDALE AND SHIPLEY

### (Procedural Due Process under the 14th Amendment)

100.    Plaintiff claims that defendants violated the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 99 of this Complaint as if set forth herein.

101.    The Fourteenth Amendment to the Constitution guarantees the right to procedural due process and protection of individual rights.

102.    Bloomingdale's and Shipley' threat of prosecution was falsely represented, without any intrinsic merit, and merely a gambit in order to secure Flynn's

discharge and resignation.  In threatening Flynn with the serious consequence of criminal

charges, defendants sought to achieve the result they wanted – Flynn's resignation – without

the most basic consideration of Flynn's right to procedural due process.  By making such

falsely represented threats of criminal prosecution and refusing Flynn the right to an

adjournment or the ability to consult with a criminal attorney for a reasonable period in which

to make a reasoned determination about giving up her employment of 40 years, defendants

violated the basic tenets of procedural due process afforded a citizen by Government.

Threatening prosecution on 40 Counts – 39 concocted as Sexual Offender related - of a Class

B Misdemeanor violated procedural due process and her opportunity to address the

misstatements underpinning defendants' threats of prosecution.

   103. Clearly, in itself, it is a violation of procedural due process to engage in

coercion in potential violation of New York Penal Code §135.60 where defendant compelled

Flynn to engage in conduct (resignation) from which she had the right to abstain.  Those rights

to procedural due process rights – and freedom from coercion to resign where she had CBA

rights to abstain from such – applies to the process for disciplinary and arbitration

proceedings.  Even proceedings pursuant to a CBA.

   104. Bloomindale and Shipley, in effectuating DOCCS's design to

accomplish Flynn's resignation, acted under the color of state law in taking acts that

knowingly violated Flynn's rights to procedural due process as protected by the 14th

Amendment.  They acted based on established state procedures.

   105. As a result of those two defendants' actions in securing Flynn's coerced

resignation under great duress and the denial of a reasonable adjournment for consulting with a

criminal attorney, Flynn is suffering  financial hardship and a loss of employment.  Such threats,

and fear of prosecution and loss of employment and a career of 40 years as a parole officer, also caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement community.

106.    By reason of the foregoing, those two defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against each individual defendant acting under color of legal authority and in his individual capacity.

107.    Further, plaintiff requests injunctive and declaratory relief from those two defendants in their individual and official capacities, including requiring defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

108.    Similarly, those two defendants' actions in disciplining Flynn in the first place for allegedly inappropriate communication with her attorney interfered with her relationship with her civil attorney and with her right to seek advice in an ongoing litigation from counsel. Such should also include whether Flynn should be subjected to discipline and arbitration of her claims in the first place, since defendants' discipline of Flynn interfered with the attorney-client relationship.

## FOURTH AND FIFTH CAUSES OF ACTION AGAINST

## DEFENDANTS BLOOMINGDALE AND SHIPLEY

**(Substantive Due Process under the 14th Amendment)**

27

111.    Plaintiff claims that defendants violated the Fourteenth Amendment of the
Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 110 of this
Complaint as if set forth herein.

112.    The Fourteenth Amendment to the Constitution guarantees the right to
substantive due process, including the protection of the property and liberty interests.

113.    Bloomingdale's and Shipley's threat of prosecution was falsely
represented, without any intrinsic merit, and merely a gambit in order to secure Flynn's
discharge and resignation.  In threatening Flynn with the serious consequence of criminal
charges, defendants sought to achieve the result they wanted – Flynn's resignation – without
any consideration of her interest in the property of her ongoing employment and her interest
in liberty, free from harassment or the threat of arrest and prosecution.  Threatening
prosecution on 40 Counts – 39 concocted -- of a Class B Misdemeanor threatened her
property interest in her ongoing 40-year career and employment.  The threat of prosecution as
made in exchange for giving up her job raised the specter of interfering with her liberty if she
chose to continue her arbitration of the matter of continued employment.

114.    Those two defendants, in effectuating DOCCS's design to accomplish
Flynn's resignation acted under the color of state law in taking acts that knowingly violated
Flynn's rights to substantive due process as protected by the 14th Amendment.  They acted
based on established state procedures.

115.    As a result of those two defendants' actions in securing Flynn's coerced
resignation under great duress and the threat of prosecution interfering with her property right in
her job as well as her liberty interest, Flynn is suffering  financial hardship and a loss of
employment.  Such threats, and fear of prosecution and loss of employment and a career of 40

years as a parole officer also caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement community.

116.    By reason of the foregoing, those two defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against each individual defendant acting under color of legal authority and in his individual capacity.

117.    Further, plaintiff requests injunctive and declaratory relief from those two defendants in their individual and official capacities, including requiring those defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

### SIXTH CAUSE OF ACTION AGAINST DEFENDANT OLIVER

### (Procedural Due Process under the 14th Amendment)

118.    Plaintiff claims that defendant Oliver violated the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 117 of this Complaint as if set forth herein.

119.    The Fourteenth Amendment to the Constitution guarantees the right to procedural due process and protection of individual rights.

120.    Defendant Oliver encouraged Flynn to send any relevant information and then contributed to bringing charges against her for doing so – also thereby interfering with her

free speech.  This Kafka-esque prosecution of Flynn after she provided information, and the

interference with her right to include her counsel about the progress and substance of the topics

for investigation, violated Flynn's constitutional right to procedural due process.

121.    Oliver both punished Flynn for having participated in and contributed

information to the constable to assist him in investigating mistreatment of her by DOCCS's

officers and for informing and relying upon her counsel in the process of that investigation.

122.    Oliver thus violated Flynn's rights to a fair investigatory process, and to

her right to rely on counsel in some way during that investigatory process.  He acted based on

established state procedures.

123.    By reason of the foregoing, Oliver is liable to Flynn for damages,

including compensatory damages, costs and disbursements, the exact amount to be proven at

trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages

against Oliver while acting under color of legal authority and in his individual capacity.

**WHEREFORE**, Plaintiff, Rita Flynn, demands judgment against Defendants

as follows:

(a)     on the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, an
        award of statutory damages, the exact amount to be proven at trial against the
        applicable defendants, including, but not limited to, attorneys' fees, costs and
        disbursements incurred in connection with this action; and appropriate injunctive
        relief as the Court may determine, including reinstatement to her position and a
        return to arbitration of the proposed discipline and termination of employment with
        DOCCS.

Dated: Croton-on-Hudson, New York
       July 27, 2021

                                             MICHAEL RANIS

                                             By:   *s/Michael Ranis, Esq.*
                                               Michael Ranis, Esq.
                                           Attorneys for Plaintiff
                                           32 Riverview Tr.
                                           Croton-on-Hudson, NY  10520
                                           914-584-6445 (MBR #3757)

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
_____ _____

RITA FLYNN,                                               Index No**.** EF006948-2018

                                    Plaintiff,            **AMENDED COMPLAINT**

        -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS and COMMUNITY SUPERVISION,


                                    Defendant.
_____


        Plaintiff, Rita Flynn, by her attorneys, Foulke Law Firm, as and for her Complaint

against defendant, alleges as follows:

                            **Jury Demand**

    1.  Plaintiff demands a trial by jury of all issues in this action.

                **Nature of the Action and Preliminary Statement**

    2.  This is an action under Civil Service Law §75-b, and as a whistleblower

action, alleging that defendant DOCCS, alleging that defendant demoted plaintiff Rita Flynn

from her Special Assignment supervising released sex-offenders in retaliation for her multiple

complaints about violations of law and a court Order – complaints about serious safety risks

posed to the public at large and grave deficiencies in the supervised release of a paroled SIST sex

offender.

    3.  In performing her job duties as a parole officer supervising the release of sex-

offenders into the community-at-large, Flynn complained to her superiors – including several of

the Governor of New York, Andrew Cuomo's political appointees, including, upon information

and belief, to the DOCCS Commissioner  -- about violations that allowed a newly released

1

convicted pedophile and sexual offender to pose serious risks to young girls and children in Orange and Sullivan counties.

       4.  As executed in the plan for his release, "John Doe" or "Doe" was to make frequent visits from Sullivan to Orange County for treatment visits after his release from prison – and to areas where there was a high risk of contact with elementary school children and families with young children – while receiving what Flynn had identified as grossly inadequate and partial treatment and supervision.  Flynn complained about major gaps in supervision and treatment of this developmentally disabled sex offender, a planned negligence and lack of monitoring of his activities, and later about Doe's violations of his parole, following his actual release into the community.

       5.  Flynn alerted Defendant about the substantial violations and deficiencies by Defendant of treatment requirements under the Mental Hygiene Law, and violations by Doe of the Court Order that conditioned Doe's release.  Such complaints constituted violations of the Mental Hygiene Law's regulations on strict supervision, and identified serious safety risk factors that this sexual predator posed to the community's children.  Rather than acting promptly on Flynn's series of warnings and encouraging a swift and safe resolution by the State Agencies, Defendant instead removed and stripped Flynn of the Special Assignment monitoring parolee sexual offenders, and harmed her livelihood and professional reputation by prohibiting her from earning substantial overtime payments while working in her area of professional expertise.

       6.  Flynn brings this action to remedy such unlawful conduct and to reclaim her lost salary and benefits, as well as to claim attorneys' fees under the Whistleblower Law.

<u>**The Parties**</u>

       7.  At the time of the acts complained herein, plaintiff Rita Flynn ("Flynn") was

and is a resident of Chester, New York, County of Orange, New York.

8.   Defendant State of New York, Department of Corrections and Community Supervision ("DOCCS"), is an agency of the State of New York that administers the State's prisons, and release of eligible parolees (including sex offenders) into the community at-large.

9.   At the time of the events complained herein, plaintiff Rita Flynn was a Parole Officer ("PO") employed by DOCCS on Special Assignment working with released sex offenders, as a provider of strict and intensive supervision.    Flynn's immediate DOCCS supervisor worked in Peekskill, New York, and Flynn worked out of DOCCS' offices in Orange and Sullivan Counties.  During that same time, she has and continues to reside in the County of Orange, State of New York.  Flynn has been employed by DOCCS since 1979.

**Jurisdiction, Venue, and Tolling**

10. As referred to in the Preliminary Statement, Plaintiff here brings a state law Civil Service "Whistleblower" Law claim. She has met the necessary prerequisites to bring this action.

11. A substantial portion of the actions complained about occurred in Orange and Westchester Counties, State of New York, and venue is appropriate here.  Plaintiff resides in Orange County.

12. Further, plaintiff had no effective recourse through the grievance process, and after she filed a grievance complaining of her demotion, and loss of income,  such was denied by defendant at Stage II.  The Articles of the relevant Contract do not guarantee her a right to arbitration of such claims or to appeal such to arbitration.  She does not fail to exhaust any administrative remedies by filing in this Court, or earlier in federal court, nor end this action: there is no "final and binding arbitration provision" to resolve alleged violations that is available

to Flynn as a matter of right.  As such, Civil Service Law §75-b(3)(c) allows plaintiff to

"commence an action in a court of competent jurisdiction" –that is, this Court.

13. Plaintiff originally filed her claim under Civil Service Law §75-b on April 20,

2017, and in an Amended Complaint of August 17, 2017, brought in federal court with a

constitutional claim under the First Amendment for speaking out on a matter of public concern.

On April 30, 2018, the federal court dismissed the constitutional claim alleging retaliation in

violation of the First Amendment, without ruling in any way on the Civil Service Law claim

before it in the exercise of its supplemental jurisdiction.  As such, there is no *res judicata* or

estoppel effect on such claim, it is properly tolled and is now timely filed with this Court.

### Statement of Facts

### Background and Flynn's Employment

14. Flynn has been employed as a parole officer ("PO") for the State of New York

since 1979.  Earlier in approximately 2000, and most recently from 2007 until October 28, 2016,

she has worked in a more specialized Special Assignment PO capacity as a Sexual Offender

Parole Officer, as part of a team administering strict and intensive supervision of sex offenders

released from prison on parole.  In that role, she has become expert in the area of closely

monitoring sex offenders and protecting of children and citizens in the community from sexual

offenders -- and extremely knowledgeable about daily living, functioning, reviewing behavioral

warning signs, and clinical and safety issues regarding those offenders.

15. Given the immediacy of issues regarding sexual offender parolees and the

need for intensive supervision and treatment, attendance at off-hours residences and treatment

offices facilities, and Flynn's overall skill and diligence in working with clinical treaters and

local law enforcement, Flynn earned substantial overtime as part of her total annual

compensation.  Indeed, by calendar years 2013-2015, Flynn's overtime earnings from substantial

overtime hours worked accrued to be almost as large as her base salary.

16. Indeed, Flynn's willingness and ability to work substantial overtime hours is a

requirement of her responsibilities as a Sexual Offender/SIST Parole Officer ("SOPO") on

Special Assignment, reviewing and enforcing the required regimen of Strict and Intensive

Supervision and Treatment ("SIST") for affected parolees.  (A regimen of specific SIST

conditions is a legal requirement pursuant to Mental Hygiene Law §10.11 (a) (2) prior to and

during the release of sexual offenders, as discussed below).  In fact, most PO's are not interested

nor motivated to do such work, because of the high stress and long hours, despite the substantial

available overtime earnings.

17. Flynn's performance appraisal for the year ending September 30, 2016 – just a

month before her removal from her Special Assignment -- noted that Flynn's performance

"exceeds the performance standards" and emphasized that Flynn was "a team player."

18. At this time, Flynn worked with Director of Sexual Offenders Management

Unit ("SOMU") Mary Kopp-Adams ("Kopp-Adams"), an officer of DOCCS appointed by the

Governor of New York.  At the time, Kopp-Adams had statewide supervision of DOCCS' strict

and intensive supervision cases ("SIST cases") governed by Article 10 of the Mental Hygiene

Law.  She also has primary responsibility for communicating and interacting with New York

State's Office of Mental Health ("OMH") on issues that intersect with parole release, such as

provision of mental health treatment and programming to released parolees.  DOCCS and OMH

are the "State Agencies."

19. Flynn also worked with Regional Director Frank Gemmati ("Gemmati"), who

is DOCCS' Regional Director for the Hudson Valley, and is a regional supervisor for DOCCS'

SOMU, as well as for general parole department supervision and policies in the region, including

release of prisoners to parole in Orange, Sullivan, Dutchess, and Westchester Counties.

20. In early September 2016, Flynn learned from supervisor Kopp-Adams that

DOCCS had proposed a prepratory investigative discharge plan for a John Doe ("Doe") to be

released to the Liberty, New York area.  Flynn made substantial recommendations to investigate

and improve that plan, before submission for approval by a State Court Judge.  Kopp-Adams

assigned Flynn primary responsibility for arranging Doe's release and coordination with OMH –

OMH had primary responsibility for arranging residence and treatment plans and planning for

his release.

21. Indeed, as part of her regular duties in her Special Assignment, Flynn also has

regularly worked with OMH's Division of Forensic Services, which administers SIST.  It was

standard practice for a DOCCS SIST Parole Officer to work with OMH in the planning and

delivery of SIST to those sex-offenders released to the community.

**The Court Order and the Statutory Framework**

22. On September 29, 2016, Hon. Mary M. Farley of the St. Lawrence Supreme

Court ordered DOCCS to plan for the release of Doe by October 20, 2016.  The Court Ordered,

pursuant to M.H.L. §§ 10.03 (r) and 10.11, that Doe "is a sex offender requiring strict and

intensive supervision [SIST]."  In its Conclusions of Law, it held that "Respondent shall be

released to a regimen of SIST" and be subject to supervision requirements contained in the

attached Conditions of Strict and Intensive Supervision and Treatment.

23. In those attached Conditions, the Court ordered and required ninety-four (94)

specific mandatory conditions applied to Doe as conditions of release and supervision pursuant

to M.H.L. §10.11:  Such constituted an Order of the Court subjecting Doe "to the lawful

conditions set by this Court"….and "a regimen of strict and intensive supervision and treatment

pursuant to Article 10 of the N.Y.S. Mental Hygiene Law…."

      24. That statute, M.H.L. § 10.11, is entitled "Regimen of strict and intensive

supervision and treatment."  M.H.L §10.11 (a) (2) states in relevant part that before issuing an

Order containing the conditions of an offender's release, it will consider "submissions by the

respondent and the attorney general concerning the proposed conditions of the regimen of strict

and intensive supervision and treatment."  M.H.L §10.11 (a) (2) goes on to specify:

> The court shall issue an order specifying the conditions of the
> regimen of strict and intensive supervision and treatment, which
> shall include specified supervision requirements and compliance
> with a specified course of treatment.  A written statement of the
> conditions of the regimen of strict and intensive supervision and
> treatment shall be given to the respondent and to his or her
> counsel, any designated service providers or treating professionals,
> the commissioner, the attorney general and the supervising parole
> officer….
>
> The court shall require the department of corrections and
> community supervision to take appropriate actions to implement
> the supervision plan and *assure compliance with the conditions of
> the regimen of strict and intensive supervision* and treatment.

§ 10.11 (c) reads in relevant part: "A person ordered to undergo a regimen of strict and intensive

supervision and treatment pursuant to this article is subject to lawful conditions set by the court

and the department of corrections and community supervision".

      25. In addition, M.H.L. § 10.11 (d) (1) notes circumstances for revoking the

release and intensive supervision:

> A person's regimen of strict and intensive supervision
> and treatment may be revoked if such a person violates a
> condition of strict and intensive supervision. If a parole

officer has reasonable cause to believe that the person has
violated a condition of the regimen of strict and intensive
supervision and treatment or, if there is an oral or written
evaluation or report by a treating professional indicating that
the person may be a dangerous sex offender requiring
confinement…. may take them into custody.

26. In preparation for the Court's implementation of this order, Flynn participated

in meetings and correspondence regarding the proposed SIST plan, even before the Court entered

its Order of September 29, 2016.   That included email correspondence on September 16, 2016

that Flynn sent to DOCCS supervisors and other emails where Flynn detailed significant

weaknesses in the proposed supervision and the lack of a true regimen:

A. Flynn learned from OMH in early September that Sullivan County had
refused to provide mental health, sex offenders or drug treatment
programming for Doe, even though he was a lifelong resident.

B. OMH referred Doe to Catholic Charities in Newburgh for opioid use disorder,
ecstasy and alcohol use disorder, among other issues.  Doe described himself
as a chronic heroin, ecstasy, and crystal meth addict.  Flynn noted that
Catholic Charities did not provide intensive outpatient services.  Further, other
programs had rejected him for treatment.

C. OMH's SIST liaison referred Doe to Options Counseling in Newburgh for sex
offender treatment related to his diagnosis of pedophiliac disorder and
schizoaffective disorder.  Flynn noted her "grave concern" that the treatment
was located in a densely populated residential area, and that Doe would have
to wait for substantial periods to get a ride to travel 60 miles between Sullivan
and Orange Counties.  In her September 16 and October 14 emails, Flynn also
observed that offenders disperse and stroll, or congregate and mill around the
road waiting for medical transport drivers to pick them up after their
appointments.  Flynn informed the OMH SIST liaison that a local school was
in close proximity to the Options location.  In an October 12 follow-up email
to her superiors, Flynn reminded them about the location challenges presented
by the Options Counseling location and noted that several "concerns noted in
the SIST report have yet to be addressed."  This case will require intensive
supervision as Doe presents *as the highest risk offender* I have been assigned
to supervise."

8

D. Further, in her September 23, 2016 draft report to the Court Flynn noted that there "is concern" about Doe attending sex offender counseling at the Options Counseling in Newburgh as "it is located in an area densely populated with families and children."

E. Further, OMH modified the plan for Doe to attend drug treatment in Newburgh, New York, as well as aversive therapy treatment at the same location in Newburgh.  Throughout September, Flynn complained to OMH and her boss that this was a faulty plan, because the entrance to the drug treatment center and the mental health center was in the same building and less than fifty feet away from the Human Resources Administration office that provides social services to children at 280 Broadway in Newburgh, New York.

F. OMH planned to release Doe to a motel in Liberty, Sullivan County, New York.  Flynn notified DOCCS officers that she had visited the XXX motel in Liberty, and learned that Sullivan County was paying the motel's owner to lodge seven sex offenders, and the owner acknowledged that he frequently rented rooms to travelers with children.

G. In her September 23 draft report to the Court, Flynn also sounded the alarm about Doe's willingness to cooperate with strict supervision and wrote, "It is significant to highlight that just about four months ago, on 5/27/16 Doe REFUSED to participate in the Forensic Evaluation that is required for this upcoming SIST hearing."  In a later October 16 email, she noted that Doe "does not appear amenable to supervision as he indicated he will have problems if it is too restrictive."

H. In all, in an email of September 16, 2016, Flynn warned that it "takes team effort and close collaboration with OMH to avoid the pitfalls whereby this case can erupt into another media sensation...."  On October 17, she warned that Doe's "case requires a collaborative effort by all agencies to formulate a cohesive release plan to meet the specific needs Doe presents."  The day before, she had written her supervisors that this "was not a case where all agencies worked in a collaborative manner to develop a cohesive program for Doe that would best……ensure the community at large was protected."

I. Flynn also noted that Doe faced additional problems in being assigned to living in a motel because he is a moderately developmentally disabled individual and managing daily activity skills, shopping, looking, and transportation posed great challenges.  Such added duties and pressures undermined a more comfortable adjustment to living in the community after incarceration.

9

27. Within an hour of Flynn's conversation with an OMH liaison about Doe's treatment plan and discussing many of these concerns, Senior Parole Officer Bill Meyers from DOCCS' Sexual Offender Management Unit, telephoned and told her to "stand down" and allow OMH more time to develop a plan.

**Events in October 2016 and the Request to Delay the Release of Doe**

28. After the Court ordered a specific regimen of intensive supervision on September 29, 2016, Flynn attended a meeting on October 13, 2016 to review the court-ordered regimen and make sure the regimen was indeed sufficiently "strict" and "intensive" as required by the Court's requirements and M.H.L §10.11 (a) (2)'s strictures.

29. In an October 14 email to her superiors regarding that October 13 meeting, Flynn wrote: "I mentioned in my SIST Investigation *grave concerns regarding community safety issues* as the sex offender treatment program at Options Counseling that [Doe] has been referred to is located in a densely populated residential area…."  Further, her email started: "At this time, due to the fact that the above captioned *has no viable release program in place*, we are requesting that the Court consider postponing [Doe's} release" scheduled for next week (*emphasis supplied*)."

30. Further, Flynn also complained verbally and in that same email to Kopp-Adams and her supervisors about this plan, stating that surrounding Doe with other sex-offenders at the Liberty motel location would exacerbate his sexual impulses and desire to repeat sexual behavior to children.

31. She explained that there was "no viable release program in place" as follows:

> He [Doe] is receiving mental health services from RPC, to include monthly injections to address his hyper sexuality.  There are serious community safety issues surrounding the release of the predicate felony

10

> sexual predator of children to the community that has a well-established history of non-compliance with supervision and treatment mandates. There are also ethical issues that arise by releasing this significantly intellectually impaired individual that has faced a lifetime of chronic mental health issues and substance abuser problems without benefit of case management services to help him with the most mundane daily activity skills to include managing finances, shopping for food, cooking meals ect…[sic]

32. These statements, among others, referenced a lack of compliance with M.H.L §10.11 (a) (2)'s strictures and the Court's requiring (through its Order) the "department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment."  Flynn also clearly referred to community safety issues impacting the health and safety of the general public.

33. Further, ten days later, on October 24, 2016, Flynn forwarded the above email to DOCCS' Deputy Commissioner Ana Enright ("Enright"), and noted it as "[r]elevant to complaint" – referring to her complaint about OMH's lack of an integrated plan for Doe's release and a dispute with OMH.  She received no immediate response.  A few days before, Flynn also forwarded the October 14 email to Orange County's Forensic Coordinator for Orange County's Department of Mental Health Meghan Keener ("Keener"), in order to alert her about the specific plans for Doe's planned use of services and release into the Newburgh community. Flynn did so because she believed that Orange County's responsible administrators required that information to best protect their public, and they had not received reasonable notice about the plan.

34. Accordingly, and in light of these issues raised again with her supervisors at

11

DOCCS, OMH, and Orange County Department of Social Services, on or about October 14, 2016, Flynn requested that DOCCS petition the court for a brief postponement of Doe's planned release six days later.  DOCCS did not make such a request.

**Doe's Release and the Complaints About the Dangers He Posed**

35. On October 20, 2016, Flynn supervised Doe's release in Sullivan County. Flynn informed Supervisor Paul Pacheco ("Pacheco") that shortly after his release from St. Lawrence Psychiatric Facility, Doe encountered a crying baby at Sullivan County Department of Social Services.  He admitted to fantasizing about forcibly, sexually abusing the small child. Flynn notified her superiors and also notified Kopp-Adams of Doe's repeated sexual arousal on October 25.

36. Further, on October 24, 2016, Flynn wrote and complained that OMH's top liaison Director had dismissed Flynn's safety concerns about the location of the Newburgh program sites and the proximity to children (during a meeting several days earlier on October 20).  The OMH official reprimanded Flynn for her concerns and explained that Doe wasn't a severe predator that "snatched" children off the street.  Flynn reiterated in the email that Doe was "an extremely high risk candidate to recidivate….and that she was not confident "that the community at large is safe under any circumstances."  Flynn again noted that referrals for Doe's treatment at the 280 Broadway site location in Newburgh

> were problematic, as this is the main county building used in the
> City of Newburgh by the Department of Social Services.  All
> agencies located at this site, primarily cater to the needs of families
> with children.  Of further concern, a local elementary school is
> located less than 500 feet away from this county building, and the
> *local law enforcement agency voiced community safety issues* that
> this high risk out-of-county resident presented.

12

Flynn noted an additional developing concern regarding securing treatment: "The release plan continued to unravel, as OMH discovered that no bus or train service were available to transport Doe the 60 miles he would have to travel to attend programming in Orange County."

37. At the October 20 meeting and in the October 24 email again, Flynn voiced concern about Doe's ability to function at a motel with other sex offenders and without appropriate support. OMH objected that "the subject could manage quite well until his food stamp award was activated, because he was in possession of a $100 in cash and had a $600 check." Given his significant developmental disabilities and the significant stressors and obstacles adversely affecting his functioning, Flynn believed it was inhumane to release him without more guidance and support. OMH's statewide Director of Office of Mental Hygiene's Sex Offender Program, Julie Pasquini, objected and derided Flynn's concerns, stating that Flynn had impeded and interfered with Doe's release.

38. After the October 20 meeting, Flynn received a telephone call from Kopp-Adams, who told Flynn that she had angered OMH in speaking out about the lack of an effective treatment plan for Doe. She also informed Flynn that no one appreciated her expressing concern that the treatment of Doe was "inhumane."

39. Upon information and belief, Flynn on or about October 25, Flynn also Informed Pacheco and Kopp-Adams that Doe had consciously avoided using the more effective ammonia stimulant as part of his aversive therapy, because of its alcohol. Such increased risk behavior by Doe was non-compliant with the Court's order.

40. On October 25, 2016, Flynn also informed Kopp-Adams that the OMH release plan did not contain Doe's signature, where he attests and agrees to actively participate in the treatment that is identified in his plan. That signature is required pursuant to the Mental

13

Hygiene Law §11.1, in order to assure effective and meaningful treatment and protection of the public.

41. Further, Flynn informed Kopp-Adams that there were difficulties implementing Aversive Therapy because of the presence of alcohol in the used stimulant and its effect on monitoring.  Doe needed that stimulant when he became stressed multiple times a day with thoughts of having sex with children and babies he met in the community.

42. On October 25, 2016, the Newburgh Mental Health and Catholic Charities Clinic Director Meg Duffy telephoned Flynn and explained that she had concerns about Doe because of the way he had described following a 13 year-old girl around a Shop-Rite.  Flynn then wrote that the treatment providers "are of the opinion that the subject would greatly benefit, if he was afforded *a more structured and supportive arrangement*."  She requested "assistance" in addressing the problem.

44. After meeting Doe again the next day, the warnings became more dire.  The treating psychiatrist, Dr. Tabassum Khan ("Khan") of the Newburgh Mental Health Clinic, telephoned Flynn and described Doe as a "ticking time bomb" and that it wasn't a matter of "if" but "when" he reoffends.  She also told Flynn that Doe was "euphoric" on his release, and that the current situation was "very dangerous."  She asked Flynn's assistance and also mentioned that she had heard that Flynn was an "excellent" PO.

45. That day, Flynn drove to the Peekskill Office and spoke with Pacheco, and told him about Khan's statement.  Pacheco countered that he would speak with Albany, but that Flynn should *not put in writing* Khan's concern that Doe was a "ticking time bomb" or very dangerous.  Pacheco told Flynn to have Khan write a letter with her concerns.

46. Flynn nevertheless precisely did put those "time bomb" concerns in writing

14

that same day (Oct. 26), in an email to Pacheco, Gemmati, and other DOCCS officials in Albany.

Notably, she again included Enright, whom was not part of Flynn's normal reporting protocol.

Flynn reported that Khan "evaluated Doe as a *high risk to sexually reoffend* at this time" and

noted that he is very "hyper-sexualized" and stimulated by violence.   Flynn also reported an

incident Khan had mentioned where Doe had followed a 13-year-old girl around a Shop-Rite

store, that he was fixated on her because she had a "beautiful ass," and that his aversive therapy

protocol had not helped him.  And Flynn reported Khan's conclusion that the current situation

was "very dangerous."

47. Further, Flynn reported Khan's view that Doe had "actually been set up

to fail."  Khan's view was that Doe "does *not currently have an adequate community release

plan* in place that *meets his needs on any level*."  By contrast, Flynn reported that Khan had told

her that it was "'critical'" that Doe be "afforded a *higher level* of supportive housing and more

intensive programming."  Flynn reported Khan's view that the case "require[ed] the highest level

of intensive supervision and treatment."  Thus, Flynn again reported a failure to comply with

M.H.L. §10.11 (a) (2) and its strictures on intensive supervision, as well as grave effects on

public safety, and did so after being instructed not to do so in writing.

48. Indeed, a few days later on October 28, Khan herself wrote and confirmed to

DOCCS that Doe was living in a motel "with insufficient residential and group services for his

continuous sexual urges.  He has very little structure during the day."

49. Further, Flynn reported on the afternoon of October 28, that the treaters at

Newburgh Mental Health Clinic were alarmed when they learned of "more descriptive and

disturbing details" that Doe was having that morning about a crying 4-year old.  Khan told Flynn

that Doe was "too dangerous" to remain in the community, and that she would take immediate

action to further alert DOCCS.  A few days later Khan reiterated in writing Doe's sexual

fantasies in arousal, and pursuits of young girls.   Khan also reported to DOCCS Doe's confessed thoughts of putting his hands on the crying child's mouth, raping her, and giving her "something to cry about."

**Defendant's Retaliatory Removal of Flynn from her Special Assignment Position**

50.     Flynn's complaints about safety regarding the place of treatment, residence, and travel, as referred to **in ¶¶ 20, 26, and 29-47, r**eferred to violations of the Mental Hygiene Law, as well as of Judge Farley's Order.  Specifically, Mental Hygiene Law Section refers to the requirement for "a regimen of strict and intensive supervision" of a designated sexual offender: Everything about the treatment, residence, travel, aversive therapy implementation and proximity to young children violated that provision, and Flynn over and over addressed those violations.

51. In addition, Doe also violated the Court's Order: that Order required Doe's participation in the treatment, proper use of aversive therapy, a regimen of strict and intensive supervision ("SIST") and monitoring of Doe's functioning, in order to assure the public's safety.

52. The complaints Flynn made about residence, places of treatment, and travel all presented serious dangers to the public safety and well-being of minors (especially young girls) residing in Newburgh and Liberty, New York.   Her complaints by email on October 24, 25, and 26, 2016 were particularly sharp regarding the complete lack of required SIST.

53. Instead of adhering and considering Flynn's complaining about essential safety, court-ordered, and statutory requirements affecting the public's safety, DOCCS instead punished Flynn.  On the early morning of October 28, 2016, Peekskill Bureau Chief Pacheco telephoned and told Flynn to appear for a 9 a.m. meeting with him only a few hours later.  There, Gemmati, in the presence of Pacheco and Supervisor Jenny Armstrong, announced that DOCCS

was relieving Flynn from her Special Assignment in the Sex Offenders' Unit, and that she was to have no further responsibility for sex offenders as of that moment.  Gemmati handed her a memo titled "Transfer" stating she had been "*released* from your Special Assignment case load" and was returning to a "non-specialized caseload in Peekskill" effective immediately.  Gemmati also directed that going forward, she was no longer to work with sex offenders in any capacity.

54. When Flynn asked the reason for her removal, Gemmati only explained that she had not "maintained a collaborative relationship" with SIST team members, and elaborated: "you don't play nicely in the sandbox".  Flynn was shocked and left.

55. Later that same day, Khan telephoned Flynn and told her that Doe had again confessed to her about currently wanting to put his hands over a child's mouth, and then assault her: Khan believed that Doe was "too dangerous" to be in the community and at imminent risk of engaging in sexual conduct with a child and violating his parole.

56. Flynn was no longer assigned to the Sex Offenders' Unit when Khan reported such to her.  Indeed, Kopp-Adams informed Khan that Flynn could not respond to any more treatment issues, because Flynn was now "confined" to her office.  Pacheco nevertheless asked Flynn to draft a memo regarding the risks Doe posed, and the violations of his parole that she had observed.  She did so, preparing a draft on Sunday, October 30, 2016 for submission.

57. On information and belief, only several days later on November 1, 2016, DOCCS, through Kopp-Adams and other DOCCS officers, submitted a much edited and altered report to Judge Farley reporting the incarceration of Doe due to his hyper-sexuality and the danger he posed to the community.  However, DOCCS did not follow the accepted process requiring Flynn to review and swear to the statement's accuracy in an Affidavit submitted to the Office of the Attorney General: instead, DOCCS submitted its own edited version signed by

17

others.  (Such was further supported by information submitted by Drs. Khan and Mayer documenting Doe's repeated fantasies about raping the 13-year-old with a "beautiful ass" that he met at Shop-Rite and other girls he met in previous days).

58. Flynn's draft memo resulted in a substantially edited and limited final report submitted by DOCCS administrators (such as Kopp-Adams and a PO co-worker) to the Judge Farley of the Supreme Court regarding Doe's violations of parole and the potential danger he posed to the public.  On or about November 1, 2016, DOCCS reported the incarceration of Doe.

59. Much of the draft (but not the final) incident report memo to the Court referred to Doe's violations of specific rules entered by the Court as conditions of Strict Intensive Supervision for Doe's release.  For example, Doe violated rule #13 of the Court Order in reporting being aroused in response to a "baby crying" and the resultant excitement and thoughts of violence jeopardized and threatened the safety and well-being of children present at the Sullivan County DSS building in Liberty.  Doe violated rule #67 of the Order in refusing to use the ammonia capsules and most effective Aversive therapy, when aroused.  Doe's recounting of similar arousal and failure to use the most effective Aversive therapy when he encountered and fantasized about a teenage girl at Shop-Rite violated these same rules in the Court Order.

60. Flynn's verbal and written warnings between mid-September and October 26, 2016 had also warned her supervisors about other violations of the Court Order's explicit conditions for strict supervision, such as complying with psychiatric exams (#3), not residing with or having contact with other sex offenders (#4), and having sustained interaction with a young girl at Shop-Rite who he described as having a "beautiful ass."  (#37).  Flynn had alerted her superiors about these issue and violations of the Court's Order, and the danger posed to the general public.

**A-104**

61. Ultimately, however, DOCCS omitted many of these charges from the final Incident Report submitted to the Court.  In fact, DOCCS engaged in a course of action to ignore most of the violations previously raised by Flynn – part of the group of concerns Flynn repeated had raised that motivated DOCCS' removal of her from the Special Assignment position.

62. In essence, DOCCS's final report excised completely Flynn's involvement in the case before October 28, 2016 – deleting reference to any violations that took place while she was the responsible PO and then removing her and another PO as the submitting authors. DOCCS chose to "delete" Flynn completely from the true and full events – all at the risk of undermining the factual support necessary to sustain Doe's incarceration.

63. Further, upon information and belief, the removal of these significant violations from Flynn's draft resulted in the Court's eventual decision to release Doe back to the community on approximately April 3, 2017: DOCCS could not substantially support Doe's incarceration once it chose limited, watered-down, and edited charges and violations.

64. Thus, DOCCS persisted in a course of conduct that may fundamentally harm the public's safety – all to "double down" on its course of ignoring and minimizing the nature of Flynn's complaints and her identification of violations, after its retaliation against Flynn.

65. None of that, however, has stopped Flynn from attempting to preserve her career and livelihood.  On February 14, 2017, Flynn filed a Stage I grievance, challenging her removal from the SIST Special Assignment and the resulting loss of overtime income.  She also complained later in 2017 about being precluded from any temporary assignments to transport sex-offenders when that work becomes available, as a means of earning some additional overtime.

19

66. On June 27, 2017, defendant issued its "agency level decision" denying plaintiff's Step II grievance challenging her loss of the Special Assignment, following a hearing conducted on June 9, 2017.  In its written denial, defendant's Labor Relations representative ratified defendant's Step I finding that there was "no contractual right to a specific case load" and that Flynn could be denied a SIST position and overtime in the "discretion of the appointing authority." The representative concluded that "Management acted appropriately" and there were no violations of the Articles of the agreement.

67. Further, the original grievance form states that a denial at Step II can only be appealed to Step III or to arbitration at Step IV by the President of the PEF bargaining group, clearly denying Flynn any individual right to arbitration.  Flynn was not required to submit a grievance as an exclusive remedy, since under §75-b(3)(b), nor could such end her right to bring an action here since Flynn is not "subject to a collectively negotiated agreement which contains….. a *final and binding arbitration* provision…." to "resolve" violations.

68. As such, Flynn followed the grievance process in challenging the denial of overtime, and her removal from the SIST position.  Flynn had no right to a binding resolution through an arbitration proceeding, and she started and exhausted her administrative remedies through the collective bargaining process.  She retains only rights under the Civil Service Law to challenge the unlawful denial of the SIST position and the overtime wages that always came from it.  She did so by filing her original complaint invoking, in part, the Civil Service Law, in federal court on April 20, 2017, and an Amended Complaint on August 18, 2017.

69. In addition, during 2017 and 2018, defendant has continued its acts of retaliation against Flynn, in denying her employment opportunities, promotions, and an improvement of her livelihood.  In or about January 2018, Flynn applied for a PRS position in

20

Manhattan, and she scored a 95 on the eligibility test. Its compensation is substantially higher than that plaintiff receives as a PO.  Defendant nevertheless chose a lesser qualified individual for the position, who had received a substantially lower test score.  Flynn was highly qualified for such position, as she had received one of the highest scores on the qualifying exam. Nevertheless, defendant denied her application, following its interview of plaintiff in a far-away and inappropriate location.  Earlier, in or about October 26, 2017, Flynn had applied for a sex offender position after her former partner, Jose Pabon, left that position to take a training position.  Defendant refused to even grant her an interview for the position, and on December 4, 2017, she grieved that decision to deny her an interview and the position, affording work that she loved and that compensated her at a substantially higher rate than her PO position.  Defendant denied that grievance, also stating that such was non-contractual, and could not be appealed by her to Stage III.

70. As described above**,** Flynn had complained of numerous deficiencies in DOCCS' treatment plan to Kopp-Adams, Gemmati and other DOCCS officers, and violations of the requirement under § 10.13(a)(2) that the Court will "require the department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment **.....**" DOCCS and OMH had failed to take "appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision…." and Flynn had complained to her supervisors about these deficiencies. Similarly, §10.11(c) specifies that a person "ordered to undergo a regimen of strict and intensive supervision and treatment….is subject to lawful conditions set by the court and the department of corrections and community supervision."  Flynn identified violations by Doe of the SIST

21

conditions – as mandated by statute – and of the specifics of the Court's "specified supervision requirements and compliance with a  specified course of treatment." She thus complained about violations of state law and a court order threatening and posing a hazard to the health and safety of the public-at-large in Orange and Sullivan counties

**Summary of Retaliatory Action and the Threat to Public Safety**

71. DOCCS', Kopp-Adams', and Gemmati's action in removing Flynn from her Special Assignment working with sex-offenders has harmed the health and safety of the public in the surrounding counties, including Orange, Sullivan, and Duchess Counties.  Indeed, Daniel Cameron, the Chief of Police for the City of Newburgh, wrote Pacheco and commended Flynn's work with "our sex offender population."  He explained the "significant assistance" that Flynn had provided in updating the City's procedures in consultation with Flynn and DOCCS, and explained that to "succeed we need to successfully collaborate together.  I feel that the removal of Officer Flynn has directly affected that collaborative effort." He asked for an opportunity to further express his "concern over the personnel change."

72. Similarly, treaters of sexual offenders in the community wrote and praised Flynn's input and efforts in participating in clinical functions and development of treatment plans.  Maria Messerschmitt of Cornerstone Family Healthcare in Newburgh stated that Flynn's "input is very valuable to our staff."  She expressed her "great disappointment" that Flynn was no longer overseeing the sex-offender population, and noted that Flynn "has always made herself available to our team no matter what time of the day it was."  She complimented Flynn's concern and effort for her clients and summarized: "Honestly, I don't think Rita ever slept a full night worrying about the needs of her clients."

73. Defendant's entire course of conduct -- their instructions to Flynn in

22

September to "stand down" when she expressed concern about the inadequacy of Doe's treatment plan, the telephone call she received from Kopp-Adams after October 20 stating that Flynn had angered OMH and shouldn't have spoken about the treatment plan being "inhumane", their warning that Flynn should not put information about Doe's imminent danger in writing, and their ultimate conclusion that she didn't "play nice in the sandbox" -- demonstrates their concerted effort to silence and stop Flynn:  every step of the way, Defendant sought to silence Flynn's advocacy about imminent safety concerns and treatment deficiencies.  In doing so, and in then removing her from the Special Assignment, Defendant retaliated against Flynn for complaining about breaking laws and regulations integral to protecting the public's safety, as well as the safety and civil rights of the released sex offender.

74. Specifically, when Flynn reported in writing (over DOCCS' objection and instruction) that OMH and DOCCS must afford a higher level of supportive housing and intensive programming, when Flynn reported that the proposed treatment locations and local schools, when she reported about the dangers of residing without supervision in the Liberty motel, when she discussed the risks of travel and roaming the streets of Newburgh, Flynn complained of violations of §10.11 and of the Court's September 29, 2016 Order.  The inadequacy of those services and their failure in detail and operation to comply with the strict and intensive supervision necessary for the public's safety – as raised repeatedly by Flynn -- violated the Court's Order and the Mental Hygiene Law.

75. Further, Flynn reported violations of §10.11 when she reported the inability and unwillingness of Doe to use the most effective tools of Aversive Therapy.  She reported Doe's failure even to agree in writing to a course of cooperative treatment conduct, as required by the Court's Order.  Most essentially, Flynn reported his repeated fantasies about

engaging in sexual contact with young children and the repeated triggers and impulses he experienced when seeing or thinking of young children.

76.     Flynn continued to endure numerous episodes of continued and ongoing retaliation in 2018 and the start of 2019, and a brief summary of the more egregious continued harassment and creation of a hostile environment are detailed below.  Now the additional retaliation concerned further limits on her income and ability or entitlement to overtime at many junctures, but in in late 2018 intensified further as ongoing retaliatory harassment and a hostile environment.  Defendant rather has focused on creating a calculated and continuing pervasive hostile environment targeting Flynn for newly manufactured, harsh and ridiculous work expectations, designed to make her life miserable and intolerable at work.  Such retaliatory environment is continuing and designed to make Flynn "take" her retirement from DOCCS and to effectuate a "constructive" discharge of Flynn's employment.  Such would also cause a resulting loss in income and earnings.

77.     For example, plaintiff's direct supervisor Pacheco has continued throughout 2017 and 2018 to refuse to allow plaintiff to work any overtime hours, whenever such may become available while in the middle of exercising her duties with a parolee.  Then, when Flynn participated in an approved special operations in serving a "no-knock" warrant, with approval to work more than six overtime hours on October 19, 2018, Pacheco repeatedly reprimanded Flynn and disciplined her in the fall of 2018 for having submitted such hours, accusing her of approximately submitting such overtime hours and formally disciplining her, resulting in a grievance.  Clearly, under applicable labor laws and the CBA, plaintiff had every right to submit and be paid for actual overtime hours worked that had been approved and authorized, as opposed to punished and retaliated against for having requested that she be paid

for special operations work authorized and performed.  But that is not good enough for Pacheco

nor defendant's retaliatory plans and in its effort to perpetuate the hostile environment, it instead

disciplined Flynn.  In doing so, defendant transparently treated Flynn differently than other

Parole officers who are forced by events to work overtime hours and then claim rightful pay for

work; defendant, through Pacheco and other officers, continues to act as part of its pattern of

creating a clearly retaliatory environment, niggling about the appropriateness of overtime

claimed in order to create and inflame retaliatory conflict and discipline.

79. 78. Defendant has escalated its creation of an ongoing retaliatory environment

in myriad ways:  in the fall of 2018 and since then, Pacheco has continued the retaliatory attacks

on plaintiff through disciplining her for failing to write and submit reports while she was on

medical leave for an eye condition, and generally criticizing and harassing her for not submitting

paperwork and reports properly, and on what Pacheco deemed a timely basis.  Such criticisms

were only harassing and pretextual, as even while Pacheco repeatedly disciplined Flynn and

referred her for investigation, especially when she was on medical leave, and in a complete and

senseless departure in how Pacheco treated other staff members regarding deadlines and

accomplishments:  Pacheco and DOCCS did not treat other parole officers who had not made

complaints about safety and lack of due care to prevent molestation of children in a way that

even  remotely resembles the way Pacheco has attacked and criticized Flynn.

79. For Flynn, especially during 2018, Pacheco has manufactured

performance issues, criticized her every word with a client while other Parole officers engage in

grave mistakes and misconduct, and then expected Flynn to submit written casework and interact

with clients while on medical and personal leave.   Pacheco also permitted a male co-worker to

verbally abuse Flynn when he disagreed with her, without either stopping or assessing the

25

intimidating actions and behavior of the male officer.  Instead, Flynn filed a grievance about the

treatment, and Pacheco exploded at her.  During this period, Pacheco also routinely criticized

Flynn and issued written reprimands to Flynn her for being derelict in submitting her timecard

information, her expense reports, and written reports on clients – all while encompassing periods

she had an eye surgery and was on medical and personal leave for almost two months between

December 2018 up until parts of February 2018.  Pacheco has thus treated Flynn in a much

harsher manner and with retaliatory harassment, subjected Flynn to manufactured performance

expectations, unreasonable and ridiculous expectations while she was on medical and other

leave, and generally engaged in a campaign to make Flynn's life miserable and drive her out of

employment so that she would take "retirement" from her employment.

80.     Flynn will not embrace a forced retirement pursuant to Pacheco's games

and manufactured written discipline.  This she cannot and will not do, as DOCCS cannot be

permitted to drive Flynn out through its well-worn campaign and organization of retaliatory

harassment.  Defendant's efforts to inflict pain on Flynn with discipline of "a hundred cuts" only

evidence its comprehensive retaliatory motive and efforts.

81.     Further, in late 2018 and after, defendant engaged in standing aside and

watching more significant real physical blows to Flynn's head and knees, while initially taking

no action against the attacking parolee or registering an investigation to protect its parole officer

- plaintiff Rita Flynn.  Defendant's animus is obvious, outrageous in even permitting physical

violence, and it must cease its egregious conduct.

82.     In late November 2018, a parolee being physically detained with an ankle

shackle and handcuffs shot her knee into Flynn's head while Flynn attempted to secure the

shackle, throwing Flynn's head back and causing injury from the shock of contact to Flynn's

**A-112**

upper back area.  First, Flynn's immediate Supervisor Lynn Johnson-Richardson ("Richardson") refused to even report the physical attack on a Parole Officer who served under her command, as is required under long-standing practice and protection of staff members from violence from parolees.  Rather, defendant, Richardson, and Pacheco were completely satisfied to ignore and essentially allow Flynn to be injured by a Parolee *with no punishment or even record made whatsoever against the Parolee for assaulting an officer while that officer conducted her job duties for the State.  Hurt with a head injury, she had to take care of her own transportation to the hospital.*

83.     This blatant attempt to first cover-up and ignore a physical attack on Flynn, a parole officer, by a Parolee in the process of being "detained" or "apprehended" for re-arrest is outrageous in its disregard for Flynn, her physical protection, and the typical process and precedent for the essential protection of Parole officers.  If parole officers are not physically protected from physical harm, Pacheco and defendant know that the very work cannot be performed and DOCCS cannot function.  They know that protection of officers is essential to the very functioning of DOCCS and parole work.

84.     Nevertheless, Pacheco and Richardson and defendant together did not even care that plaintiff had been assaulted and needed to visit the Hospital to assure her safety and functioning.  They did not begin to prepare a report of the attack or launch an investigation, until many days later at Flynn's request when she saw there was no plan to investigate nor discipline the parolee who attacked her**.**  In fact, Richardson, the supervisor and Commanding Officer then on duty, actually instructed another officer to not even write up the violent incident, departing radically from practice to immediately report such offenders and memorialize violent attacks on officers.  Further, no fellow officer  - let alone her Commanding Officer Richardson –

27

drove her to the emergency room; Flynn had to drive herself there, even though injured and hurt in the head.

85. Obviously, the typical practice or procedure after any injury or attack is that someone will drive the injured officer to the hospital; nevertheless, Richardson radically departed from mandated procedure in forcing Flynn to drive herself to the hospital, even though injured. Richardson only showed up at the hospital to do a cosmetic "check-in" on Flynn's health and concussion status.

86. Later, when it became clear that defendant had to respond to an incident report and written information submitted by plaintiff, Pacheco and Richardson in December 2018 shifted to harassing Flynn about the speed of her own descriptions and report details, after she had already submitted one written version of the events. Instead, Flynn's supervisors now insisted that she re-submit more and identical information in report form, even while Flynn was not working during a period in December and January when she was on a medical leave for eye surgery, or on personal leave.

87. Whether turning a blind eye to actual physical violence and allowing such on Flynn by parolees without report or consequence, or then deriding and pressuring Flynn for constant submission of time records, updated and revised incident reports, work reports, etc, -- all during periods of time when she was on leave for surgery or taking personal days off – defendant has escalated its program and "refined" its practice of retaliatory harassment, operating primarily through Pacheco and Richardson.

88. Enough. Defendant will not prevail in forcing or compelling Flynn to lose more income and "take" a retirement from DOCCS, while simultaneously severely reducing her livelihood. Defendant, Pacheco, Richardson should be enjoined by this Court from taking

28

any such further action and discipline while plaintiff has returned from her surgery and leave

period in early April 2019. Escalated and supposedly more "precise" retaliatory harassment

violates the Civil Service Law and should be enjoined and stopped by this Court.

89.     Nor may defendant be permitted to engage in a widespread pattern of

retaliatory harassment, manufacturing of job duties, and pretextual criticisms of her submissions

while on medical leave in order to try to force Flynn's resignation. Defendant should be

prohibited from engaging in a pattern of behavior designed to constructively discharge Flynn.

90. Further, defendant has now been subjected to an investigation by the

Office of State Investigations, in reviewing its treatment of Flynn and whether such complies

with the State's internal policies and appropriate practices on the payment of overtime hours, the

internal investigation and review of violence against a parole officer (Flynn), and its treatment in

repeatedly disciplining Flynn for manufactured infractions, including not completing her work

while she was on medical and personal leave at the end of 2018 and the first six to seven weeks

of 2019. Further, Pacheco has even seized on the OSI investigation itself, accusing Flynn

erroneously of using "clocked-in" time to prepare and submit materials and responses to the OSI

as part of its investigation. This she has not done, and defendant grasps at straws to now create

some new level of manufactured criticism and harassment of Flynn, clutching for new

allegations that she is not performing her job duties.

91. Defendant's conduct in removing Flynn from the SIST position in October

2016, in refusing her requests to apply for that vacancy position in October 2017, and in denying

her request for the PRS position in January 2018, and the ongoing harassment regarding Flynn's

submission of paperwork documentation, overtime hours, and the utter failure to report violence

against Flynn  in any report, are all continuing acts of retaliation and retaliatory harassment in violation of the Civil Service Law.

WHEREFORE, plaintiff RITA FLYNN avers the following causes of action against the Defendant, and requests the foregoing relief, as follows:

## CAUSE OF ACTION

### (Civil Service Law §75-b against defendant DOCCS)

92.  Plaintiff repeats and realleges paragraphs 1 through 91 of this Complaint as if set forth herein.

93. Flynn engaged in a course of conduct of continued complaints about the failure to enforce and implement conditions of the regimen of strict and intensive supervision as required under §10.11(a)(2).

94. These complaints by Flynn about the failure to comply with the Mental Hygiene Law directly related to protecting the public's health and safety – since, as specified in the Court's Order and by treatment professionals, without the appropriate conditions and implementation of supervision, Doe posed a serious risk to the health and safety of children. Further, as specified by Flynn, Defendant's actions and lack of serious treatment and implementation posed a serious risk of harm to Doe himself.  As Flynn quoted Khan two days before Defendant demoted Flynn, Doe was a "ticking time bomb" that could explode and seriously harm members of the public:  Flynn spoke out repeatedly to advocate preemptive action to avoid such an explosion.

95. In the alternative and in light of all of the safety issues posed and raised by Flynn, even if her complaints did not constitute a clear violation of §10.11(a)(2), Flynn had a good faith belief that DOCCS had violated the SIST statute – which is the only showing required

by §725(b).

96. After several weeks of Flynn's complaints to her supervisors and DOCCS, and only days after her emails of October 24, 25, and 26, 2016, Defendant declared that she did not "play nice" in her complaints about the lack of treatment, and the serious potential harm on the public's health and safety.  Accordingly, Defendant demoted Flynn and stripped her of her Special Assignment position and overtime compensation after she complained about lack of compliance with the law, and about the significant risk of harm to the public.

97. In retaliating against Flynn for her complaints about the potential for serious harm to the health and safety of the public from Doe if he was permitted to roam at large and be present near an elementary school, defendant DOCCS violated Labor Law §75-b (the "Civil Service Law").

98. As a result of Defendant's actions, Flynn is suffering financial hardship and a loss of substantial back pay earnings, from the substantial overtime she has typically earned in her Special Assignment position.  Further, she requests injunctive and declaratory relief from defendant DOCCS, requiring that such defendant place Flynn back in her Special Assignment position, in the Sexual Offenders' Unit, where she has worked most of her career in the last fifteen years, and grant her the typical overtime pay that had been part and parcel of that position for many years.  By reason of the foregoing, defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, injunctive relief to stop all such harassment from continuing to date and beyond, and to attorneys' fees.

99. Defendant has also created a pattern of harassing behavior by Pacheco and Richardson, including turning a blind eye to violence against plaintiff, manufacturing complaints

about submission of overtime, reports during her medical and personal leaves, and routinely

retaliating against her and treating her far more harshly than other parole officers.  Suc h

includes criticizing her every submission, timecards, and use of language, in an attempt to make

her very uncomfortable and "convince" Flynn to abandon her more than twenty-five year career

and employment by resigning.

100. This she will not do and Flynn will not cooperate with defendant's effort to

constructively discharge Flynn from employment – even where defendant has done plenty to

make the working conditions and daily harassments intolerable.

101.  Defendant's unlawful retaliation, the loss of her Special Assignment

position and constant day-to-day harassment about her performance in the midst of a physical

attack by a parolee, has caused Flynn to suffer severe emotional harm.  Such has greatly

aggravated her anxiety and worry now as to her very physical safety, her livelihood and support

and professional standing in the law enforcement community.

102.      By reason of the foregoing, Defendant is liable to Flynn for damages,

including compensatory damages, costs and disbursements, the exact amount to be proven at

trial, and attorneys' fees. Plaintiff repeats and realleges paragraphs 1through 90 of this

Complaint as if set forth herein.

**WHEREFORE**, Plaintiff, Rita Flynn, demands judgment against Defendant

as follows:

> (a)      on the Cause of Action, an award of statutory damages, lost
> backpay, the exact amount to be proven at trial against Defendant;
> including, but not limited to, attorneys' fees, costs and
> disbursements incurred in connection with this action; and further
> injunctive relief as the Court may deem just, proper, and
> equitable, including reinstatement to her Special Assignment in
> the Sexual Offenders' Unit and the reinstatement of overtime
> compensation that comes with that position.  Such request also

includes, but is not limited to, an Order prohibiting defendant
from any further retaliation against Flynn in her performance of
her job duties, or expectations of submitting paperwork while on
leave periods for surgery or personal reasons,  or in standing
silent while she sustains physical violence at work from Parolees,
promotion to positions she would have received absent
defendant's retaliation.  Defendant should be prohibited from
further actions designed to create intolerable conditions through
its retaliatory harassment and prohibited from engaging in a
retaliatory pattern of severe harassment designed to constructively
discharge Flynn from her employment.

Dated: Goshen, New York
       April 29, 2019

FOULKE LAW FIRM

By:  *s/Michael Ranis, Esq.*
      Michael Ranis, Esq.
Attorneys for Plaintiff
55 Main Street, 2nd Floor
Goshen, NY  10924
845-294-4308 (MBR #3757)

33

**A-119**

STATE OF NEW YORK
AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Pursuant<br>To Article 33 of the PEF-State Contract Between<br><br>RITA FLYNN,<br><br>                     Grievant,<br><br>    -and-<br><br>NEW YORK STATE DEPARTMENT<br>OF CORRECTIONS AND COMMUNITY<br>SUPERVISION,<br><br>                     Employer. | STIPULATION OF<br>SETTLEMENT<br><br><br>AAA Case No.<br>01-19-0002-5971 |

This is an agreement by and between Rita Flynn (hereinafter "Grievant") and the New York State Department of Corrections and Community Supervision (hereinafter "DOCCS").

WHEREAS, disciplinary charges were brought against Grievant pursuant to Article 33 of the PEF-State Contract ("Contract") by Notice of Discipline ("NOD") dated August 5, 2019 seeking Grievant's termination in connection with those charges; and

WHEREAS, Grievant was placed on suspension without pay by DOCCS on July 31, 2019 in connection with the charges contained within the NOD; and

WHEREAS, Grievant utilized accruals to remain on the payroll pursuant to Article 33 of the Contract during a portion of her suspension without pay; and

WHEREAS, Grievant duly filed a disciplinary grievance pursuant to Article 33 of the Contract contesting the NOD and suspension without pay; and

WHEREAS, the parties have entered into settlement negotiations wherein Grievant was represented by counsel; and

WHEREAS, the parties wish to avoid future hearings, have had all of the terms and conditions of this Stipulation clearly explained, and now freely consent to enter into this

**A-120**

*[handwritten: assignment will take a]*

Stipulation, such consent not having been induced by fraud, duress or any other undue

influence; and

WHEREAS, no party to this proceeding is an infant or an incompetent person for whom

a committee has been appointed, and no one not a party has an interest in this matter;

NOW, in consideration of the mutual undertakings and promises contained in this

Stipulation, solely by way of compromise, and in full settlement of the NOD, the parties agree

as follows:

1.      Grievant shall be suspended without pay from July 31, 2019 until April 10, 2020

unless she retires before April 10, 2020, in which case the date of her suspension shall be

through the date of her retirement (whichever comes earlier), less the one day of administrative

leave referenced below.  Any utilization of accruals by the Grievant to remain on the payroll

shall be allowed and considered as part of the suspension.  The Employer shall reinstate the

Grievant to Administrative leave with pay for one working day that is to be determined at a

later time, but shall occur before April 10, 2020, and Grievant shall receive all pay, benefits and

accruals due and owing as a tenured State employee for the one-day period.

2.      The Employer shall pay the Grievant two-weeks of pay as soon as

administratively feasible after the execution of this document, less any normal and lawful

deductions.

3.      Grievant shall be allowed on the date she is placed on administrative leave to

return to her office to collect her belongings and to return any DOCCS property still in her

possession.

4.      Grievant shall retire from her position as a Parole Officer with DOCCS no later

than April 10, 2020.  Should the grievant fail to file her retirement paperwork, she shall be

deemed to have resigned her position effective beginning of business on April 11, 2020.

*[handwritten note at top]* Not upsetting Ours → adjournment

*[handwritten note in left margin]* inadmissible you any award — not advisable any subsequent matters — I'm so upset by outcome

*[handwritten notes in right margin]* original defense Ore

No such Ora award

5.  Grievant acknowledges she has had the opportunity to challenge the disciplinary charges in arbitration hearings pursuant to Article 33 of the Contract, and that by entering into this Stipulation, he is freely and voluntarily waiving that right.

6.  The parties agree that this Stipulation represents the full, final, and complete resolution of the NOD and the allegations associated with the NOD. Neither the charges contained in the NOD nor the disciplinary grievance may be reinstated for any reason.

7.  No aspect of this Stipulation may be used as precedent for, or introduced at, any current or future disciplinary actions taken against other DOCCS employees.

8.  The parties agree that this Stipulation is solely by way of compromise to avoid further hearings and, as such, ~~Grievant does not admit guilt to the charges, nor~~ shall this be construed as an inability by DOCCS to prove their case.

9.  The parties shall take such other and further steps as are necessary to implement the terms of this Stipulation.

10. For the purposes of this Stipulation, scanned or facsimile signatures will be deemed to have the same force and effect as original signatures.

11. This Stipulation may be executed in one or more counterparts, which together shall constitute a single agreement. This Stipulation may be executed and transmitted electronically to any other listed party and shall be deemed to be, and utilized in all respects as, an original executed document.

DATED: February __, 2020

_____
RITA FLYNN
Grievant

RENEE L. DELGADO, ESQ.
Attorney for the Grievant

DATED: February __, 2020          By: _____

asking for an adjournment [illegible] to counsel

#2 arrived today

Issues [illegible] about [illegible]

& possible [illegible]

NATHANIEL J. NICHOLS, ESQ.
Of Counsel

NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND
COMMUNITY SUPERVISION

DATED: February __, 2020

By: ______________________________
JOHN A. SHIPLEY
Director of Labor Relations

administrative leave

3. informed me going forward [illegible] 40 [illegible]

4. gave [illegible] & need to consult [illegible] administrative leave [illegible]

[illegible]

5 put me in position where I can not answer questions pertaining to my suspension w/ possibility of criminal charges [illegible]

[illegible]

**A-123**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

RITA FLYNN,                                              **No. 7:20-cv-09381 (PMH)**

                                        Plaintiff,

           -against-

MATTHEW BLOOMINGDALE, in                      **NOTICE OF APPEAL**
his individual and official capacities, and
JOHN A. SHIPLEY, in his individual and
official capacities, DONALD OLIVER, in
his individual and official capacities,
all officers of the NEW YORK STATE
DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION,

                                        Defendants.
_____

**NOTICE OF APPEAL**

       PLAINTIFF RITA FLYNN hereby appeals to the United States Court of Appeals for the

Second Circuit from the United States District Court's Order of Dismissal and Judgment of June

8, 2022 in favor of Defendants Matthew Bloomingdale, John A. Shipley, and Donald Oliver

Dated: July 5, 2022
       Goshen, New York

                                        Respectfully submitted,

                                        Michael Ranis, Esq. (#3757)

                                        *s/Michael Ranis_____*

                                        ATTORNEY AT LAW

                                        Atty. for PLAINTIFF RITA FLYNN

                                        Co-Lab Goshen
                                        45 St. John Street
                                        Goshen, NY  10924
                                        mranislaw@gmail.com
                                        (914) 584-6445