# 22-1431

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———— ◆◆ ————

RITA FLYNN,

*Plaintiff-Appellant,*

—against—

MICHAEL BLOOMINGDALE, individually and in his official capacity for the New York State Department of Corrections and Community Supervision, JOHN A. SHIPLEY, individually and in his official capacity for the New York State Department of Corrections and Community Supervision, DANIEL OLIVER, individually and in his official capacity for the New York State Department of Corrections and Community Supervision,

*Defendants-Appellees.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

MICHAEL B. RANIS
MICHAEL B. RANIS, ATTORNEY AT LAW
Co-Lab Goshen, 45 Saint John Street
Goshen, New York 10924
(914) 584-6445

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES .................................................... iii

JURISDICTION STATEMENT ................................................ 1

QUESTIONS PRESENTED.................................................... 1

FACTS AND A STATEMENT OF CASE ALLEGED ....................... 2

    Two Lawsuits and the Speech ............................................... 2

    The Outcomes and Status of the Two Lawsuits and the Next
        Events: Flynn III ...................................................... 11

    The District Court Decision and the Flynn I Litigation.................. 15

    Flynn I and Flynn II, Evaluated by the District Court ................... 16

    The District Court's Procedural Due Process Decision ................. 18

SUMMARY OF ARGUMENT................................................. 19

ARGUMENT ................................................................. 21

    POINT I—
    THE DISTRICT COURT ERRED IN HOLDING THAT
    APPELLANT DID NOT ENGAGE IN CONSTITUTIONALLY
    PROTECTED FREE SPEECH ............................................ 21

    A. APPELLANT SPOKE OUT ON A MATTER OF PUBLIC
       CONCERN THROUGH THE TWO LAWSUITS .................... 22

       1. Speech Through Lawsuits Can Be Protected Speech............. 22

    B. THE DISTRICT COURT ERRED IN ITS SEEMING
       CONCLUSION THAT JUDGE BRICCETTI HAD FOUND
       THAT APPELLANT HAD NOT SPOKEN OUT ON A
       MATTER OF PUBLIC CONCERN ................................... 26

i

1. Judge Briccetti Found That the Speech About Safety in Flynn I (identical to that in Flynn I) To Be A Matter Of Public Concern.................................................... 26

2. Appellant Sought Personal Remedies In Flynn I, and Judge Briccetti Nevertheless Found The Speech To Be On A Matter Of Public Concern...................................... 29

C. BY EXCLUSIVELY RELYING ON APPELLANT'S SEEKING OF PRIVATE REMEDIES IN THE LAWSUITS, THE DISTRICT COURT ERRED IN HOLDING THAT FLYNN DID NOT SPEAK ON A MATTER OF PUBLIC CONCERN............................................................... 30

1. The District Court Ignored the Speech in the Lawsuit Regarding Law Enforcement's Actions, Its Failure to Protect the Public's Safety, and the Failure to Adhere to the Statutory Framework for Supervising, Monitoring, and Treating Sexual Offenders...................................... 31

2. The District Court Erred In Concluding That Appellant's Mention Of Personal Employment Benefits Mandated A Finding That She Did Not Speak On A Matter Of Public Concern............................................................. 33

a. The district court erred in focusing on appellant's motivation as the only factor in determining the nature of the speech........................................... 37

b. Elevating motivation as solely dispositive contravenes this Circuit's precedents and unacceptably constricts the definition of public concern ............................. 39

c. The remedies sought here are distinguishable from the "private grievances" referred to in Ruotolo, and the district court erred in its reliance on Ruotolo ............... 41

d. The exclusive remedies under §75-b are "grievances" to protect public employees from the consequences for whistleblowing, and are by definition employment related........................................................ 45

PAGE

POINT II—
THE DISTRICT COURT ERRED IN DISMISSING
APPELLANT'S PROCEDURAL DUE PROCESS CLAIMS
AGAINST BLOOMINGDALE AND SHIPLEY..........................46

A. THE DISTRICT COURT FAILED EVEN TO CONSIDER
FACTS REGARDING FRAUD, DENIAL OF EFFECTIVE
COUNSEL AT THE ARBITRATION HEARING ....................46

B. APPELLANT HAS PLED SUFFICIENT FACTS TO
INVALIDATE THE AGREEMENT AND OMITS THE
ACTUAL VERBAL (AND ILLICIT) CONSIDERATION...........51

CONCLUSION..................................................................54

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Ackson-Lipscomb v. City of New York*,
　2022 U.S. Dist. LEXIS 59113 (S.D.N.Y March 30, 2022) .............. 42

*Bell Atl. Corp. v. Twombly*,
　560 U.S. 544 (2007) ....................................................... 21

*Cioffi v. Averill Park Central School District Bd. Of Education*,
　444 F.3d 158 (2d Cir. 2006) .......................... 28, 35, 39-41, 43, 45

*Citibank, N.A. v. Real Coffee Trading Co., N.V.*,
　566 F. Supp. 1158 (S.D.N.Y. 1983) ...................................... 52

*Cleveland Bd. of Educ. v. Loudermill*,
　470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).............. 19, 47

*Connick v. Myers*,
　461 U.S. 138 (1983).............................................21, 27, 38, 41

*Cotarelo v. Vill. of Sleepy Hollow Police Dep't*,
　460 F.3d 247 (2d Cir. 2006) ...................................... 25, 35, 40

*David v. City & Cty. of Denver*,
　101 F.3d 1344 (10th Cir. 1996) .......................................... 25

*Doe v. Pataki*,
　481 F.3d 69 (2d Cir. 2007) ............................................... 45

*Ezekwo v. New York City Health & Hosp. Corp.*,
　940 F.2d 775 (2d Cir. 1991) .............................................. 44

*Garcetti v. Ceballos*,
　547 U.S. 410, 126 S. Ct. 1951 (2006) ......... 1, 2, 15, 16, 23, 27-28, 33

*Gideon v. Wainwright*,
　372 U.S. 335 (1963) ..................................................... 49

*Goldberg v. Kelly*,
　397 U.S. 254 (1970) ..................................................... 49

*Goldman v. Belden*,
　754 F.2d 1059 (2d Cir.1985) ............................................. 22

iv

PAGE(S)

*Golodner* v. *Berliner*,
770 F.3d 196 (2d Cir. 2014) ......................... 25, 32, 34, 36-37, 40

*Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*,
372 F.2d 753 (2d Cir. 1967) .............................................. 52

*ICOM Holding, Inc. v. MCI Worldcom, Inc.*,
238 F.3d 219 (2d Cir.2001) ............................................... 22

*Indus. Recycling Sys., Inc. v. Ahneman Assocs., P.C.*,
892 F. Supp. 547 (S.D.N.Y. 1995) ........................................ 52

*Jackler v. Byrne*,
658 F.3d 225 (2d Cir. 2011) ......................................... 34, 35

*Johnson v. Ganim*,
342 F.3d 105 (2d Cir. 2003) .............................................. 46

*Konits v. Valley Stream Cent. High Sch. Dist.*,
394 F.3d 121 (2d Cir. 2005) .............................................. 24

*Lewis v. Cowen*,
165 F.3d 154 (2d. Cir. 1999) ............................... 31, 36, 42-44

*Nogbou v. Mayrose*,
400 Fed. Appx. (2d Cir. 2010) ........................................... 22

*Reuland v. Hynes*,
460 F.3d 409 (2d Cir. 2006) ......................................... 40, 44

*Ruotolo v. City of New York*,
514 F.3d 184 ............................................ 18, 23, 31, 41-44

*Sousa v. Roque*,
578 F.3d 164 (2d Cir. 2009) .........................................38-41, 44

*Spencer v. Philemy*,
540 Fed. Appx. 69 (*summary order*) (2d Cir. 2013)................ 33, 35

*United States v. Kopstein*,
759 F.3d 168 (2d Cir. 2014) .............................................. 21

*Velez v. Levy*,
401 F.3d 75 (2d Cir. 2005) ............................................... 22

v

PAGE(S)

**Statutes**

New York Civil Service Law §75-b . . . . . . . . . . . . . . . . . 3-4, 9, 11, 17, 24, 45, 46

New York Mental Hygiene Law § 10.11 . . . . . . . . . . . . . . . . . . . 4-5, 7-8, 11-12, 43

New York Penal Code §135.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 48, 53

Sexual Offenders Registration Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 49

## JURISDICTION STATEMENT

This is an Appeal from the Order of Decision and Dismissal by the Hon. Phillip M. Halpern of June 8, 2022 (Special Appendix ("SPA") 2-48). This appeal is from a final order and judgment that disposes of all parties' claims, granting Defendant's Motion to Dismiss pursuant to F.R.C.P. 12 (b)(6). Appellant timely filed the Notice of Appeal on July 5, 2022 (SPA ). Jurisdiction of the Court of Appeals is conferred by F.R.C.P. 4 (a)(1).

## QUESTIONS PRESENTED

Whether a law enforcement official speaks on a matter of public concern as a private citizen when she files two civil lawsuits raising (1) multiple and well-detailed facts and issues about serious threats to the public's safety, *and* (2) adverse effects on her employment status.

Whether a lawsuit filed by an individual can never constitute speech on a matter of public concern when the lawsuit seeks any "personal" remedies or contains personal "grievances" as part of her prayer for relief – and any part of her "motive."

Whether a lawsuit cannot constitute free speech where it re-states the same speech (and events) already found in a prior lawsuit to be on a matter of public concern (though nevertheless unprotected as speech within the employment setting, pursuant to *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006)).

1

Whether procedural due process protects an individual where she waives a procedural protection where threatened with duress – effectuated with a threat of criminal prosecution, misrepresentation, and prohibition on seeking meaningful legal counsel.

## FACTS AND A STATEMENT OF CASE ALLEGED

**Two Lawsuits and the Speech**

Plaintiff filed the Third Amended Complaint ("TAC" or "Flynn III") in this action (the subject of this Appeal) on August 24, 2021. A-54-84. The TAC referred to speech in two earlier lawsuits that Flynn had filed – the first federal district court ("Flynn I"), and the second in New York State Supreme Court. A-58-60, ¶¶11-21. In both Flynn I and II, appellant alleged that she spoke out as a Special Assignment parole officer about the significant risk to the public from its exposure to a recently released sexual offender parolee ("Doe"), during a period that appellant supervised sexual offender Doe's release from prison. A-33-44,¶¶27-60; A-93-104, ¶¶25-68. Both Flynn I and II detailed how appellant supervised Doe's release in her capacity as a parole officer in the Sexual Offenders' Management Unit. *Id*.

As to Flynn I, the district court dismissed the federal action for constitutional claims related to her speech in 2016 and her claims of retaliation affecting her unit

2

assignment and overtime. A-58, ¶12. Following the dismissal of Flynn I, Flynn filed an action ("Flynn II") in the Supreme Court of the State of New York alleging retaliation under Civil Service Law §75-b (now in the Court of Claims). A-58-59, ¶¶14, 16.

The allegations in those lawsuits are referred to in the instant case filed with the district court, Flynn III. A-58-60, ¶¶14-19.

Both Flynn I and II are replete with details as to the lack of treatment, dangerous housing in a roadside motel, required long and independent travel to areas near schools and children, and the high risk of recidivism and molestation of children. Those references to facts in Flynn I and are summarized in Flynn III. *Id*. at 16-2.; *see* Flynn II, Ex. A to TAC, A-92-101,¶¶20-25, 29-47.

Both Flynn I and II allege that DOCCS removed her from her position retaliation affecting her position in the SOMU unit and overtime payments. A-58-60, ¶¶11-20. Flynn I also brought a constitutional claim, alleging violations of Free Speech under the First Amendment, alleging that Flynn had spoken with the high-level official named defendant Deputy Commissioner Ana Enright in 2016 on the matter of public concern. A-34, ¶¶36. Flynn III's introduction summarized:

> Flynn alerted Defendant about the substantial violations and deficiencies by Defendant of treatment requirements under the Mental Hygiene Law, and violations by Doe of the Court Order that conditioned Doe's release. Such complaints constituted violations of the Mental Hygiene

3

Law's regulations on strict supervision, and identified
serious safety risk factors that this sexual predator posed
to the community's children.

A-87, ¶5.

It further summarized that DOCCS did not act promptly on these warnings,

but "instead removed and stripped Flynn of the Special Assignment monitoring

parolee sexual offenders, and harmed her livelihood….*Id*.

And it summarized: "Flynn brings this action to remedy such unlawful

conduct and to reclaim her lost salary and benefits, as well as to claim attorneys'

fees under the Whistleblower Law." *Id.* at ¶6.[1]

The lawsuits both referred to Flynn's duties on Special Assignment as a

member of SOMU, and the statutory requirements and conditions for release of

sexual offenders. They referred to Article 10 of the N.Y.S. Mental Hygiene Law.

Flynn II reads: "That statute, M.H.L. § 10.11, is entitled 'Regimen of strict and

intensive supervision and treatment.'" A-92, ¶24. The Complaint explains:

"M.H.L §10.11 (a) (2) goes on to specify: 'The court shall issue an order

specifying the conditions of the regimen of strict and intensive supervision and

---

[1] In the detail of the presented claims, appellant refers here, *infra* at 8-14, to the paragraph
numbers to the Amended Complaint ("AC") in Flynn II, the Civil Svc. Law §75-b whistleblower
claim brought in Supreme Court in 2018. But almost all of the identical facts – also claimed to
be on a matter of public concern – also make up the body of Flynn I. Those paragraphs in Flynn
I that are identical to those in Flynn II are referred to more specifically. *Infra* at 8 n.2.

4

treatment, which shall include specified supervision requirements and compliance with a specified course of treatment.'" A-92, ¶24

Almost the entirety of the texts of Flynn I and Flynn II then detail the "conditions of the regimen of strict and intensive supervision and treatment" and Flynn's experience and conclusions about DOCCS failure to meet those conditions upon the release of one parolee, John "Doe." A-91-93, ¶23-25. Flynn II refers to M.H.L. § 10(d)(1) and the statute's strictures for a parole officer supervising an offender: A-92, ¶25. "If a parole officer has reasonable cause to believe that the person has violated a condition of the regimen of strict and intensive supervision and treatment or" if there has been a report that the "person may be a dangerous sex offender requiring confinement…. may take them into custody." A-92-93.

Flynn had overall responsibility for Doe's treatment and release, as well as significant responsibility in complying with the statute and the requirement to place the parolee in custody where there has been a violation of "a condition of the regimen" or a report that the parolee "may be a dangerous sex offender requiring confinement…."A-92-93, ¶¶25-26.   Flynn I describes in detail the numerous acts by Flynn to assure the appropriate treatment to meet the Court's conditions for Doe's release in the period from early September 2016 until the parolee's release

5

on October 20, 2016. It details repeated examples of failure to provide the required

treatment – creating a substantial risk to the public. A-92-101.

    Flynn II spoke to Flynn's concern noted that several "concerns "that some of

the conditions in the SIST report "have yet to be addressed….This case will

require intensive supervision as Doe presents as the highest risk offender I have

been assigned to supervise." A-92, ¶26C. Flynn II further specifies in the below

summaries of ¶¶26D-I (quoting emails later disclosed in discovery):

> D. Flynn warned of concerns that sexual offender
> counseling in Newburgh "is located in an area densely
> populated with families and children.";
>
> E. Throughout September 2016, Flynn complained "that
> this was a faulty plan, because the entrance to the drug
> treatment center and the mental health center" were less
> than fifty feet away and "in the same building" from the
> HRA "office that provides social services to
> children….";
>
> F & I. Flynn warned in the Complaint that Office of
> Mental Health planned to release Doe to a motel in
> Liberty, Sullivan County, New York that she had visited,
> and where the owner rented to 7 sex offenders, and the
> motel frequently rented rooms "to travelers with
> children."  She warned that because Doe was moderately
> developmentally disabled, "managing daily activity
> skills, shopping, looking, and transportation posed great
> challenges.";
>
> G. Flynn "sounded the alarm about Doe's willingness to
> cooperate with strict supervision and his lack of
> cooperation with a required Forensic Evaluation that is
> required for this upcoming SIST hearing." The AC also

> noted that "does not appear amenable to supervision as
> he indicated he will have problems if it is too restrictive."

A-94.

The AC (or "Flynn II") noted that the State's treatment plan only provided Doe to travel approximately 60 miles for treatment several days per week, organize such transport by bus or taxi, and experience potentially long waiting periods between appointments while in downtown Newburgh. Flynn described the inadequacy of such treatment for Doe, as well as the danger to children in a very nearby school and an adjacent area. A-95-98 ¶¶28-34, 37. Including the danger with a child he encountered. A-95, ¶¶35-36.

Overall, the AC charged in general that OMH and DOCCS were neglecting Doe and creating significant risks, and should instead provide him with integrated services in a controlled facility – instead of the piecemeal treatment.

The AC also referenced a violation of the Court's very Order regarding Doe's release. It alleged DOCCS' "lack of compliance with M.H.L §10.11 (a) (2)'s strictures and the Court's requiring (through its Order) the 'department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment.'" A-96, ¶32.

Flynn II also describes an email in which Flynn wrote of "'serious community safety issues *surrounding the release of the predicate felony sexual*

7

*predator of children to the community* that has a well-established history of non-compliance with supervision and treatment mandates.'" A 95-96, ¶31. The AC also reported a Mental Health Director telling Flynn of "concerns about Doe because of his description of following a 13-year-old girl around a Shop-Rite." A-99, ¶42. It refers to Flynn's written summary that the "'treatment providers are of the opinion that the subject would greatly benefit, if he was afforded *a more structured and supportive arrangement*.'" She requested assistance in addressing the problem. *Id*.

The treating psychiatrist, according to the AC, "described Doe as a *'ticking time bomb'* and that it wasn't a matter of 'if' but 'when' he reoffends." A-99, ¶44. That same psychiatrist concluded, as reported in the AC, "does not currently have an adequate community release plan in place that meets his needs on any level." By contrast, Flynn reported that Khan had told her that it was "'critical'" that Doe be "afforded a higher level of supportive housing and more intensive programming." A-100, ¶47.[2] Thus, as reported in the AC, Flynn was again reporting "a failure to comply with M.H.L. §10.11 (a) (2) and its strictures on intensive supervision, as well as grave effects on public safety, and did so after being instructed [by her DOCCS superiors] not to do so in writing." *Id*.

---

[2] The AC reported that psychiatrist's conclusion in Flynn's email that Doe '"require[ed] the highest level of intensive supervision and treatment." *Id*. The AC notes that Khan later herself wrote that "Doe was living in a motel 'with insufficient residential and group services for his continuous sexual urges. He has very little structure during the day.'" *Id*., ¶ 48.

8

Significantly, the AC reported that Doe needed an effective Aversive Therapy "stimulant when he became stressed multiple tim*es a day with thoughts of having sex with children and babies* he met in the community." A-99, ¶41 (*emphasis supplied*).

Importantly, the AC referred to other contemporaneous and later concern by treaters. In summary, the AC charged that after Doe's release under the foregoing conditions and treatment deficiencies, Doe engaged in many behaviors reflecting the great danger he posed to children – as well as insufficient treatment and his inability to control his impulses. Those are referred to below.[3]

---

[3] The AC spoke about a meeting on October 20, 2016 (the same day of Doe's release) in which "OMH's top liaison Director had dismissed Flynn's safety concerns about the location of the Newburgh program sites and the proximity to children." It noted that Flynn had been reprimanded because "Doe wasn't a severe predator that 'snatched' children off the street." A-97-98, ¶¶ 35-36. The AC describes that Flynn continued to voice concerns about Doe's functioning at the hotel, and that "Flynn believed it was inhumane to release him without more guidance and support." A-98, ¶37. The AC also referred to problems with the administration to Doe of "Aversive Therapy" necessary for his treatment.

It charged that the OMH Director had stated "that Flynn had impeded and interfered with Doe's release." *Id.*

The AC further charged a deviation from practice in fully and most accurately documenting the events leading to Doe's re-arrest pursuant to the M.H.L. "DOCCS did not follow the accepted process requiring Flynn to review and swear to the statement's accuracy in an Affidavit submitted to the Office of the Attorney General: instead, DOCCS submitted its own edited version signed by others." A-102-03, ¶57.

The AC also charged that DOCCS' superiors had accused Flynn of interfering with Doe's release, explaining that "'you don't play nicely in the sandbox'" with others. A-102, ¶54. It also alleged that DOCCS removed Flynn from the Special Assignment (resulting in the loss of overtime payments), and later retaliation in the terms and conditions of employment, including permitting a physical attack of Flynn by an inmate during the handcuffing of a detainee. A-102,

9

The AC reported a multiplicity of violations of the Court Order regarding Doe's mandated treatment – absent from the report to the Court. A-103,¶60. The report omitted that Doe "violated rule #13 of the Court Order in reporting being aroused in response to a 'baby crying' and the resultant excitement and thoughts of violence jeopardized and threatened the safety and well-being of children….." A-103, ¶59. The AC alleged misstatements by DOCCS and that it had "omitted many of these charges from the final Incident Report submitted to the Court." A-103-04, ¶¶59-61. In its report to the Court, the AC alleged that DOCCS "engaged in a course of action to ignore most of the violations previously raised by Flynn…" *Id*.

The AC's prayer for relief requested "an award of statutory damages, lost backpay, the exact amount to be proven at trial against Defendant…." which included "further injunctive relief as the Court may deem just, proper, and equitable, including reinstatement…." So did Flynn I in terms of in terms of remedy. A-52-53,¶89-91.

And Flynn II's AC spoke about the physical effects on Flynn, including believing she had been subjected to physical attack. A-112-13, ¶¶82-84; A-117, ¶101.

---

¶54; A-105-111, ¶¶68-91. (This lawsuit (Flynn III) seeks no remedy for that alleged retaliation as such is not part of the case on appeal).

But in its "Cause of Action" under Civil Service Law §75-b, the AC also referred to Flynn's complaints about the requirements of M.H.L. 10.11(a)(2) and "the failure to comply with the Mental Hygiene Law directly related to protecting the public's health and safety." A-115-16, ¶¶93-95. It referred there to her complaints about Doe being "a ticking time bomb." A-115, ¶94.

**The Outcomes and Status of the Two Lawsuits and the Next Events: Flynn III**

Judge Vincent Briccetti of this district dismissed Flynn I, finding that Flynn's speech to Deputy Commissioner Enright in 2016 was unprotected, though she did "undeniably" speak on a matter of public concern. A-21. Flynn II proceeded in State Court and the parties (Flynn and DOCCS) conducted discovery (such now pending in the Court of Claims). A-58-61, ¶¶12-21.

But following the filing of the lawsuits, over a period of more than a year, DOCCS brought disciplinary actions against Flynn for a variety of alleged infractions – from rudeness to a co-worker to other issues. A-61-62, ¶¶25-27. Defendant Donald Oliver, Deputy Commissioner for DOCCS' Office of Special Investigations, launched a more serious investigation of Flynn. A-62-63, ¶¶28-31. It started as an investigation and detailed interview of Flynn about her treatment as a parole officer, and with Oliver also soliciting additional information from Flynn about DOCCS and employees abusive and retaliatory treatment of her. *Id*.

11

But following Flynn's substantiating abusive and retaliatory treatment, Oliver changed his goal and investigated Flynn for her very act of providing that information – doing  so by email.  *Id*.  In providing the emailed information, she also did so by cc'ing the information to her counsel, who continued to represent her in the pending Flynn II action. A-66-67*,* ¶¶43, 45, 49.

That became the subject of Oliver's investigation, discipline, and ultimate termination of Flynn's employment. A-68, 70*,* ¶¶54-56, 61, 63, 64. In these emails, Flynn identified parolees and cases in which  DOCCS had retaliated against her, giving specific examples and explanations. In only one of those identified cases, did she refer to an individual who was a sexual offender. A-65-66,71, ¶¶41-42, 68-69. The other 39 examples referred to parolees who were not sexual offenders but identified in emails as case-related incidents of retaliation Flynn experienced in 2018 and 2019.

Matthew Bloomingdale, John Shipley, and DOCCS then sought Flynn's termination, notwithstanding Flynn having sent that information as part of her consultations with her attorney during the ongoing litigation of Flynn II. A-66-70, ¶¶45-50, 54-56, 61, 63, 64.[4] During the arbitration session seeking to uphold that termination, those two defendants participated in communicating a settlement: only

---

[4] Shipley and Bloomingdale did so pursuant to their respective management positions in Labor Relations. A-27, 70-71, ¶¶4-5, 61-63, 66.

if Flynn would resign her employment and take her retirement, DOCCS' would not pursue prosecution of Flynn for the alleged disclosures to her attorney of confidential information, described as 40 Counts of a Class B misdemeanor. A-68-70, ¶¶54-56, 61, 63-64. Defendants threatened Flynn with no less than two years' incarceration, based on the alleged 40 Class B misdemeanor counts.[5] A-71,75, ¶¶66, 68-69, 84.

They did so even though New York Penal Code §135.60 identifies the crime of coercion – which can be committed by compelling conduct which she had a right to abstain from by instilling a fear that criminal charges will be brought against her. A-72, ¶75.

Defendants Bloomingdale and Shipley threatened Flynn with no less than two years' incarceration, based on the alleged 40 Class B misdemeanor counts. A-71, 75, ¶¶66, 68-69, 84.

Flynn requested an adjournment after speaking to a criminal attorney about the serious criminal charges she faced, so as to have time to engage in informed deliberation about the threat of incarceration. A-74, ¶72. But defendants Shipley and Bloomingdale did not agree to provide one. A-74, ¶¶72-73. And they refused to do so - even after the PEF Union's attorney told the criminal attorney on the

---

[5] The threat of criminal sanction for violating the Sexual Offenders Registration Act did not match the actual list of non-sex offenders of individuals listed in the Notice of Discipline, where only one of 40 identified were sexual offenders. A-71-72, ¶¶66-70.

telephone, that he would request an adjournment so that Flynn could first consult with the criminal attorney and review the serious charges and her choices about retirement from DOCCS. *Id.*

But when defendants Bloomingdale and Shipley then refused the adjournment, Flynn acted on her alarm and fear and agreed to retire with her pension rather than face potential Ail time. A-74, ¶¶79-80. The parties then entered into a written settlement agreement – as is typical in the resolution of labor arbitrations. When Flynn reviewed the agreement, she "specifically deleted the language stating that she had not entered into the agreement under duress." *Id*. ¶79; *see* A-120. Striking the absent "duress" condition phrase signified that the Agreement had indeed been secured under duress given the serious threats made, and the refusal to permit her to consult with her chosen criminal attorney." *Id*. ¶80.

The agreement made no mention whatsoever of DOCCS giving up as consideration its prosecution of Flynn on the 40 Counts. It was silent as to that term - the real issue in the room - referring only to Flynn's retirement and two weeks' pay. Stipulation at www.iapps.courts.state.ny.us, Case No. EF006948-2018, Doc #116, Ex. B to Ranis Affirm., Stipulation of Settlement (for judicial notice and hereto attached, see A-120; *see* A-74, ¶¶79-80.[6]

---

[6] Flynn herself only referred to the prosecution threat in that she *crossed out* the part of the disclaimer language stating that the agreement was *not* the product of duress. *Id.* ¶¶79-80. That

**The District Court Decision and the Flynn I Litigation**

The district court dismissed the instant action, citing to the language and claims from the Amended Complaints ("AC") in Flynn I and Flynn II). In Flynn I, appellant claimed that she had engaged in protected speech on a matter of public concern when *speaking to high level managers*. That district court first found that the speech was indeed on a matter of public concern because it raised issues about public safety. "Here, the question is not whether Flynn's speech addressed a matter of public concern -- *undeniably it did*." Flynn I, A-21 (*emphasis supplied*).

But it then found the speech to be unprotected pursuant to *Garcetti*, 547 U.S. at 410 because it was made to Flynn's supervisors as part of her employment responsibilities. Flynn I, A-22-23.

The district court relied on this earlier decision in Flynn I, and that speech in its dismissal:

> *Notably*, the speech at issue in this case *has already been considered* by another judge in this courthouse in Flynn against DOCCS, available at 2018 WL 2041713. Judge Briccetti analyzed Flynn's speech and the complaints relating to her supervision of Doe under the two-step inquiry and found that it was not protected speech by the First Amendment resulting in the dismissal of her case.

SPA 36-37 (*emphasis supplied*).[7]

---

crossing out signified the duress, and the denial of her ability to consult with criminal counsel while facing the prosecution threat. *Id*.

[7] At oral argument, counsel explained: "Judge [Briccetti] found it -- a federal judge found

Significantly, it certainly agreed about the close similarity in speech between Flynn I and Flynn II, and noted it as a seeming admission by appellant: "Plaintiff acknowledges and concedes that the speech she claims protected in this case is the same speech articulated in that prior federal lawsuit." SPA 38. The district court then noted Judge Briccetti's two-step analysis as to whether such was protected speech. SPA 37.

In noting Judge Briccetti's decision that the speech was "unprotected", the district court omitted the reasoning for that determination and Judge Briccetti's dismissal of the First Amendment claim in Flynn I. SPA 36-37. [8]

**Flynn I and Flynn II, Evaluated by the District Court**

In determining whether appellant could satisfy the "speaking on a matter of public concern" prong of the analysis, the district court reviewed the heart of the matter as to whether the employee's speech in both lawsuits (Flynn I and II) was

---

that exact same speech was protected [sic], even though she was asking for a *private personal* issue in that lawsuit also." SPA 32.

[8] Judge Briccetti agreed that appellant had "not plausibly alleged" a violation "because she was *not speaking as a private citizen* when she expressed concerns about Doe's discharge plan." Flynn I, SPA 20 (*emphasis supplied*). "Here, all of the statements Flynn made were related to her supervision of Doe, and therefore pursuant to her official duties…. Flynn's speech at issue unquestionably involved the job responsibilities described above. Therefore, her speech 'owes its existence to [Flynn's] professional responsibilities' as a public employee and is not protected. *Garcetti v. Ceballos*, 547 U.S. at 421". SPA 22. On this basis alone, he found the speech unprotected under the First Amendment. SPA 23.

16

calculated to address personal grievances or whether it had a broader public

purpose.

> Plaintiff's previous lawsuits highlighted adverse career,
> financial and emotional effects, and sought personal
> damages and reinstatement to her prior employment
> position. A review of the 2018 state court complaint,
> which is annexed to plaintiff's Third Amended Complaint
> as Exhibit A, and the federal complaint considered by
> Judge Briccetti, solidifies this point. Plaintiff in both
> actions sought reinstatement to her specialized caseload
> and an injunction prohibiting further acts of retaliation
> against her, as well as retroactive overtime pay
> and compensatory damages for emotional harm, the
> adverse effect on her reputation in the law enforcement
> community, and the aggravation of her anxiety and worry
> as to her future livelihood and support and professional
> standing in the law enforcement community.

> The filing of the previous lawsuits against DOCCS and
> other nonparties does not turn her personal grievances
> into a matter of speaking out on a matter of public
> concern.

SPA 38-39. Those same facts also formed the basis of appellant's §75-b claim in

Flynn I and II. Both charged that DOCCS had engaged in actions that put the

public at risk. That speech in Flynn II tracked the identical speech in Flynn I.

*Compare* Flynn II, A-93-104, ¶¶25-68; A-107-109, ¶¶71-75 with Flynn I, A-33-44,

¶¶27-60, 63; also *compare* Flynn III, A-58-61, ¶¶12-21, Flynn II, A-86, ¶2; A-

113-16, ¶¶88-97, and Flynn I, A-47-48, ¶¶67-71, A-50-52, ¶¶83-91.

In addition to discussing the safety and treatment issues, both Flynn I and

Flynn II also requested some specific remedies as to Flynn in their prayers for

17

relief. Both again used identical language in requesting the same "private" remedy of lost overtime pay due Flynn, and assignments. *Compare* Flynn I, A-51-52, ¶¶89-91, and Flynn II, A-117, ¶¶101-102.

Citing *Ruotolo v. City of New York*, 514 F.3d 184, the district court looked at the "heart of the matter" articulated in the TAC in Flynn II and in Flynn I. SPA 37-38. It noted in *Ruotolo* that the "plaintiff sought to redress her personal grievances" and determined that the same applied to the speech in Flynn I and Flynn II. According to the district court, the federal Flynn I and the state Flynn II lawsuits spoke out on a private matter in Flynn's self-interest regarding her employment status, rather than on a more generalized public issue. SPA 37-38.

The district court ultimately relied on the fact that both lawsuits referred to her employment status in their prayer for relief and in part "sought reinstatement to her specialized caseload and an injunction prohibiting further acts of retaliation against her, as well as retroactive overtime pay and compensatory damages for emotional harm…." SPA 39.

**The District Court's Procedural Due Process Decision**

The district court also dismissed appellant's procedural due process claim regarding appellees' conduct at the arbitration itself, resulting in her feeling forced to take early retirement.

In other words, the plaintiff was not terminated. She

18

> resigned her post and accepted the benefits of a
> settlement agreement instead of availing herself of the
> procedural safeguards afforded to her, to wit, notice and
> opportunity to be heard. Therefore, all of the process that
> was due is provided by the pre-termination opportunity to
> respond, coupled with post termination administrative
> procedures as provided by state statute. *Loudermill* at 547
> and 48. The state provided due process regardless of
> whether the Court finds the defendants' actions to be
> random and unauthorized or an established state
> procedure. Accordingly, plaintiff's due process claims
> fail as a matter of law and will be dismissed.

SPA 43. In finding that appellant had been offered sufficient process, the district

court held that she "was afforded notice and an opportunity to be heard, and was

represented by PEF counsel in an arbitration that would have provided the due

process she claims she was now denied." SPA 43. It held that appellees had

satisfied "the essential requirements" of due process. SPA 43.

It concluded that "at least some form of pre-deprivation hearing was

provided to the plaintiff." SPA 42-43.

The opinion was silent as to the pleading that Flynn sought out additional

criminal counsel during the hearing, and that such had been denied. SPA 42-43. It

referred to appellant's allegation about the threat of criminal prosecution (SPA 43),

but made no specific statement as to any effect on the process in any way.

## **SUMMARY OF ARGUMENT**

This case is simple. The district court erred in finding that appellant did not

speak out on a matter of concern under the First Amendment when she filed two

19

previous lawsuits regarding her speech rights and freedom from retaliation under the New York State's Civil Service Law.

The district court erred in holding that appellant's speech in the lawsuits was not on a matter of public concern because she brought the two previous lawsuits in part requesting remedy of personal grievances. It erroneously focused exclusively on appellant's motivation – contrary to this Circuit's caselaw. It also determined that the *presence of any personal grievance whatsoever* is fatal to finding that the speech was on behalf of the public – when in fact that is not the exclusive factor to consider. It then ignored the extensive specificity in the complaints demonstrating her speech to expose the safety and health dangers posed by the too early release of a sexual offender in Orange County, New York. It ignored the finding of another district judge that the identical speech – in a pre-litigation context – "undeniably" was on a matter of public concern. Appellant submits that speech about the failures of the law enforcement system and the significant dangers posed to public safety – when made through the legal system in a lawsuit - is on a matter of public concern and is protected speech.

Further, the district court erred in dismissing appellant's claim under the 14th Amendment that defendants Bloomingdale and Shipley denied her due process at an arbitration hearing (following the filing of the two lawsuits). It ignored the pled facts that appellees violated a penal code statute, misrepresented the charges

against Flynn, and denied her an adjournment in which to consult with a criminal attorney. The district court simply assumed that appellant failed to "avail" herself of her right to proceed with her grievance hearing. In doing so, it erred in holding that appellant had pled no facts supporting a violation of due process.

## ARGUMENT

## POINT I

### THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANT DID NOT ENGAGE IN CONSTITUTIONALLY PROTECTED FREE SPEECH

The district court erred in finding unprotected appellant's speech through the filing of the Flynn I and II lawsuits. Specifically, it erred in holding that the detailed speech in the lawsuit specific and repeated multiple health and safety risks to the public posed by the sexual offender's release was not a matter of public concern.

Whether a given instance of speech is protected under the First Amendment for the purposes of evaluating a retaliation claim is a matter of law. *See Connick v. Myers,* 461 U.S. 138, 150 n. 10 (1983). The Circuit reviews conclusions of law *de novo*. *Cf. United States v. Kopstein,* 759 F.3d 168, 173 (2d Cir. 2014).

To survive a Rule 12 (b) (6) Motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" (*quoting Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 570 (2007)).  In reviewing defendant's Motion for Dismissal, this Court must "accept []all

21

allegations in the complaint as true and draw [] all inferences in favor of the

plaintiff." *Velez v. Levy*, 401 F.3d 75, 80 (2d Cir. 2005) (*quoting ICOM Holding,

Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001).

      The district court's role is "not to weigh the evidence…" *Goldman v.

Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). The Motion should be denied "unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Nogbou v. Mayrose*, 400 Fed. Appx., 617,

619 (2d Cir. 2010) (*citation omitted*).

      Here, the district court zeroed in upon the summary claims made by

appellant requesting lost overtime pay in her prayer for relief. The district court did

not weigh or even truly consider the specific facts alleged about the threats to the

public that Flynn raised. The district court thus erred in omitting consideration of

many pled facts about the repeated deficiencies of DOCCS' law enforcement and

her pointed speech addressing a vital public concern. .

### A.    APPELLANT SPOKE OUT ON A MATTER OF PUBLIC CONCERN THROUGH THE TWO LAWSUITS

#### 1.    Speech Through Lawsuits Can Be Protected Speech

      It is hard to contemplate anything more public in speech than a publicly filed

lawsuit other than perhaps a screaming headline in the local newspaper.

      A lawsuit stands as a form of independent speech and a powerful means to

raise a matter of public concern as a private citizen – even where that *same speech*

in the work setting was found to be unprotected under *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006) and this Circuit's precedents. A lawsuit can speak to the public and help inform the public with a powerful voice – and even where that same lawsuit in part also seeks "personalized" and private remedies, such as the loss of overtime backpay.

Appellant here presents the case where she did not speak through any such press headlines – *but rather* spoke in a publicly filed lawsuit about the dangers posed to children in Orange and Sullivan Counties during a several month period.

Curiously, the district court's reasoning was less than consistent on this issue. On the one hand, the court stated that it was unnecessary for it to rule on the issue of generally whether the earlier events described in a lawsuit is speech by a citizen. SPA 38 ("don't need to decide whether bringing a lawsuit converts the same speech from that made as an employee into speech made as a citizen)."

Yet it also held – and arguably more specifically - that "[t]he filing of the previous lawsuits against DOCCS and other nonparties does not turn her personal grievances into a matter of speaking out on a matter of public concern." SPA 38. It concluded that appellant here, like plaintiff in *Ruotolo*, 514 F.3d 184, did not speak on a matter of public concern where "plaintiff's lawsuit sought to redress her personal grievances." *Id.* at 39.

23

But almost all lawsuits seek some type of personal grievance as at least part of the prayer for relief. Lawsuits almost always have some personal aspect – and such may be required by the cause of action (*see* Point IIC2d, *jnfra* at 45 *re*: §75-b action). That is typically what is contained in a "prayer for relief" seeking redress.

Even the premise that a lawsuit potentially "converts the same speech" (SPA 38) as that made by an employee is curious. Individuals can speak in multiple formats and locations – at work to a supervisor, to a high-level agency commissioner (as failed as a matter of protected speech in Flynn I), to newspapers, or in the court system. Such is dynamic – and not some formulaic attempt to convert speech.

The district court, *sub silentio*, condemned a broad swath of all lawsuits as speech, despite its protestations that it does "not need to decide" about the "conver[sion]" of the speech. The district court erred in starting with a preliminary view - in its breadth - that devalued speech through a lawsuit. And it did so despite clear law that speech through a lawsuit can be a powerful form and context for speech that is a matter of public concern – and may be a powerful agent for informing the society and for change.

This Court and other Circuits have consistently held that a lawsuit by a public employee can constitute speech on a matter of public concern. *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) (holding

lawsuit as public speech because "we have held repeatedly that when a public

employee's speech regards the existence of discrimination in the workplace, such

speech is a matter of public concern"); *Cotarelo v. Vill. of Sleepy Hollow Police*

*Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (surviving summary judgment as police

officer's lawsuit is a matter of public concern where his allegations concerned

"discrimination problems generally and were not limited to instances affecting

only" the officer as plaintiff).

Indeed, in *Cotarelo,* 460 F.3d at 252, the officer's lawsuit related to the

working conditions and harassment of a group of officers, affecting the very

functioning of the department, and spoke on a matter of public concern. *David v.*

*City & Cty. of Denver*, 101 F.3d 1344, 1356 (10th Cir. 1996)(statements about

sexual harassment by individual speaker could only be public speech if included

conduct impacting the government's performance of its responsibilities).

This has been affirmed in multiple more recent decisions by this Circuit. *See*

*Golodner* v. *Berliner*, 770 F.3d 196, 202, 205 (2d Cir. 2014) (filing of *Golodner I*

seeking emotional harm damages because of unlawful arrests constituted protected

speech on a matter of public concern, even where it raised private concerns); *see*

*infra* at 29-31, 33-36 (discussing private grievances).

**B.** **THE DISTRICT COURT ERRED IN ITS SEEMING CONCLUSION THAT JUDGE BRICCETTI HAD FOUND THAT APPELLANT HAD NOT SPOKEN OUT ON A MATTER OF PUBLIC CONCERN**

**1.** **Judge Briccetti Found That the Speech About Safety in Flynn I (identical to that in Flynn I) To Be A Matter Of Public Concern**

In determining that appellant had not spoken out on a matter of public concern in the filing of her lawsuits in Flynn I and II, the district court relied erroneously on Judge Briccetti's dismissal of the First Amendment claim in Flynn I.

The district court erred and conflated apples and oranges – mixing up the issue of whether Flynn had spoken on a matter of public concern on the one hand, with the next inquiry as to whether she had indeed spoken as a private citizen. Judge Briccetti found that Flynn's speech "undeniably" addressed a matter of public concern – and he then went on to conclude that the speech was unprotected for other reasons. A-21-23.

But the district court erred in converting or portraying Judge Briccetti's holding as one finding no speech by appellant on a matter of public concern, and then using it to bolster its rejection of appellant's claim that she spoke on a matter of public concern through her filing of both Flynn I and II.

The content of the speech in Flynn II tracked the content of that speech held to be "undeniably" on a matter of public concern in Flynn I. *Compare* Flynn I, A-

26

44, ¶¶25-68, with A-93-104, ¶¶ 26-64 in Flynn II, as identical speech. Flynn I AC, A 69.[9]

Accordingly, the district court's analysis began from a flawed – and even distorted - premise that appellant's speech was unprotected because it was not on a matter of public concern.[10] While also finding it "[n]otabl[e]" that appellant agreed that the language in Flynn I and Flynn II were in most parts identical.

For in the analysis by Judge Briccetti – and again in the instant case – a court should first determine the nature of the speech. "*Connick* instructs that courts begin by considering whether the expressions in question were made by the speaker 'as a citizen upon matters of public concern.'" *Garcetti*, 547 U.S. at 415-16 (*quoting Connick v. Myers*, 461 U.S. at 147 (1983). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* at 418.

---

[9] During oral argument immediately preceding the district court's bench ruling, counsel specifically noted Judge Briccetti's holding that the original speech "undeniably" spoke on a matter of public concern. SPA 31; *see* Flynn I, A-21-23. The district court expressed some uncertainty as to the reason Judge Briccetti found the speech to be unprotected in Flynn I, referring to the speech as "private." SPA 31-33. The point was not that appellant in that action had "private" aims or requests as to her employment or reinstatement, but that Judge Briccetti had held in Flynn I that she had not spoken out as a "private" citizen. It was her speaking pursuant to her job duties that was dispositive (under *Garcetti*) in making that speech unprotected; it was *not* some exclusive private interest that she sought then or later, as implied by the district court.

[10] Judge Briccetti's finding about the speech is not necessarily dispositive as to the speech in the lawsuits, but is instructive as a first step in evaluating the district court's conflation about protected speech in defining public speech.

> Yet the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion……The [*Pickering*] Court's approach acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed.

*Id*. at 419. As Flynn is skilled, knowledgeable and experienced as an SOMU Officer with more than fifteen years' experience working with the sexual offender population, society should not repress her opinions on keeping the public safe. A-55, ¶2. She is one of "the members of a community most likely to have informed and definite opinions" about the public's lack of safety, and the gravity of the potential effects from the sex offender's inadequate placement and treatment. *Id.* at 419.

Flynn added important expertise and insight where the public was unaware of the potential danger and the state's role in providing insufficient protection to its citizens. security risks and the protocol for handling and treating such risks to the community. *See Cioffi v. Averill Park Central School District Bd. Of Education*, 444 F.3d 158, 167 (2d Cir. 2006)(athletic program supervisor who "personally investigated the initial allegations of hazing [of players], is well suited to provide information to local citizens and parents regarding the matter of public concern.").

Clearly, Flynn spoke out repeatedly about her concern that the public would be harmed by the release of Doe under the circumstances proposed by DOCCS and the Office of Mental Health. Accordingly, Judge Briccetti found that such speech was on a matter of public concern.

That speech contained in the lawsuits was on a matter of public concern (a) when made in October 2016; (b) when determined by Judge Briccetti to be so in his decision of May 2017; and (c) when articulated in the lawsuits themselves - Flynn I and II filed in federal and state court respectively.

> ## 2. Appellant Sought Personal Remedies In Flynn I, and Judge Briccetti Nevertheless Found The Speech To Be On A <u>Matter Of Public Concern</u>

The near identical language in Flynn I and II implicates the central issue relied upon by the district court (and to follow here) – that is, what Flynn stated about *her own aims* in the text of the lawsuits – as opposed to the public policy and safety issues predominating in both. The speech tracked in both was almost identical as to the "private" remedy seeking lost overtime pay due Flynn, and a restoration of her assignment to the Sex Offenders' Management Unit, where she had been employed for more than a decade.

Curiously, the district court notes that appellant "acknowledges and concedes" that the speech in Flynn I is identical to that in Flynn II. Flynn III, SPA 37. But this is no "admission" and concession, and the district court reveals its

29

error or mis construal of the legal argument presented by appellant: Appellant embraces that the speech was indeed the same in Flynn II as in Flynn I (or for that matter Flynn II, the Supreme Court complaint). And it is on that basis that Judge Briccetti found it to be speech on a matter of public concern – even if not protected speech.

Far from an admission or concession, such makes the very point that the speech itself is on a matter of public concern – but that in this instance through public filings in court (rather than through speech to the highest-level supervisors), it is also protected speech.

The nature of the language about personal "remedy" or "grievance" – and as existing not only in Flynn II, but also in the language of Flynn I reviewed by Judge Briccetti – is the central issue in the district court's dismissal of the First Amendment claim. For Judge Briccetti's decision gave some context to the appropriate *de-emphasis* – including the non-dispositive result - on the personal grievance aspect to the complaints.

**C.    BY EXCLUSIVELY RELYING ON APPELLANT'S SEEKING OF PRIVATE REMEDIES IN THE LAWSUITS, THE DISTRICT COURT ERRED IN HOLDING THAT FLYNN DID <u>NOT SPEAK ON A MATTER OF PUBLIC CONCERN</u>**

The heart of this appeal is that the speech in both lawsuits constitutes speech on a matter of public concern. In contrast, the district court erred in holding that Flynn's *exclusive* motivation was for her own personal benefit, and then dismissing

her First Amendment claim. It errs in the overbreadth of its holding: the making of any private claims in an employment context mandates that the speech *per se* cannot address a matter of public concern.

Under this Circuit's caselaw, that is an impermissible conclusion with its myopic and unstated focus only on Flynn's alleged motivation – without appropriate reference to the context and content of the speech itself.

As referred to in Section IA, there is no automatic bar, suspicion, or disqualification of statements that are made in the public realm through a lawsuit. To the contrary, this court of course evaluates the actual content and context of the words in the lawsuit, but also reviews the purpose and the "heart of the matter" as it exists in a lawsuit. *See Ruotolo*, 514 F.3d at 189 (*citing* to *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d. Cir. 1999).

> **1.** **The District Court Ignored the Speech in the Lawsuit Regarding Law Enforcement's Actions, Its Failure to Protect the Public's Safety, and the Failure to Adhere to the Statutory Framework for Supervising, Monitoring, and Treating Sexual Offenders.**

In ruling that appellant had failed to speak on a matter of public concern through the two lawsuits, the district court did so by essentially ignoring practically the entirety of the narrative and language of the AC's in Flynn I and II. Flynn articulated the danger to the public in clear detail in the body of the action she filed in New York State Supreme Court in November 2018, as she had earlier in her

earlier filing in federal court.  As discussed, the full context of both AC's are replete with detailed pleadings about the risks to public safety and the violation of statutes and minimally effective treatment practices, including:

(1)     DOCCS' and even OMH's failure to comply with the Mental Hygiene Law's strictures on the treatment of released sexual offenders;

(2)     their failure to adequately treat releasees with efficacious drug and therapy treatments;

(3)     the danger to the public's safety from housing the parolee in a well-traveled highway motel;

(4)     the failure to provide adequate transportation;

(5)     the danger to the public in planning for far-ranging travel by the parolee without supervision while waiting next to an elementary school;

(6)     her description of Doe as a sexual predator;

(7)     the recommendations from professionals that Doe be afforded "a more structured and supportive arrangement" and Flynn's opinion about providing hospital residence and treatment for Doe;

(8)     a consulting psychiatrist's strong warning that Doe was only a "ticking time bomb" while waiting in the community and having repeated thoughts of having sex with children**.**

It is essentially "axiomatic" that allegations in a lawsuit about law enforcement's conduct, its failure to comply with statutory requirements designed on behalf of the public and its chosen policies, and the very health and safety of society's citizens (and its children) speak to a matter of public concern. *Golodner*,

770 F.3d at 205 (regarding lawsuit alleging potentially illegal dual-arrest policy, "it is axiomatic that misconduct within a police department implicates a matter of public concern…").

Flynn I and II's important allegations about negligent and deficient supervision and treatment of sexual offender employees and the effects in placing the public at significant risk – should be afforded the same protection as the speech in *Golodner*. Appellant's speech about the safety of the public and the application of the State's Mental Hygiene Law is precisely that which is most encouraged and welcome. *Spencer v. Philemy*, 540 Fed. Appx. 69, 71 (*summary order*) (2d Cir. 2013) ("Because Spencer's speech concerned seriously disruptive and criminal behavior on the grounds of a public school, the content of her speech supports a determination that she was speaking on a matter of public concern."); *see Garcetti*, 547 U.S. at 419 (importance "in receiving the well-informed views of government employees engaging in civic discussion…").

### 2. The District Court Erred In Concluding That Appellant's Mention Of Personal Employment Benefits Mandated A Finding That She Did Not Speak On A Matter Of Public Concern

First silent about appellant's repeated speech about the danger to the public and the specific examples of violating the statutory framework on the release of sexual offenders, the district court then erred in its myopic focus. It zeroed in only on the far shorter portion of Flynn I and II with the prayers for relief - the remedies

sought by appellant and her prayers for relief.  In summary fashion, the district

court essentially determined that appellant could not have spoken on a matter of

public concern, because she sought remedies related to her employment.  And that

such by definition was self-serving and not on behalf or of concern to the public.

*See* Dec., SPA-38 (concluding "plaintiff's lawsuit sought to redress her personal

grievances…."; SPA-39 (noting that plaintiff "sought reinstatement to her

specialized caseload…. an injunction….as well as retroactive overtime pay and

compensatory damages for emotional harm….").

   This contravenes cases in this Circuit where a plaintiff has sought personal

remedies – *including* in the employment context. A prayer for relief does not

preclude speech for the public's benefit; that has never been the precedent in this

Circuit.  For example, *Golodner* did indeed make a claim for personal relief in his

lawsuit.  *Golodner*, 770 F.3d at 205 (*emphasis supplied*) (finding speech on a

matter of public concern while rejecting proposition that the "*personal nature* of

Golodner's requests for relief requires the conclusion that he was in fact merely

raising private concerns.").

   As discussed, the public has a paramount interest in learning facts about

abuse of authority resulting in violence to its citizens. In many circumstances,

"police malfeasance…..is plainly a matter of public concern." *Jackler v. Byrne*,

658 F.3d 225, 236-37 (2d Cir. 2011) (referring to cases concerning the use of

excessive force); *see Cioffi*, 444 F.3d at 167 (in assessing the direct, personal effects for plaintiff from the speech, "the public has a pointed interest in obtaining information not only about the fact of the hazing, but also the possible administrative failures that allowed it to occur."). Speech about bodily safety and potential violence assists the public, even where there may be appended arguable employment issues relating to the retaliation against her and the remedy sought. *Spencer*, 540 Fed. Appx. at 71 (where other teachers also expressed safety concerns about a dangerous student, such supported conclusion that this was "not a case in which the plaintiff's speech related to an individual employment matter that was of little public concern, such as a payroll issue, promotion, or discipline."); *see Cotarelo*, 460 F.3d 247 at 252 (finding individual claims implicated "discrimination problems generally and were not limited to instances affecting only" the officer).

Without doubt, speech designed to stop potential violence is vitally important. Appellant's detailed rendering of facts about potential violence and sexual offense against children benefits the public, as Judge Briccetti already found.

This Circuit has applied the criteria of "public safety and welfare – as well as preservation of the public fisc." when denoting a matter of public concern. *Jackler*, 658 F.3d at 236-37; *id* at 237 ("Taxpayers foot the bill" when assessing

police misconduct and other uses of the police budget). Here also, Flynn's lawsuit raises important fiscal concerns about the lack of budgeting for appropriate supervision, inferior housing, long travel trips, saving money on appropriate and effective treatment for sex addiction.

Many – if not most lawsuits – at least typically *include* private benefits or claims. As contained in a lawsuit, the speech can still be protected as a matter of public concern where it may seek remedies and/or in many cases discuss facts that concern the public, and even where a plaintiff in parallel also seeks a private remedy.

But the district court did not refer to or give weight to the factual allegations that were the actual "heart of the matter" of appellant's complaints. *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d. Cir. 1999) (instructing to look to the "heart of the matter" and requiring that the speech at least have some "broader public purpose."); *Golodner*, 770 F.3d at 200 (prayer for relief sought personal redress (of a "personal nature"), including emotional distress damages, loss of work time, and the loss of his constitutional rights, but arrest policy issues were matter of public concern).[11]

---

[11] Granted, the complaint was "wholly unrelated to any personal grievances as to the conditions of Golodner's employment." *Golodner*, 770 F.3d at 204. Golodner referred to a personal "grievance" related to employment (as also referred to in R*uotolo*) as one description that may not be a matter of public concern, while concluding that the "personal nature" of the prayer for relief seeking "compensation for the emotional distress suffered, loss of work time," was not a personal grievance. *Golodner*, 770 F.3d at 200, 204. Any fine line demarcating a line between

In its silence, the district court usurped its role on a motion to dismiss by disregarding pled facts.

In failing to even consider or weigh the many facts alleged by plaintiff, the district court embraced its own erroneous standard: a prayer for relief alleging any employment grievances or direct affects is *ipso facto* of such a personal nature so as to automatically preclude being speech on a matter of public concern.

That should be rejected here.

### a. The district court erred in focusing on appellant's motivation as the only factor in determining the <u>nature of the speech</u>.

Appellant's motive for making the speech, with some reference to the lawsuit's prayer for relief, is not dispositive in determining whether the speech is on a matter of public concern. When evaluating the constitutional implications in the matters of public concern, the Court here should "not assign any significant weight to the specific prayer for relief as a proxy for [plaintiff's] motive." *Golodner,* 770 F.3d at 205 (discussing the prayer for relief and error in ascribing motive for the speech based exclusively on the remedies sought). In light of the constitutional issues raised, "we do not assign any significant weight to the specific prayer for relief as a proxy for Golodner's motive." *Id*.

---

personal nature of damages for emotional harm sought in *Golodner* and the type of employment remedies sought here (lost backpay, etc.) is of no great import and is not dispositive – as to motive or anything else. In *Golodner*, 700 F.3d at 205 and other cases cited herein (*infra* at 38-41), the speech as a whole was found to be on a matter of public concern.

This Circuit has never adopted a sweeping rule that all speech from a complaint that is by definition limited to employment status or conditions in its relief sought does not and cannot - as a matter of law - contain speech on a matter of public concern. This Circuit did not intend – in *Golodner* (*supra* at 36 n. 11), nor even in *Ruotolo* – to establish an inflexible rule that all prayers for relief concerning employment remedies mandates that the complaint as a whole cannot be speech on a matter of public concern.

"Whether or not speech addresses a matter of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record,' *Connick*, 461 U.S. at 147-48, and while motive surely *may be one factor* in making this determination, it is not, standing alone, dispositive or conclusive." *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009) (*emphasis supplied*). Even if motive alone were dispositive, the language of the lawsuits is not easily susceptible to a conclusion that the employment grievance was her sole motive in bringing the action - let alone when considering the whole record regarding her speech and its full content.[12]

---

[12] Further, although *Ruotolo* implies that the district court could or did look at the whole record, such was on summary judgment and also considered years of litigation, deposition testimony, and later amendments to the Complaint – and not on a motion to dismiss. Here, the district court reached very far in considering only a small portion of the pled facts.

The district court's conclusory determination that appellant simply sought to transform private speech into public through a lawsuit (A-38-39) ignores the nature of the speech here, as well as the powerful nature of public speech generally.

The specificity and language of the statements about the public good are the critical issue. Flynn's speech about her experiences and effort to manage Doe are not just her personal gripes, but describe her observed reality of the parole system and its failures. *See Cioffi*, 444 F.3d at 670 (describing speech as a "don't blame me" measure "bolsters, rather than diminishes, the public nature of the speech….." since in "proclaiming that he is not to blame, [plaintiff] presents a theory of what went wrong and who is to blame.")

> **b.** **Elevating motivation as solely dispositive contravenes this Circuit's precedents and unacceptably constricts <u>the definition of public concern</u>.**

This Court explicitly has rejected an exclusive focus on motive as dispositive, even where there are employment grievances raised as part of the speech.[13] Similarly, there is no fixed or automatic rule that when a complaint contains a prayer for relief related to employment (and employment remedies), that it cannot speak on a matter of public concern. *Sousa* made clear that a court should

---

[13] The framework for *Sousa*, 578 F.3d at 166, 173-74, recognized some confusion in the weight to be afforded motivation, particularly in the context of employment grievances – and including in its discussion of *Ruotolo*. "We acknowledge that our precedents on what constitutes 'a matter of public concern,' and particularly, the extent to which a court may take into account the speaker's motives when making that determination, are less than clear." *Id*. at 166.

not determine whether speech is on a matter of public concern *solely* from whether the employee was "motivated by employment grievances…"). *Sousa*, 568 F.3d at 166. The reasoning in *Connick v. Myers* supports this conclusion. *Sousa*, 568 F.3d at 170 (*Connick* supporting "proposition that a speaker's motive was not dispositive in determining whether his or her speech addressed 'a matter of public concern.'"); *Cioffi*, 444 F.3d at 165-66 (motive alone is not dispositive).

"Our analysis is content-based and not as defendants would have it, solely motivation-based." *Cioffi*, 444 3d at 166. In moving away from an exclusive focus on whether there is a private benefit from "personal grievances," this Court has often refocused the issue about the speaker's motive for making the speech in the first place. The Court has repeatedly reaffirmed its previous holding in *Reuland* that "'the speaker's motive is not dispositive in determining whether speech is on a matter of public concern.'" *Sousa*, 578 F.3d at 166 (*quoting Reuland v. Hynes*, 460 F.3d 409, 411 (2d Cir. 2006); *see Golodner,* 770 F.3d at 203. The "Court in *Reuland* emphasized that even though some earlier cases had indeed taken motive into account, particularly in the employment grievance context, "[n]one of these cases suggest that the speaker's motive *alone* is dispositive of the public concern issue[.]" *[Reuland, 460 F.3d at 317]* (*emphasis in the original*)." *Sousa*, 578 F.3d at 174-75.

Returning to the more holistic evaluation of speech principles highlighted above and by the Supreme Court brings the district court's error into greater relief. "Whether an employee's speech addresses a matter of public concern must be determined by the *content, form, and context* of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48 (emphasis supplied).

In discussing *Connick* and its direction about those criteria, the *Sousa* court quoted *Cioffi's* similar admonition about the broader context to be evaluated:

> *"In other words, although the speaker's overall motivation was personal, that fact was not dispositive*. If it were, then the Supreme Court's direction that we examine the content, form, and context of a given statement to determine whether it addresses a matter of public concern would be stripped of its meaning and purpose."

*Sousa*, 578 F.3d at 171 (*emphasis in original*) *quoting Cioffi*, 444 F.3d at 165-66.

### c. The remedies sought <u>here</u> are distinguishable from the "private grievances" referred to in *Ruotolo*, and the district court erred in its reliance on *Ruotolo*.

The district court erroneously relied upon *Ruotolo v. City of New York*, 514 F.3d 184, 187 (2d Cir. 2008) in dismissing appellant's claim. It is not dispositive.

*Ruotolo* offers superficial parallels to the instant case. In an amendment to the original lawsuit, Ruotolo added "the actual filing of his lawsuit as the second -

and only other -instance of speech for which Ruotolo alleged retaliation." *Id*. at

187.[14] Appellant's speech is also lawsuits.

As the district court did here, *Ruotolo* considered the "enumerate[ed]

adverse career, financial and emotional effects that *Ruotolo* suffered personally."

*Id.* at 190 (considering the assertions of changes in reassignment, transfer, time off,

and discipline). The district court did so in characterizing the instant complaints

with identical language as that in *Ruotolo*. A-38 (appellant's lawsuits "highlighted"

plaintiff's "adverse career, financial and emotional effects….").[15]

But the nut of the error is that the district court *stopped there*, and applied a

mechanical formulation zeroed in on appellant's alleged "highlight[ing]" of

"adverse career" effects. But *Ruotolo* instead continued an inquiry of broader

criteria, in adherence to the Circuit's precedent and the clarifications in *Cioffi* and

*Sousa.* It went on to review whether the lawsuit also sought "to advance a public

---

[14] *Ruotolo* cites to the district court's reliance that the underlying speech was unprotected – so that the plaintiff could not rely on that same speech (in the amendments to the Complaint) as contained in the lawsuit. *Ruotolo*, 514 F.3d at 187-188 (quoting district court, "that filing a lawsuit alleging retaliation for non-protected speech would give rise to a First Amendment complaint would defy logic, allowing a plaintiff to bootstrap a non-actionable objection to legitimate employer discipline into a valid First Amendment claim."). But this Circuit explicitly declined to adopt that reasoning. *Id*. at 189. It instead engaged in the above analysis.

[15] "Admittedly, speech *on a purely private matter*, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." *Lewis*, 163 F.3d at 164 (*emphasis supplied*); *see Ackson-Lipscomb v. City of New York*, 2022 U.S. Dist. LEXIS 59113, 17-CV-10093 (S.D.N.Y March 30, 2022) at *25 (speech alleged to "safeguard" complaint processes in fact "largely consists of a recounting of Plaintiff's own negative experiences").

purpose…." *Ruotolo*, 514 F.3d at 190. Even though it held against the plaintiff, the Circuit considered *the facts* and the plaintiff's actual effort to deter "future illegal" conduct,  reviewing the actual speech that was "arguably *hinting* at some broader public purpose…." *Id.* (*emphasis supplied*).

*Ruotolo* limited public speech in requiring specifics – specifics provided here by Flynn. "A generalized public interest in the fair or proper treatment of public employees is not enough." *Id.* at 190; *see id.* at 189 ("The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" (*quoting Lewis*, 165 F.3d at 163-64) (emphasis supplied)).

But appellant here engaged in a pattern of dogged conduct in revealing important system malfunctions, violations of the Mental Hygiene Law, and danger to the public (*supra* at 6-8 & A-104, ¶¶63-64, 69). It is dangerous to disregard the continued nature of that public speech in her filing of lawsuits by failing to consider the full panoply of facts presented – instead settling on the alleged one exclusive motivation that the lawsuit was "calculated" to redress "personal grievances." *See Cioffi*, 444 3d at 167 (as a matter of law, insufficient to show that motivated by "solely by personal interest" where he stated his "overriding concern " for the "health and safety" of students subjected to physical hazing).

Flynn's seeking of remedies that that "concerned a matter of some personal interest" does not mean the speech is a matter of purely in the personal interest. *Lewis*, 163 F.3d at 164 (*emphasis supplied* by *Lewis*)("*Connick* precludes First Amendment protection for public employees when they speak 'upon matters *only* of personal interest.'"); *see Sousa*, 578 F.2d at 174 (*quoting* R*euland*, 460 F. 3d at 417) (*emphasis supplied*)("**We make clear today, however, that it does not follow that a person *motivated by* a personal grievance cannot be speaking on a matter of public concern.").[16]

Indeed, *Cioffi* also clarified that *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) – upon which *Ruotolo* relied – did not support the speaker's motivation as the exclusive factor or even primary purpose to be evaluated.

> In support of their primary purpose test defendants mistakenly seize upon [*Ezekwo*, 940 F. 2d 775]. We did not hold in *Ezekwo* that when a speaker is motivated by personal interest, *that alone* takes the speech out of the public sphere. Nor did we articulate a primary purpose test. Rather, we applied *Connick*'s content, form and context test, holding that "viewed objectively and as a whole, [the public employee's] statements did not address matters of public concern." *Id*. at 781. While the employee's motive in *Ezekwo* informed our analysis, it

---

[16] *Sousa* recognized that *Ruotolo* implied too broad of a reliance on "motivation" in evaluating public concern. *Sousa*, 578 F.3d at 173 ("Despite our holding in *Reuland* that a speaker's motive is not dispositive when a court considers whether the speech at issue addresses a matter of public concern, our recent holding in *Ruotolo v. City of New York*, 514 F.3d 184 suggested otherwise.").

> was *only one of many factors* considered under the settled
> test of content, form and context. To the extent defendants
> read *Ezekwo* to announce a primary purpose test, they are
> mistaken.

*Cioffi*, 444 F.3d at 167 (*emphasis supplied*). The district court here similarly erred in focusing myopically on the prayer for relief, and declining to review the multitude of alleged facts about the failure of the system for releasing dangerous sexual offenders.

This Court has previously addressed the extremely difficult societal issues and public policy raised in the release of sexual offenders, and the intricate and careful balancing of the potential danger to the public and the rights of those offenders. *Doe v. Pataki*, 481 F.3d 69 (2d Cir. 2007). Appellant raised related issues about the release of sexual offenders in her lawsuits and this Circuit should require a more careful review of the actual facts that she alleged about the public's welfare and compliance with procedural safeguards.

> **d. The exclusive remedies under §75-b are "grievances" to protect public employees from the consequences for whistleblowing, and are by definition employment <u>related</u>.**

The State's protection of civil service employees against retaliation, with its limited remedies, is all that plaintiff availed herself of in Flynn II (as well as including in Flynn I). That statute only provides employment-related remedies, such as lost backpay and reinstatement. Appellant should not be placed in a Catch-

22 where she could only speak and seek a remedy under §75-b that sought personal remedy and damages, while then being told that she should have pursued or even concocted additional claims and relief that are unavailable under that statute.

"Were we to accept defendants' proposition that [the employee's] speech is not a matter of public concern simply because it personally and directly affects him 'would mean that only those persons with the least amount of firsthand knowledge about the subject matter could utter speech without fear of government reprisal.'" *Id.* at 167 (*quoting Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003).

## POINT II

### THE DISTRICT COURT ERRED IN DISMISSING APPELLANT'S PROCEDURAL DUE PROCESS CLAIMS AGAINST BLOOMINGDALE AND SHIPLEY

#### A.  THE DISTRICT COURT FAILED EVEN TO CONSIDER FACTS REGARDING FRAUD, DENIAL OF EFFECTIVE COUNSEL AT THE ARBITRATION HEARING

The district court erred in holding that appellees Bloomingdale and Shipley did not violate appellant's right to procedural due process during the arbitration hearing to uphold appellant's discharge.[17] Appellee's conduct in threatening appellant with criminal prosecution, misrepresenting the criminal charges that she faced violated her right to due process, and failing to pursue legal representation

---

[17] The district court avoided the issue of evaluating whether or not the actions by defendants constituted random or authorized acts. Appellant need not address that argument since it does not figure in the district court's dismissal.

when she requested an adjournment to continue consultation with her criminal attorney – a consultation only first begun during the arbitration day itself – violated the process due.[18]

This court is to review the decision *de novo*. The court committed legal error.

The district court's reliance on *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545-46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) is not dispositive here. Under *Cleveland Bd*., the hearing provided "need not be elaborate" so long as it provides "[t]he essential requirements of due process," which are "notice and an opportunity to respond".  470 U.S. at 545-46. But the district court embraced a concept of due process that is so constricting as to provide little guarantee. Appellant cannot dispute nor claim that no opportunity to respond existed whatsoever – but the district court is simply completely silent as to the *conditions and context* of that opportunity.

Appellees provided an inadequate opportunity amounting to a form devoid of the essential requirements of due process.

---

[18] Appellant makes no challenge as to appellees Shipley and Bloomingdale's authority to subject Flynn to discipline (the merits of the arbitration as part of the CBA), but to the *manner in which they conducted and treated* plaintiff during the arbitration itself. As to those two appellees, that treatment and the process due is the only subject of this appeal.

The denial unfolded through several acts building upon each other – ultimately violating the principles of voluntariness through a right to notice of actual and accurate charges, truly informed consent, procedural safeguards of consulting an attorney and misrepresenting the Class B Misdemeanors at issue.

As pled, these two appellees' threat or "resignation for no prosecution" directed at Flynn states a violation of procedural due process.

Appellees Bloomingdale and Shipley made the threat of criminal prosecution in order to secure Flynn's involuntary resignation. That was the exchange, and distinct and more powerful than a "strong-arm" tactic in the test of wills that typically occur at arbitration between a union and management. In promising to forbear from prosecution on 40 alleged Class B misdemeanor in exchange for Flynn's continued employment, defendants violated Penal Code §135.60. A-71-73, ¶¶66-69, 74-75.

Plaintiff pled plausible facts that securing Flynn's retirement at the arbitration - in exchange for defendants forbearing from prosecuting Flynn and potentially jailing her. The jail threat tainted the very process and fairness of the resignation as the "result" or the voluntariness of the settlement at arbitration.

Appellant does not assert that defendants never have a right to pursue criminal prosecution. Flynn does challenge proposing any "exchange" where the

one side of the ledger constituted the threat of criminal prosecution and a statutory violation.

Flynn pled that Bloomingdale's and Shipley's threat of 40 counts of the Class B felony violation purposefully misstated and misrepresented the actual number of such counts by 39, thus further harming Flynn's decision-making when weighing her liberty and property interests. Specifically, Flynn pled that they misrepresented 40 Class B misdemeanor counts as posing a threat of a jail sentence of two years, when such misrepresented misdemeanor charges as felonies under the Sexual Offenders Registration Act. A-71,¶¶66, 68; A-75, ¶83-84.

The district court simply omits mention of this due process issue.

Flynn made multiple efforts to secure legal representation and advice about the threat of criminal prosecution now connected to the arbitration and potential forced retirement. The denial of that counsel and the request for an adjournment – while facing a potential jail threat or the end of her career in the balance – pled a further actionable procedural due process violation. *See Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) ("[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."). In every instance "the fundamental requisite of due process is the opportunity to be heard". *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).

The district court only noted that Flynn "was represented by PEF counsel in an arbitration's hearing…" while silent about Flynn's allegation that appellees denied her request for meaningful consultation with criminal counsel - even denying her an adjournment to consult that counsel before giving up her 40-year career with DOCCS.  SPA-43; A-72, ¶¶71-74; A-75, ¶85. It omitted any evaluation as to whether that meets due process – thus *declining to take appellant's facts* as even pled, let alone as true.  SPA-42-43.  It only made a cursory reference, subsuming facts in its silence. *See* SPA 43 (appellant "contends she was not able to adequately defend herself because the defendants threatened criminal prosecution…").

It only generally concluded that appellees generally provided "at least some form" of a "hearing." SPA 42-43. And that "she failed to avail[]herself of the procedural safeguards afforded to her…" SPA-43.

Gotcha on that representation concern.

Flynn found her Union representation sufficiently inadequate (and not expert in criminal law) such that she required assistance in that moment from other criminal counsel. A-72, ¶¶71-74; A-75, ¶85. But the district court is not free to disregard the pled circumstances of why and how appellant arrived at not "availing herself of the procedural safeguards afforded to her…."  It is precisely those

safeguards and their potential dilution that are at issue, and those facts should be fully considered.

Talismanic immunity is not afforded a proceeding only because that proceeding results in a written settlement – while failing to consider the facts alleged. The district court thus erred in grafting its conclusion and melding all of the facts about the afforded protections.  And doing so while maintaining silence as to the salient pled facts regarding the inaccurately described 39 misdemeanor charges and the denial.

### B.    APPELLANT HAS PLED SUFFICIENT FACTS TO INVALIDATE THE AGREEMENT AND OMITS THE <u>ACTUAL VERBAL (AND ILLICIT) CONSIDERATION</u>

Incorporating the same logic as to the nullified safeguards actually in place at the time appellant allegedly failed to "avail" herself of them, the written agreement to accept the benefits is not fatal to appellant's due process claim. Rather, it is the very product created by that lack of process:  it reflects the lack of safeguards, the fraudulent representation, the coercion, and denial of counsel referred to above.

An agreement is not worth the paper it is written on and should not be afforded any talismanic value where obtained in such a manner.

"[It] is well recognized that the state of mind of the victim who claims to have been coerced or defrauded is a critical element in cases involving economic

duress." *Citibank, N.A. v. Real Coffee Trading Co., N.V.*, 566 F. Supp. 1158, 1163 (S.D.N.Y. 1983) citing *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 757 (2d Cir. 1967). Further, where there has been some expression of duress by one party, the agreement may be voidable. *Citibank*, 566 F.Supp. at 1163 (denying summary judgment against defendant where defendant had "suggested the agreement had been the product of duress, fraud or negligence.").

Plaintiff crossed out the language agreeing that the agreement was not the product of "duress" and has followed up and complained since then (in letter from Counsel). As in *Citibank*, "conflicting inferences" can be drawn as to whether Flynn here raised the issue of fraud or duress**.** "In order to prove duress, Indrec must show that there was (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative." (citation omitted). *Indus. Recycling Sys., Inc. v. Ahneman Assocs., P.C.*, 892 F. Supp. 547, 551 (S.D.N.Y. 1995).

Flynn understood the circumstances to permit no alternative, given the fear of prosecution – reacting to what was an unlawful threat of prosecution, without the benefit of criminal counsel. The threat was "unlawfully made." On this motion, those inferences, and as how they may support Flynn's constitutional claims, must be read in the light most favorable to plaintiff.

It should at least be suspicious – and should have been considered by the district court – that the most important consideration offered by defendants simply does not appear in the written agreement. A true contract would represent the actual terms – yet defendants omitted their agreement to forego prosecution from the contract itself. '

Such should call into question its enforceability – especially where appellant submitted a draft to defendants objecting to the terms and referring to the fact that she was signing the settlement agreement under duress. A-71, ¶66. If there was no actual coercion and no potential violation of the Penal Code, then why would that term forbearing prosecution simply be omitted from the actual contract?

This informal system of "justice" and its production of a written contract fails to actually provide safeguards and protection – the very centrality of procedural due process. And it should not be honored, particularly when a party requested counsel.

Nor was retiring with her paid pension from 40 years of service with DOCCS an additional benefit for Flynn.

## <u>CONCLUSION</u>

For the foregoing reasons, appellant requests that this Court reverse the district court's dismissal of the above-referenced action as to the First Amendment and Fourteenth Amendment procedural due process claims (the latter against appellees Bloomingdale and Shipley only).  She requests remand of only those claims. Appellant does not appeal nor request reversal of the district court's dismissal of the other claims in the TAC.

Respectfully submitted,

Dated: Croton-on-Hudson, New York
     October 20, 2022

MICHAEL RANIS, Atty at Law

By:   *s/Michael Ranis, Esq.*
     Michael Ranis, Esq.
Attorney for Plaintiff
32 Riverview Tr.
Croton-on-Hudson, NY  10520
914-584-6445 (MBR #3757)

54

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,031 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: October 20, 2022      Respectfully submitted,

By:  <u>*s/Michael Ranis, Esq.*</u>

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Judgment of the Clerk Appealed from, dated June 8, 2022 . . . . . . . . . . . . . . SPA-1

Transcript of the District Court Decision (bench ruling)
      Appealed From, dated June 8, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
RITA FLYNN,

                       Plaintiff,

       -against-                                      20 **CIVIL** 9381 (PMH)

                                                           **JUDGMENT**

MATTHEW BLOOMINGDALE, et al.,

                       Defendants.

------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Order dated June 8, 2022, the motion to dismiss filed by Defendants

Matthew Bloomingdale, John A. Shipley, and Donald Oliver, pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure (Doc. 41) is GRANTED. The Third Amended Complaint is

dismissed; accordingly, the case is closed.

**Dated:**  New York, New York

       June 8, 2022

                                       **RUBY J. KRAJICK**
                                  _____
                                       **Clerk of Court**
                **BY:**       K. Mango
                                    _____
                                       **Deputy Clerk**

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ---------------------------------------x
 3  RITA FLYNN,

 4                         Plaintiff,

 5                                  Case No. 20-cv-09381-PMH
       -vs-
 6                                  BENCH RULING

 7  MATTHEW BLOOMINGDALE, et al.,

 8                         Defendants.

 9  ---------------------------------------x

10                                  United States Courthouse
                                    White Plains, New York
11
                                    June 8, 2022
12                                  11:02 a.m.

13
    B e f o r e:
14                                  HONORABLE PHILIP M. HALPERN

15                                  United States District Judge

16
    A P P E A R A N C E S:
17
    MICHAEL B. RANIS (Appearing via videoconference)
18       Attorney for Plaintiff

19
    CAPEZZA HILL, LLP
20       Attorneys for Defendants
    BY:  BENJAMIN W. HILL
21

22

23

24

25
```

```
 1           THE DEPUTY CLERK:  In the matter of Rita Flynn against

 2  Matthew Bloomingdale, et al.

 3           Would the plaintiff who is on video conference please

 4  note your appearance?

 5           MR. RANIS:  Good morning, Your Honor.  Michael Ranis

 6  for the plaintiff.

 7           THE DEPUTY CLERK:  Defense counsel, please note your

 8  appearance.

 9           MR. HILL:  Good morning, Your Honor.  Benjamin Hill

10  from the law firm of Capezza Hill for the defendants.

11           THE COURT:  All right.  Good morning, counsel.  Please

12  be seated.  Mr. Ranis, I hope you are -- although a little bit

13  under the weather -- up to the task.  I haven't seen you in a

14  while.  How are you?

15           MR. RANIS:  I am good.  I am sorry I am not able to

16  make it in person.

17           THE COURT:  That's okay.

18           MR. RANIS:  I didn't quite pass it, so but thank you.

19           THE COURT:  That's okay.

20           Mr. Hill, good morning to you.

21           MR. HILL:  Good morning, Your Honor.

22           THE COURT:  All right.  Why don't we do this:

23  Mr. Hill, it's your motion.  I am happy to hear from you.  I

24  have some questions for both of you, but why don't we start by

25  hearing from you?  There are six claims for relief, and you want
```

1  them all dismissed, and so I am happy to have you highlight for

2  me whatever it is you want me to hear this morning, and I think

3  then we will hear from Mr. Ranis, and we will see where we go

4  from there.  All right?  How does that sound?

5        If you want to stay seated, you are more than welcome

6  to.  If you want to go to the podium, you can take your mask off

7  in the podium as long as you put it back on when you leave the

8  podium.  So whatever you're more comfortable doing, I am happy

9  to have you do that.

10        MR. HILL:  I will take the opportunity to take this

11  mask off if that's okay with you, Judge.

12        THE COURT:  Yes.  I am happy to have you do it.  Okay.

13        Just talk into the microphone so our crackerjack,

14  best-in-the-house court reporter will hear everything you say.

15        MR. HILL:  Can everybody hear me okay?

16        THE COURT:  Pretty good.  Mr. Ranis, can you hear him?

17        MR. RANIS:  So far, yes.

18        THE COURT:  Okay.  Good.

19        MR. HILL:  Well, Judge, as you know, as you mentioned,

20  there are six causes of action.  There is really three

21  constitutional claims, though:  First Amendment, procedural due

22  process and substantive due process, and for each of those three

23  claims there is a dispositive question, and for each of those

24  questions, there is an answer that has been clearly provided to

25  us by the Second Circuit Court of Appeals.

1          The first question is:  Does filing a lawsuit turn

2   unprotected speech into protected speech?  And the answer

3   pursuant to *Ruotolo versus the City of New York*, Your Honor, is

4   conclusively, no, it does not.

5          The second question on the procedural due process

6   claim is in the scenario that we have here where an employee

7   leaves her employment pursuant to a settlement agreement or a

8   stipulation, resigns, retires, is the provision of an Article 78

9   proceeding sufficient process under the Fourteenth Amendment?

10  *Giglio versus Dunn*, Second Circuit precedent that's been cited

11  by numerous courts since its publication in 1984 says that it is

12  sufficient.  I believe that's binding precedent.

13         The third question on the substantive due process

14  claim is when you have these specific claims under the First

15  Amendment, and then under the Fourteenth Amendment procedural

16  due process, is the substantive due process claim subsumed by

17  those other specific claims?  And for the reasons that I put

18  forth in my papers, I think it is, particularly under *Velez*

19  *versus Levy*.

20         THE COURT:  Let me stop you and ask the first question

21  that I have because I have looked at your cases, looked at the

22  laws.  We have looked at everything.  It appears to me that that

23  broad statement that no substantive due process claim exists

24  when you can pursue a more pointed or other constitutional law

25  theory exists.  So but in those cases where other constitutional

1   law theories exist, whether it's First Amendment or procedural

2   due process, doesn't matter.  The other more precise targeted

3   constitutional law claims, they actually exist and go forward.

4           In your scenario, if you are right that no First

5   Amendment claim exists, and whether the procedural due process

6   claim is pre or post, you know, arbitration, there is due

7   process; then am I not -- because there being, according to your

8   theory, they should be dismissed by me, then the plaintiff is

9   left with only a substantive due process theory, and I should

10  consider it on its merits, on its 12(b)(6) merits because there

11  is no other claim.

12          In other words, what I am trying to say is, let's

13  change the context for a second.  We all know that if you have a

14  written contract dispute, then with rare exception you can't

15  also assert a claim for unjust enrichment, right?  And so this

16  comes up in my world all the time, and I say to the lawyers, you

17  know, we are not going to hear an unjust enrichment claim

18  because you have conceded you have a written contract claim.

19  Okay, Judge.  You're right.

20          But it's because there is a written contract claim

21  that the unjust enrichment claim falls by the wayside.  So, too,

22  in this example, back to our constitutional law theory, I have

23  read those cases to mean, in fact, if there is a viable -- or

24  plausible for this context -- other constitutional law claim,

25  even more precise First Amendment or some other theory, then in

1  fact, the generic substantive due process claim falls by the

2  wayside; but when there isn't one, it has to be considered by

3  the Court.  And, you know, the case that we looked at, is this

4  Judge Rakoff *Tessler against Paterson* case, and the Second

5  Circuit affirmance of Judge Rakoff, who is, you know, a really

6  terrific judge as well.  There is a -- hold on.  As well, there

7  is a *Kia P. against McIntyre* case where the Second Circuit said,

8  and this is *Kia P. against McIntyre*, 235 F.3d 749 at 758, Second

9  Circuit said -- because in that case, Kia P's claims cannot be

10 analyzed under any other more specific constitutional provision,

11 because they were dismissed, we must assess them in terms of the

12 Fourteenth Amendment substantive due process guarantee.

13        So I don't -- I don't think it changes your outcome,

14 but I don't think I can ignore the substantive due process claim

15 because there are two other more specific claims.  I think I

16 need to look at it, and so if you wouldn't mind, address

17 yourself to the other argument on substantive due process, that

18 is, this conduct just doesn't shock the conscience.

19        MR. HILL:  Well, I appreciate the point, Your Honor.

20 I think accepting everything that is said in the Complaint is

21 true, as you must do, I do not believe that the specific conduct

22 that is alleged against any of the three individual defendants

23 rises even close to the level of anything that would shock the

24 conscience.

25        And just returning to your prior point, I do believe

1  that there is a connection in that it would only -- and this is

2  the analysis that was in the *Velez versus Levy* Second Circuit

3  case -- and what the Court said in that case is, it's only

4  shocking to the conscience if you could find that, you know,

5  they had this retaliatory animus under the First Amendment

6  analysis, and the same thing with respect to the intent under

7  the due process claim.

8          And I don't think that whether you analyze it purely

9  under the substantive due process lens or you're looking back to

10 the other claims, the allegations, the specific allegations

11 against my clients do not raise to that outer reach of

12 prohibited conduct that we are talking about when we are

13 discussing a substantive due process claim.

14         THE COURT:  And the other feature here is that this

15 employment was pursuant to a Collective Bargaining Agreement,

16 right?

17         MR. HILL:  Correct.

18         THE COURT:  And so generally, contract-based rights

19 don't rise -- don't get constitutional protection.

20         MR. HILL:  That's correct, Your Honor, and I think,

21 you know, the general thrust of my argument that you see in my

22 papers is that you can't just -- you can't constitutionalize

23 what is a contractual or, at best, a procedural issue in the

24 context of a Collective Bargaining Agreement or under the civil

25 service law or whatever it may be.

```
 1          In this case, there was a Collective Bargaining
 2  Agreement.  The plaintiff decided to resign her employment.  I
 3  understand they say that that was under duress, but the case law
 4  is clear that she had the opportunity to file an Article 78, and
 5  I think, you know, there is a four-month statute of limitations
 6  to bring that claim.  It wasn't brought.  And so plaintiff
 7  brings a 1983 claim seeking the same relief that she would have
 8  sought in an Article 78, which is reinstatement, you know, some
 9  damages, but all that gets to the First Amendment issue, which I
10  mentioned earlier, which is:  Is this -- is this a matter of
11  public concern?  Is she speaking as a private citizen?  And I
12  think the answers to those questions are conclusively no.
13          THE COURT:  I interrupted you.  So let me return you
14  back to where you were.
15          MR. HILL:  Well, Judge, I was going to go through a
16  little bit more of the First Amendment analysis if you would
17  like to hear more on that.
18          THE COURT:  Well, I am happy to hear whatever you want
19  me to hear.  I have read your papers.  I have gone through your
20  analysis, but if you want to highlight something, by all means.
21          MR. HILL:  Well, Judge, to be frank with you, I think
22  I have highlighted the points that I wanted to highlight.
23          THE COURT:  Good.
24          MR. HILL:  I am happy to answer any other questions
25  that you may have.
```

1              THE COURT:  No, I think I want to talk to Mr. Ranis

2    now about a couple of things, and I want to hear from him first,

3    but thank you for your presentation, Mr. Hill.

4              All right, Mr. Ranis.  Just keep your voice up.

5              I don't want to make it too loud, but I need you to be

6    able to hear, Mr. Hill, what's going on so let me know if you

7    are not hearing Mr. Ranis.  Okay?

8              All right.  Mr. Ranis, I am all ears.

9              MR. RANIS:  Thank you, Judge.  So I would like to

10   address the First Amendment issue.  Let me know if you are not

11   hearing me, and I will raise my voice.  I think one of the

12   issues in the First Amendment that's maybe not getting clear in

13   defendants' papers is, I don't think there is any doubt that

14   Ms. Flynn spoke out on this matter of public concern.  The

15   defendant keeps pointing out to the fact that there had been a

16   prior decision by Judge Briccetti dismissing the First Amendment

17   claimed in federal court for -- while she was still an employee.

18   That really has now -- there is no collateral estoppel about

19   that here, and if anything, the judge there did say that it was

20   undeniably speaking on a matter of public concern.  That wasn't

21   the issue.  It was dismissed because the question was:  Was she

22   speaking as a citizen?

23              Now we are in a different phase where it's the same

24   speech.  She is undeniably speaking on the matter of public

25   concern.  She is speaking about the safety and welfare of

1  children, about how this man and what the procedures were for

2  taking care --

3          THE COURT:  But she wants her job back, Mr. Ranis.

4          MR. RANIS:  Well, she wants her job back.  That's part

5  of the issue.  She wants her job back, but there is a hybrid

6  nature to her lawsuit.  There is both the speech.  That's been

7  there, and there is a sizable part of it is the speech about

8  what happened and the events in terms of the public problem; and

9  as part of that, as part of this lawsuit, she is referring to

10  the lawsuit that she had already filed; and the essence of this

11  lawsuit is, yes, that she believes her constitutional rights

12  were violated because of the speaking out as a matter of public

13  concern in the prior lawsuit so that then she has had these

14  other violations in terms of the arbitration, the procedure we

15  talk about with Mr. Hill.  Now, so it is --

16          THE COURT:  Let me ask you another -- let me ask you

17  another question.

18          MR. RANIS:  Sure.

19          THE COURT:  Are you saying because the speech is the

20  same, that by referring to it in a lawsuit, by bringing a

21  lawsuit about it, that that somehow changes the analysis under

22  the First Amendment?

23          MR. RANIS:  No.  I am only saying that this protected

24  speech, what she said in the --

25          THE COURT:  I see.

1    MR. RANIS:  -- in the lawsuit, and I am addressing --

2  maybe not what Mr. Hill just said more in his papers -- he said

3  that somehow we are seeking to transform something into a public

4  speech or protected speech through a lawsuit.  We are not.  The

5  speech is a matter of public concern, and she is speaking as a

6  citizen through a filing in a court.  I mean, in state Supreme

7  Court actually she was speaking as a citizen.  She wasn't

8  speaking --

9    THE COURT:  But there she wanted her job back.  What

10  -- I am struggling with this because I understand what you are

11  saying to me.  You're very clear, and it's plain.  But this is a

12  lawsuit about a plaintiff who wants to be reinstated.  This is

13  not any more or less than anything else, and I guess the other

14  concern I have about this whole situation, more applicable, I

15  guess, to the due process arguments, but so this plaintiff, like

16  a lot of plaintiffs in a Collective Bargaining Agreement

17  arbitration, is confronted with a choice, right?  A fork in the

18  road comes.  She is represented at the arbitration by union

19  counsel; counsel paid for by her union.  She is at the

20  arbitration, and they say, oh, by the way, you've got some

21  exposure here criminally.

22    Now, is it right or is it wrong to do that?  Can

23  lawyers do that?  Can arbitrators do that?  Put it all aside for

24  the minute.  She makes a choice, and she allegedly talks to or

25  the allegation is she talks to a criminal lawyer, and she

1   decides to retire and settle her grievance in that manner.

2          And, as the story goes, she also claims that this was

3   done under duress.  I have had many a situation before I was so

4   privileged as to become a district court judge, and after,

5   where, oh, Judge, I signed it under duress.  I didn't mean -- I

6   didn't want to.  I had no choice, et cetera, et cetera.

7          Well, in this case, assuming that all of that is true,

8   which I assume it's true, why didn't she just go and bring an

9   Article 78 proceeding or some other plenary action maybe?  And I

10  am not offering advice under the labor law, the federal labor

11  law that she wasn't represented properly.  Why didn't she do

12  that as her remedy, as a practical solution to the practical

13  problem that she was facing?  Why didn't she do that?  And

14  because she didn't do that, where is it written that she then

15  can -- you will forgive me -- constitutionalize her grievances?

16  So let's talk about that for a minute because that is of real

17  concern to me here.

18          MR. RANIS:  Thank you, Your Honor.  A couple of

19  points:  One is she -- I don't know if this is essential to your

20  ruling at all, but she has made -- she did make a claim about

21  the improper representation of the union.  She is pursuing that.

22  I don't know on the motion to dismiss that's important to you,

23  but she has gone down that road that the union did not fairly --

24  did not fully and fairly represent her interests.

25          THE COURT:  Didn't adequately represent her at the

**SPA-14**

```
 1  arbitration.
 2              MR. RANIS:  Correct.
 3              THE COURT:  Yes.
 4              MR. RANIS:  I am representing her in that, but that
 5  has -- she has counsel for that, and that's been ongoing, but I
 6  think the more immediate issue is the one we get to is the
 7  Article 78.
 8              THE COURT:  Yeah.
 9              MR. RANIS:  And there is no real good explanation for
10  why she had not -- she did not decide that until later after the
11  limitations period had expired, but right after that.  So it was
12  not --
13              THE COURT:  I see.
14              MR. RANIS:  So yes, it's going around that in the
15  sense of the period expired for her to make an Article 78.
16              THE COURT:  Because you are a constitutional scholar,
17  you were able to frame this in a way that you want me to
18  believe, accept as plausible, and I am saying, but wait a
19  minute.  Where is it written that you get to do that because she
20  missed the deadline?
21              MR. RANIS:  Correct.  And that's where I don't want to
22  say we're throwing ourselves on the mercy of the Court at all,
23  but we are in the sense of constitutionalizing her claims, the
24  area that you were talking about, let's put that all aside.
25  That's the box, putting all that aside, where basically the
```

1  claim rests for the plaintiff that you can't look at it on all

2  sides or at least we have to talk about all of that part of it.

3          THE COURT:  That's why I am talking to you.

4          MR. RANIS:  That's fine.  And I also appreciate that,

5  and hopefully I am going in the right direction to define this,

6  but that's where I think the rubber hits the road because it's

7  indisputable what you say about Article 78.  It's indisputable

8  the time having elapsed, lawyering or whatever happened

9  happened.

10          THE COURT:  Yes.

11          MR. RANIS:  So --

12          THE COURT:  You wouldn't have let that happen.

13          MR. RANIS:  What's that?

14          THE COURT:  I said, you would not have let that

15  happen.

16          MR. RANIS:  Well, among other things, but I don't want

17  to get into that.  But thank you, Your Honor.

18          But, you know, plaintiffs, clients, they have changed

19  the part what they want to do.

20          THE COURT:  I understand that.

21          MR. RANIS:  That doesn't allow someone to be in

22  federal court because somebody changes their mind, but we have a

23  mixed hybrid issue here in my view, and that is getting back to

24  when you say put that aside, it's the degree of what occurred.

25  It's not just whether she felt duress.  It's not just whether

1  she changed her mind or whether she forgot or didn't decide

2  within four months to do an Article 78.  Those things are

3  indisputable, but that's not the only issue on the table.

4          THE COURT:  You are right.

5          MR. RANIS:  The other issue is, you know, let's talk

6  about whether if a state authority threatens criminal

7  prosecution in exchange for doing something in an arbitration

8  and it misrepresents what those criminal charges are, they point

9  to 42 charges when there are really only two.  The employee

10  there is, yes, trying to get the legal counsel, telephoning him

11  on the phone and trying to get an adjournment, and they are not

12  giving her the adjournment, even after they did make the

13  effort -- it cuts both ways -- they made the effort to get legal

14  counsel.  Did that attorney represent her in the employment?

15  Sure.  For purposes of attorney-client privilege, he represented

16  her, but he wasn't effective representation.  His representation

17  was:  You need an adjournment because I don't think -- I don't

18  make decisions for clients in three minutes with a gun to their

19  head when they are physically alone.  So that's the problem; is

20  there a constitutional claim?

21          THE COURT:  But it's wrapped -- you can't -- and I

22  appreciate your sincerity and your honesty -- those allegations

23  are wrapped, though, not in some other fact pattern.  They are

24  wrapped in this fact pattern.  This is the fact pattern, and

25  it's not to say in my mind's eye, Mr. Ranis, isolating those

1  facts that you just described could not shock the conscience.

2  It's not that they couldn't shock the conscience, but in this

3  wrapper, in this complaint, I am struggling, frankly, to

4  understand how I could plausibly say that this shocks the

5  conscious, this is so egregious.  I mean, as I am educating

6  myself in my new role, this "shock the conscience" concept comes

7  up all the time now, and it's reserved for things that really

8  shock the conscience.  It's hard to pigeonhole thoughts that are

9  frankly less than shocking the conscience into this umbrella of,

10 oh, this shocks the conscience.

11        Now, I get your point to me, which is, Judge, take

12 these isolated thoughts and they could plausibly shock the

13 conscience in some other fact pattern, yes.  But in this fact

14 pattern, how does that shock the conscience?  She is represented

15 by counsel.  She's had the opportunity to talk, and this all

16 devolves from -- and if I am not mistaken, her speech, her

17 talking about and identifying individuals to her counsel, I

18 guess, that she should not have done, right?  That's what this

19 42-versus-two criminal issue is; am I right?

20        MR. RANIS:  Yes.  As far as the representation and

21 seeking counsel, that was me in this circumstance, identifying

22 those individuals to me.

23        Now, the merits of whether that's inappropriate to

24 even do that if you are trying to get a full defense of your

25 attorney, I think -- you know, I think that's very questionable.

1  Your attorney needs full information to be able to, you know --

2  the fact that she's been -- she was investigated at all, sharing

3  material with her counsel, we are not talking about going to the

4  "New York Times."  This was her counsel in a state law claim

5  that she is cc'ing to them and Mr. -- I am sorry -- Deputy

6  Oliver, he knew about that for at least 15 years.  So, I mean,

7  that's going to be a little more into the weeds and the merits,

8  but what she's been charged is a part of a tertiary -- as she is

9  defending herself in the state lawsuit.

10          So they knew about the lawsuit.  Mr. Oliver is

11  maintaining that nobody knew about the lawsuit.  It's in the

12  complaint that Mr. Oliver specifically knew about the lawsuit so

13  he wasn't going to allow it to affect his view that he was

14  investigating retaliation claims that she brought up.  So that's

15  a bigger question.  I don't mean to side-step.

16          THE COURT:  You are not side-stepping.  I am not going

17  to let you.  You know better than that, you know.

18          MR. RANIS:  I know.  Which is -- and possibly, it's --

19  I don't -- if we are talking about -- I don't think it's

20  semantic, but I think there is a philosophical issue of when you

21  say "shock the conscience," do you agree it shocks the

22  conscience?  Well, I wrap it up in all the facts if somebody

23  could have gone somewhere else, they blew it.  You can't shock

24  my conscience that they didn't do that.  I am looking --

25          THE COURT:  No, it's not just that.  It's also that

1  this is an employment pursuant to a contract.  It's government

2  employment, which may not be a fundamental right.  It's not a

3  fundamental right.  It's the Collective Bargaining Agreement.

4  It's the lawyer present.  It's not just -- you know, it's all of

5  it.

6          MR. RANIS:  Okay.  Well, the other -- but the part of

7  it -- and maybe I am doing what lawyers do, they pick out the

8  strands they want --

9          THE COURT:  Yes.

10         MR. RANIS:  -- but the strand that I am picking out

11 about potentially shocking is when somebody pursues

12 representation with a criminal attorney, I don't care where it

13 is, whether it's an arbitration or is it different because it's

14 not an arraignment?  No matter where it is, if you pursue

15 criminal counsel, and you are denied that in some way, we are

16 talking criminal -- I don't need to tell you, I am talking about

17 potential prosecution, and it doesn't matter where you are, on

18 the street or wherever, but as long as there is potential for

19 law enforcement, it doesn't matter that it's an arbitration, not

20 really.

21         Secondly, you have this issue that without -- you

22 know, so there was an attempt to get more representation, and

23 the second issue is -- I think maybe bigger -- is when we look

24 at shocking the conscience, do -- can it be possible that

25 something can still shock the conscience in a narrow way in the

1   context even though there would have been some better way, a

2   better way for a person to act under pressure where they could

3   have taken care of things in a better way?  I don't mean suing

4   your union attorney, you know.  I don't think that's what you

5   mean.  I mean, yeah, you could have -- you could have dug your

6   heels in and said, I am not going to continue with the

7   arbitration or you could have gone through the arbitration and

8   then done the Article 78.  That one has particular strength

9   perhaps, but -- but my point is that I don't think the

10  constitutional violation should be a question of so holistic in

11  a matter of "gotcha."  These are -- these are the things you

12  should have done.

13          THE COURT:  I understand, but it's that the fact

14  pattern leads to the Constitution.  The lawyer leads the client

15  to the Constitution.  There are other options here that make

16  this inquiry unnecessary, and that's what I am struggling with.

17          MR. RANIS:  Sorry.  The criminal attorney did try to

18  lead her to the Constitution.  That's sort of my point.  There

19  is more than -- the attorney presence is not mechanical.  One

20  attorney said --

21          THE COURT:  Yes.

22          MR. RANIS:  -- here is what you need to do to settle

23  this.  Another attorney was telling her the opposite.  And the

24  other thing that's alleged is the union attorney told the

25  criminal attorney, yes, we will get an adjournment.  You know,

1  so you got two different attorneys going in two different

2  directions.  Does that mean somebody has, you know, given up all

3  of their rights because they don't know which attorney -- one is

4  in person.  One is on the phone.

5          THE COURT:  Let me interrupt our thinking for a second

6  just to clear up two other thoughts.  The claim you brought

7  against Mr. Oliver is a procedural due process claim, right, not

8  a substantive due process claim.

9          MR. RANIS:  Right.

10          THE COURT:  So we have a little disconnect there in

11  the briefing about that.  So there isn't a substantive due

12  process claim against Mr. Oliver.

13        Do you agree with me that it's -- it's the current

14  state of the law that this federal employment is not a protected

15  right, or do you disagree with me?

16          MR. RANIS:  Well, I agree with you about that.

17          THE COURT:  Okay.

18          MR. RANIS:  It's a more narrow claim as to how

19  basically the gotcha type investigation, the fact that

20  Mr. Oliver knew the information was being shared with the

21  attorney.  It's very much in the weeds in -- and then not

22  informing me, anyway, that there was a problem.  And then

23  suddenly this emerges as a whole line of criticism and

24  discipline resulting in the suspension and then termination.

25        Now, and again, I -- in terms of your point about the

1  Collective Bargaining Agreement, again, that's parsed too

2  finely.  We are not actually -- to your question, we are not

3  challenging the actual decision to fire her or not in the

4  arbitration.  That is a matter for the Collective Bargaining

5  Agreement.  We are challenging the procedural due process that

6  got them to that point with Mr. Oliver, and we are challenging

7  what they did when they were at that point, the conduct of the

8  arbitration; but we can't say "she should."  You know, it's

9  clear that she did nothing wrong, and she should get her job.

10  That's not -- that isn't the proper place for this, and we are

11  not trying to constitutionalize that.  We are

12  constitutionalizing distinct time periods, procedure of due

13  process for Mr. Oliver, and --

14            THE COURT:  But she wants her job back and she --

15            MR. RANIS:  She wants -- no.  She wants to go back to

16  the arbitration.  She wants to go back to that day, have the

17  clock set back to 10 o'clock that morning so that she goes back

18  to the arbitration.  She can arbitrate that issue and lose.  She

19  can decide -- she can decide to settle it on some different

20  terms.  So she is not -- this lawsuit, I just want to address

21  one thing on which lawsuit.  This lawsuit is not to get her job

22  back.  The lawsuit in the State Supreme Court was to get her job

23  back.  This lawsuit is just to put her back in the same place

24  she was on that morning.

25            THE COURT:  Well, I am just reading, for example, I am

1   reading paragraph 117 of your Complaint and 116 of your

2   Compliant.  That's not what you are asking for.  What 117 says,

3   "Further, plaintiff requests injunctive and declaratory relief

4   from those two defendants," that's I guess Shipley and

5   Bloomingdale, "in their individual and official capacities,

6   including requiring those defendants to place Flynn in the same

7   position she was prior to the violation, prior to the violation,

8   that is reinstated to her job position, subject to discipline

9   with a right to grieve her termination before her resignation

10  and discharge."

11          MR. RANIS:  Yes.  That's what we attempted to say,

12  subject to the discipline.  So she is right there.  Put her back

13  in that exact same place subject to whatever discipline she is

14  going to be.  It's not saying that the discipline is to be

15  overturned or that she is to automatically be --

16          THE COURT:  And the paragraph before is for

17  compensatory damages and legal fees, of course.

18          MR. RANIS:  You notice we -- but not for backpay.  We

19  claimed no compensatory damages.  There is no backpay because

20  she has to have to that arbitrated as a matter of verification.

21  It's only a claim for the compensatory damages that are offset

22  from going through and having her constitutional rights

23  violated, but there is -- so that's what I mean about this

24  lawsuit is not for her job in the sense of --

25          THE COURT:  Well, it's for her job.  It's for her job,

1  and I guess -- although I didn't read it that way with your

2  clarification -- I guess you are saying, put her back in the

3  arbitration and make her enjoined and direct that she is now

4  reemployed as of that moment in time where she signed the

5  agreement.

6          MR. RANIS:  Prior to the violation.  The violation is

7  not -- is not her activity in sending emails.  The violation is

8  what happened on that day.  So she should go back to that

9  position that morning when she walked in and was ready to

10 arbitrate.

11         THE COURT:  I don't even know if I have the authority

12 to do that.  I am not sure I do.  I mean, I know I have

13 authority.  I get that.  Article III gives me certain authority,

14 but I am not sure I can do that.

15         All right.  I interrupted you, Mr. Ranis.  Go back to

16 where you were and let me hear what else it is you want to tell

17 me.

18         MR. RANIS:  Thank you, Your Honor.

19         One issue I was going to touch on a little more, and

20 you did mention it, I just want to get the lawsuit straight

21 about to what you just said she wanted her job.  This lawsuit,

22 as I just said, is not to get her job back.  The prior

23 lawsuit --

24         THE COURT:  No.  This lawsuit is to get her job back.

25 You can't tell me that.  You can't tell me that because it says

1   it.  Reinstate her job.  So I can't -- once I see the reality, I

2   can't change my mind.  You have asked to have her job

3   reinstated, but you are telling me now that you want it to be

4   reinstated so she can continue to arbitrate her case.  I got

5   that.  All right.  The other one is for backpay and front pay

6   and everything else.

7               MR. RANIS:  Correct.

8               THE COURT:  I got it.

9               MR. RANIS:  And the reason I go back to that other

10  lawsuit is just to underline that the language in that lawsuit

11  does speak on the matter of public concern in great detail.  We

12  didn't repeat it all in this lawsuit.  It's a footnote still in

13  our brief about what she spoke about, and clearly, she was not

14  speaking -- she was speaking as a citizen, not as an employee,

15  when we filed a public lawsuit.

16              The other issue I wanted to talk about is the -- the

17  concept that there is no procedural due process claim, and I

18  think that goes to some -- in some way to we have a little bit

19  of a ships in the night as to how common is this filing or is

20  this practice of when somebody walks into a room, they are

21  threatened with they maybe did something inappropriate, and

22  people negotiate and say, well, if you get rid of your claim, we

23  won't prosecute you.  That's just the way we do business in this

24  world.  Well, the allegation here is that that's -- and the

25  attorney says that's a routine decision that faces public

1   employees.  Well, our very point is that that is not necessarily

2   something abhorrent.  In fact, I think that's admitted to some

3   degree in the brief.  It's not an abhorrent act of criminality

4   where somebody went off on their own and it should be done, it

5   has to be done through the Article 78.  It is if something is a

6   routine decision, a routine practice, then it's that much easier

7   to not have to go through an Article 78.  Now, I agree from what

8   I said to you before it's an additional hurdle that the

9   plaintiff has made for herself by not doing an Article 78.

10              THE COURT:  Yes.

11              MR. RANIS:  But it's not -- but maybe another

12  statement, but we still maintain that because of the -- because

13  of allegations that this is not just somebody who's unauthorized

14  going off and doing this.  In fact, the very point is they were

15  authorized.  This is perhaps the regular practice, to put people

16  in a room, threaten them with prosecution, see what they do and

17  deny them an attorney.  So that's not just an Article 78 about

18  somebody --

19              THE COURT:  That may implicate the labor law because

20  it's not just that they are in a room.  It's that they are

21  within a room in a Collective Bargaining Agreement setting with

22  a union lawyer who maybe should say or do something different,

23  and maybe there is some other body of law implicated; but what I

24  am saying is I am struggling to get that in this context -- not

25  in any other context, Mr. Ranis -- in this context, to the

1  constitutional shocks the conscience, that behavior level.

2          MR. RANIS:  No, I see that, Your Honor, and I won't

3  belabor it.  The only distinction I was trying to make is I

4  think this -- I think this does go to the procedural due process

5  claim.

6          THE COURT:  But she had a lawyer.  She had a lawyer.

7  She had a process.  She was given notice.  She had an

8  opportunity to be heard.  She chose to settle her case and not

9  bring an Article 78.  What process is missing from that?

10  Because she was pushed to settle by a threat of criminal

11  prosecution, which may or may not be as dangerous as they

12  claimed it was for her?

13         MR. RANIS:  We won't go back whole, you summarized it

14  well.  The only thing I would maybe again -- well, to emphasize

15  again about that is that because it's in a particular room it's

16  not magic, the fact that it's a Collective Bargaining Agreement,

17  Collective Bargaining Agreement hearing, and we point to a lot

18  of protections the Collective Bargaining Agreement process is

19  supposed to have.  That's the issue is not -- I think that's

20  where we are focusing on --

21         THE COURT:  Yes.

22         MR. RANIS:  -- one of the procedures.  There is

23  nothing magic about it, and I would just basically say that

24  again that beyond the duress, beyond the misrepresentation,

25  which we -- you might say is just something with you and your

1  lawyer.  I think that crosses a line when someone asks a

2  different lawyer in the room.  Now that doesn't often happen at

3  union arbitrations, but I am sure it does happen.

4        THE COURT:  No, no, no, but sometimes -- sometimes, I

5  mean, we are off our script here a little bit, but --

6        MR. RANIS:  Yes.

7        THE COURT:  -- sometimes the union is forced to

8  represent the employee but potentially has a conflict because,

9  you know, the employee stole from the employer, and while they

10 want to represent the employee, they have a bit of a conflict,

11 and so sometimes third-party lawyers come up -- come in to

12 bridge that gap.  So it isn't unusual to -- in that context to

13 suggest a third-party lawyer.  What's unusual maybe a little bit

14 is that it's a -- we need a criminal lawyer to come in, you

15 know.

16        MR. RANIS:  Correct.

17        THE COURT:  That -- that --

18        MR. RANIS:  I think that's unusual, but also which way

19 does the "unusual" cut?  The unusual cuts not to the union's

20 benefit or about their ethical issues of a conflict.  It also

21 cuts more the other way, is that it has to do with the rights of

22 somebody being potentially charged with jail time.  These are

23 charges that she could have faced, I think a year of

24 imprisonment, all because she communicated with me.

25        THE COURT:  I get that part, and that is the -- you

1 are hanging onto that with hoops of steel, as you should, but

2 that's just one fact in the circumstance here.

3          MR. RANIS:  It's only one, but it's a central --

4          THE COURT:  I get it.  I get it.

5          MR. RANIS:  Anyway, I should not repeat any more.  I

6 appreciate your indulgence.

7          You know, that is the main issue I wanted to get to

8 procedural, but I am happy to stop there.  I've taken up a lot

9 of time.  Thank you, Your Honor.

10          THE COURT:  Mr. Hill, is there anything you need to

11 add or want to add?

12          MR. HILL:  Judge, I would just add a couple of points

13 in response to what was said.

14          THE COURT:  It's your motion, so you should.

15          MR. HILL:  With respect to -- I think some of the

16 timing is important here, particularly with respect to your

17 substantive due process analysis.

18          The NOD, or the charge, if you will, that was brought

19 by the plaintiff's former employer was filed in August of 2019.

20 Okay.

21          THE COURT:  NOD meaning Notice of Discipline?

22          MR. HILL:  Yes.  Correct, Your Honor.

23          August 5th of 2019.  The arbitration does not occur

24 until February 24th of 2020.  Okay?  The charges in the NOD lay

25 out exactly what it is she is alleged to have done.  She had

1  counsel during this entire period.  Whether or not that counsel

2  looked into the issue about whether there was criminal exposure

3  or not, that is not something that should require this Court, as

4  counsel is suggesting, to intervene now and try to undo a --

5  really a contractual agreement.  And to your point, I am not

6  sure that, notwithstanding your Article III powers, this Court

7  could go in and essentially undo under the contract clause what

8  is an agreement between the union and the employer, which is

9  exactly what he is asking you to do.  He is asking you to do

10 that today in a way.  So I think the Court should consider that.

11       I do need to make a point about the counsel issue.  As

12 Mr. Ranis has noted, there was a third claim filed against

13 PER -- against the plaintiff's union lawyer.  In that sworn

14 claim, which Mr. Ranis is now representing her on, the plaintiff

15 alleges that her attorney during this pre-arbitration

16 negotiation, did not ask for an adjournment from my clients in

17 her sworn statement.  In this lawsuit she is alleging that her

18 lawyer passed on the request for an adjournment and was denied.

19 And I raise that because to the extent Your Honor is going to

20 rely on that allegation in rendering a decision on the

21 substantive due process claim, I think that -- I guess I would

22 ask for permission to submit that PERB claim for Your Honor's

23 consideration.

24       THE COURT:  You are outside the four corners of the

25 Third Amended Complaint.  I don't need it.  It's -- you know, we

1   have laundered a little bit here -- I with you, and I with

2   Mr. Ranis -- to flesh out my understanding of where we are and

3   what I need to do right now, but because we do, that doesn't

4   mean I have lost sight of my task.  My task is to say yes or no

5   to the plausibility of a Third Amended Complaint.  So I don't

6   want to add to the record.  I don't -- you know, I am hearing

7   what you are saying, but frankly, I am just going to let that

8   thought go because I don't need it, A; and B, it's outside the

9   four corners of the application, so I appreciate it, but I don't

10  need it.

11          MR. HILL:  Okay.  Understood, Your Honor.

12          I guess the last point I would make is with respect to

13  the First Amendment claim, it's -- the District Court Judge

14  Briccetti did rule that the speech was not protected.  It's not

15  just, as counsel suggests, a matter of whether it's public

16  concern.  It's:  Were you speaking as a private citizen?  And

17  was it a matter of public concern?  So my argument in my papers

18  is, the judge has ruled that it was not protected, and filing

19  this lawsuit does not make it protected.

20          And on that point -- and this is what I will end

21  with -- as I understand counsel's argument, the speech is -- the

22  protected speech as alleged in the third amended complaint is

23  the lawsuit itself.  That lawsuit seeks only relief that is

24  personal to this particular plaintiff.  So even if you are going

25  to cut out the speech that was made before, the speech in this

1 lawsuit, the prior lawsuit that she is alleging is the protected

2 speech, that -- the aim of that is entirely personal and not

3 protected by the First Amendment in this lawsuit for that

4 reason.

5          THE COURT:  Not because it's not of public concern,

6 but because it's coming from a private grievant; is that what

7 you are saying?

8          MR. HILL:  Well, I think it's both, Judge.  I think

9 it's --

10          THE COURT:  I know you do, but if you had one and not

11 the other, it wouldn't be protected speech, right?

12          MR. HILL:  Correct.

13          THE COURT:  Okay.  All right.

14          MR. RANIS:  Your Honor, can I explain one more time?

15          THE COURT:  Mr. Ranis, I thought you might.  Yes.  But

16 that's going to give Mr. Hill his opportunity, and then we will

17 be done.

18          MR. RANIS:  Thank you.  So I still think we are

19 getting -- we are getting a little -- maybe we are going back a

20 little too far, but to the federal case that was dismissed, I

21 will just refer you to page 9 of that decision.  Judge Briccetti

22 said, "Here, the question is not whether Flynn's speech

23 addressed a matter of public concern -- undeniably it did."  And

24 went on to find it wasn't protected because --

25          THE COURT:  Why?  Why did Judge Briccetti say it was

1  unprotected speech?  Why?

2          MR. RANIS:  Because she was not speaking out as a --

3  as a citizen.

4          THE COURT:  Right.

5          MR. RANIS:  And that was the only reason he was

6  undeniably -- as he said, it was undeniable it was speech as a

7  matter of public concern.

8          Now, my point about this, to correct this a little

9  bit, hopefully, is that is the same speech that was in the state

10  law lawsuit.  I mean, it tracks the exact same speech about what

11  occurred.  Yes, it asked for her personal grievance.  It asked

12  for her reinstatement; not of her job because she was still

13  employed at the time.  It asked for her reinstatement to her

14  position and her -- and restoring of her overtime.  She had not

15  been fired.  She was still a parole officer.  So yes, it had

16  that private nature to it, but again, we have a private issue.

17          THE COURT:  And that makes it unprotected speech under

18  the First Amendment, right?

19          MR. RANIS:  Correct.

20          THE COURT:  Okay.

21          MR. RANIS:  Judge found it -- a federal judge found

22  that exact same speech was protected, even though she was asking

23  for a private personal issue in that lawsuit also.  So I am not

24  saying it's an estoppel issue that, you know, as a matter of --

25          THE COURT:  No, no, but he found it unprotected speech

1  because she spoke as a private person.

2          MR. RANIS:  Correct.  But now she is speaking --

3  right, correct.  But now this circumstances she was speaking as

4  a citizen, the same speech she was speaking as a citizen.  She

5  was speaking --

6          THE COURT:  Because she filed a lawsuit concerning it.

7          MR. RANIS:  Correct.  A lawsuit concerning --

8          THE COURT:  I got it.

9          MR. RANIS:  -- the same issue, the overtime.  The

10 other thing I don't think that for -- I don't know that this

11 makes much difference at all.  Mr. Hill referred to the

12 arbitration occurring in 2021.  It was February 24 of 2020.

13         THE COURT:  He said '20.  He said '20.

14         MR. HILL:  That's what I said.

15         MR. RANIS:  Okay.  Maybe I misheard.

16         And then the issue about -- you already addressed

17 about any difference.  I don't -- you know, clearly, in the

18 complaint at paragraph 63, the allegation is not what the

19 criminal attorney said to the union; what Ms. Flynn did was

20 speak on that issue.

21         THE COURT:  I got it.

22         MR. RANIS:  So anyway, a factual difference, but as

23 you said, the pleading is as it stands about what the criminal

24 attorney sought on behalf of his client and communicating

25 directly with the other attorney as opposed to playing telephone

1  through his client.

2        THE COURT:  Got it.

3        All right.  Mr. Hill, you got 30 seconds to tell me

4  anything you want to tell me.

5        MR. HILL:  Judge, thank you for calling us in here.  I

6  haven't been asked to give oral argument on any case in two

7  years, so I appreciate it.

8        THE COURT:  I like seeing lawyers, and I like sitting

9  in my courtroom, and I like having Darby with us because she is

10 terrific.  Well, I am glad to have you, and I am sorry,

11 Mr. Ranis had to go remote, but those are the rules.

12        I am going to take a two-minute, five-minute recess,

13 just gather my thoughts.  I think I am ready to rule on this

14 motion.

15        THE DEPUTY CLERK:  All rise.

16        (Recess)

17        THE DEPUTY CLERK:  All rise.

18        THE COURT:  You may be seated.

19        All right.  First, let me say how much I appreciate

20 good lawyering.  Clearly, you have done a fine job, Mr. Ranis.

21 We have been together before, and you always do a fine job, so I

22 greatly appreciate the effort put in here.

23        Plaintiff's Third Amended Complaint was filed on

24 August 31, 2021, and really alleges four separate claims for

25 relief, but is denominated as six.  The first is a First

060822.1                          Proceedings                          35

```
 1  Amendment claim against all defendants.  The second and third

 2  are Fourteenth Amendment procedural due process claims against

 3  defendants Bloomingdale and Shipley.  The fourth and fifth

 4  claims for relief are Fourteenth Amendment substantive due

 5  process claims against the same two defendants; and the final

 6  claim, the sixth, is a Fourteenth Amendment procedural due

 7  process claim against Defendant Oliver.

 8           Before the Court is the motion to dismiss filed by the

 9  defendants for failure to state a claim for relief.  I have

10  reviewed in detail all of the parties' submissions, heard oral

11  argument, and I am now prepared to make my ruling.

12           This motion is brought under Federal Rule of Civil

13  Procedure 12(b)(6).  The familiar standard applicable enables

14  the Court to dispose of a complaint for failure to state a claim

15  upon which relief may be granted.  To survive such a motion, a

16  complaint must contain sufficient factual matter, accepted as

17  true, to state a claim for relief that is plausible on its face.

18           With respect to the first claim for relief, the First

19  Amendment theory, plaintiff's first claim alleges that the

20  defendants violated her First Amendment rights to free speech

21  and to petition the government for redress of grievances.  She

22  alleges that the defendants retaliated against her for

23  exercising such rights.  Specifically, plaintiff alleges that

24  she filed a federal lawsuit in 2017 and a lawsuit in Orange

25  County Supreme Court in 2018.  She was retaliated against
```

DARBY GINSBERG, RPR (914) 390-4102

 1  through the OSI investigation against her, and an August 5th,

 2  2019 Notice of Discipline was sent to her under the Collective

 3  Bargaining Agreement and caused the proposed termination of her

 4  employment.

 5          A plaintiff asserting a First Amendment retaliation

 6  claim must establish:  One, that her speech or conduct was

 7  protected by the First Amendment; two, that the defendant took

 8  an adverse action against her; and three, there is a causal

 9  connection between the adverse action and the protected speech.

10  That's *Cox against Warwick Valley Central School District*, 654

11  F.3d 267 at 272, a Second Circuit 2011 case.

12          With respect to the first element, the Court conducts

13  a two-step inquiry to determine whether a public employee's

14  speech is protected.  The first requires determining whether the

15  employee spoke as a citizen on a matter of public concern.

16  That's the *Garcetti against Ceballos*, 547 U.S. 410, 418, United

17  States Supreme Court case, 2006.  The step-one inquiry

18  encompasses two separate questions:  First, whether the subject

19  of the employee's speech was a matter of public concern; and

20  second, whether the employee's speech was -- I am sorry --

21  whether the employee spoke as a citizen rather than solely as an

22  employee.  *Jackler against Burn*, 658 F.3d 225 at 235, Second

23  Circuit, 2011.  If the answer to either question is no, that

24  ends the matter.

25          Notably, the speech at issue in this case has already

060822.1                         Proceedings                         37

1    been considered by another judge in this courthouse in *Flynn*

2    *against DOCCS*, available at 2018 WL 2041713.  Judge Briccetti

3    analyzed Flynn's speech and the complaints relating to her

4    supervision of Doe under the two-step inquiry and found that it

5    was not protected speech by the First Amendment resulting in the

6    dismissal of her case.

7            Plaintiff acknowledges and concedes that the speech

8    she claims protected in this case is the same speech articulated

9    in that prior federal lawsuit.  That's Document 44 at page 11.

10   She contends, however, that by filing public lawsuits concerning

11   that speech, what was deemed unprotected speech is thereby

12   converted into protected speech.

13           I don't need to decide whether bringing a lawsuit

14   converts the same speech from that made as an employee into

15   speech made as a citizen.  Rather, the simple question before

16   me, as the Second Circuit has explained in *Ruotolo against City*

17   *of New York*, 514 F.3d 184, is whether the speech at issue was on

18   a matter of public concern.  In other words, the heart of the

19   matter is whether the speech, employee's speech, was calculated

20   to address personal grievances or whether it had a broader

21   public purpose.

22           Plaintiff's previous lawsuits highlighted adverse

23   career, financial and emotional effects, and sought personal

24   damages and reinstatement to her prior employment position.  A

25   review of the 2018 state court complaint, which is annexed to

1  plaintiff's Third Amended Complaint as Exhibit A, and the

2  federal complaint considered by Judge Briccetti, solidifies this

3  point.  Plaintiff in both actions sought reinstatement to her

4  specialized caseload and an injunction prohibiting further acts

5  of retaliation against her, as well as retroactive overtime pay

6  and compensatory damages for emotional harm, the adverse effect

7  on her reputation in the law enforcement community, and the

8  aggravation of her anxiety and worry as to her future livelihood

9  and support and professional standing in the law enforcement

10 community.

11        The filing of the previous lawsuits against DOCCS and

12 other nonparties does not turn her personal grievances into a

13 matter of speaking out on a matter of public concern.  Indeed,

14 in *Ruotolo*, plaintiff's lawsuit sought to redress her personal

15 grievances, and therefore, the speech at issue was not

16 protected.  Accordingly, the first claim for relief fails as a

17 matter of law.

18        With respect to the second and third procedural due

19 process claims and the sixth procedural due process claim

20 against Oliver, plaintiff alleges that Bloomingdale and Shipley

21 falsely threatened criminal prosecution of the plaintiff to

22 coerce her resignation.  She alleges further that Oliver

23 encouraged her to send relevant information to him during the

24 course of an OSI proceeding and then contributed to bringing

25 charges against her for doing so.  As a result, she contends she

1   was denied procedural due process.

2          A procedural due process claim in the employment

3   context is composed of two elements:  The existence of a

4   property or liberty interest that was deprived, and deprivation

5   of that interest without a due process.  That's the *Salahuddin*

6   *against City of Mount Vernon* case, 2022 WL 564002 at page 2.

7   That's a February 2022 case.

8          Defendants argue that, accepting all of plaintiff's

9   allegations as true, and assuming she had a protectable property

10  and liberty interest, the claim fails at the second element of

11  the analysis.  There is no constitutional violation and no

12  available 1983 action where there is an inadequate state post

13  deprivation procedure to remedy a random, arbitrary deprivation

14  of property or liberty.  That's *Hellenic American Neighborhood*

15  *against the City of New York*, 101 F.3d 877 at 882, Second

16  Circuit, 1996 case.

17         A procedural due process claim is generally precluded

18  where an Article 78 proceeding is available.  *Gonzalez against*

19  *the City of New York*, 2018 WL 10323053 at page 7, Southern

20  District 2018 decision.

21         Plaintiff argues, however, that the Court must

22  distinguish this as a claim based on established state

23  procedures as opposed to random, unauthorized acts by state

24  employees.  Plaintiff alleges that each of these defendants

25  acted in their official and routine capacities in having either

1 conducted an investigation, or performing a core of their human

2 resource duties in participating in the arbitration process and

3 settlement.

4        Ultimately, the question for me of how to classify

5 these defendants' actions is really immaterial.  If the Court

6 were to determine that the conduct was random and unauthorized,

7 the existence of a meaningful post deprivation remedy would

8 automatically satisfy procedural due process.  If, on the other

9 hand, I were to find that the conduct was part of an established

10 state procedure, such that the availability of a post

11 deprivation remedy would not automatically satisfy due process,

12 the Court must simply determine what process was due by

13 balancing three factors:  First, the private interests that

14 would be affected by the official action; second, risk of an

15 erroneous deprivation of such interest through the procedures

16 used, and the probable value, if any, of additional or

17 substitute procedural safeguards; and finally, the government's

18 interest, including the function involved and the fiscal and

19 administrative burdens that the additional or substitute

20 procedural requirement would entail.  *Rivera-Powell against the*

21 *City of New York Board of Elections*, 470 F.3d, 458 at 466

22 through 68, a Second Circuit 2006 case.

23        Under both tests, the process provided to plaintiff

24 was adequate.

25        First, plaintiff pleads she received the August 5,

1  2019 Notice of Discipline charging her with a violation of

2  restrictions on protecting correspondence regarding parolees and

3  their identities.  That's paragraph 54 of the Third Amended

4  Complaint.  She pleads further that, "Through this notice of

5  discipline, Bloomingdale, Shipley and DOCCS gave notice of this

6  proposed termination."  Paragraph 58 of the Third Amended

7  Complaint.

8          She further pleads that she "invoked the provisions of

9  the Collective Bargaining Agreement between the New York State

10  Public Employees Federation and DOCCS, exercising her right to

11  file a grievance regarding her discipline."  Paragraph 61 of the

12  Third Amended Complaint.

13          She alleges further that "DOCCS through defendants

14  Bloomingdale and Shipley, and PEF, proceeded to adjudicate only

15  the termination Notice of Discipline after proceeding through

16  numerous steps in the CBA grievance process.  On February 24,

17  2020, DOCCS and PEF held an arbitration of Flynn's challenge to

18  the termination action attended by Bloomingdale representing

19  DOCCS and supervised in some manner by Shipley."  Paragraph 63

20  of the Third Amended Complaint.

21          Plaintiff further alleges that at that arbitration,

22  "PEF's counsel represented Flynn in her challenge to DOCCS's

23  proposed termination."  Paragraph 64 of the Third Amended

24  Complaint.

25          Certainly, at least some form of pre-deprivation

1 hearing was provided to the plaintiff.  She was afforded notice

2 and an opportunity to be heard, and was represented by PEF

3 counsel in an arbitration that would have provided the due

4 process she claims she was now denied.  She was -- sorry -- then

5 denied.

6          The law is clear.  A pre-termination hearing need not

7 be elaborate so long as it provides the essential requirements

8 of due process, which are:  Notice and an opportunity to be

9 heard.  *Cleveland Board of Education against Loudermill*, 470

10 U.S. 532 at 545 and 46, 1985 case.

11          Plaintiff contends she was not able to adequately

12 defend herself because the defendants threatened criminal

13 prosecution, criminal charges against her if she did not resign,

14 and as affirmatively pled by the plaintiff, instead of

15 continuing with the arbitration, "she chose to resign her

16 position on the spot and reviewed the paperwork and agreement

17 submitted to her by DOCCS and PEF as necessary for resigning her

18 position and taking retirement."  That's paragraph 79 of the

19 Third Amended Complaint.

20          In other words, the plaintiff was not terminated.  She

21 resigned her post and accepted the benefits of a settlement

22 agreement instead of availing herself of the procedural

23 safeguards afforded to her, to wit, notice and opportunity to be

24 heard.  Therefore, all of the process that was due is provided

25 by the pre-termination opportunity to respond, coupled with post

1  termination administrative procedures as provided by state

2  statute.  *Loudermill* at 547 and 48.

3          The state provided due process regardless of whether

4  the Court finds the defendants' actions to be random and

5  unauthorized or an established state procedure.  Accordingly,

6  plaintiff's due process claims fail as a matter of law and will

7  be dismissed.

8          The Third Amended Complaint alleges as the fourth and

9  fifth claims for relief that the defendants Bloomingdale and

10 Shipley violated plaintiff's substantive due process rights when

11 they falsely threatened criminal prosecution of her to coerce

12 her resignation.  Plaintiff argues that these facts -- that

13 defendants intentionally, maliciously and falsely accused and/or

14 wildly inflated references to 40 criminal charges that could be

15 brought against plaintiff if she did not resign in a common

16 effort to deprive the plaintiff of her job for no reason other

17 than to oppress her and to cause her injury -- is sufficiently

18 arbitrary and outrageous in a constitutional sense to make out a

19 valid substantive due process claim.

20         Defendants argue, among other things, that when a

21 substantive due process claim is subsumed by other alleged

22 constitutional violations like here, the First Amendment and

23 procedural due process claims, the substantive due process claim

24 must be dismissed.  Where another provision of the Constitution

25 provides an explicit textual source of constitutional

060822.1                              Proceedings                              44

1  protection, the Court must assess the plaintiff's claims under

2  that explicit provision and not under the more generalized

3  notion of substantive due process.

4         But because this plaintiff in this case does not

5  allege cognizable First Amendment or Fourteenth Amendment

6  procedural due process claims as previously discussed, these

7  claims cannot be analyzed under any more specific constitutional

8  provision.  Thus, I must assess in terms of the Fourteenth

9  Amendment's substantive due process guarantee, this Complaint

10 for plausibility.  That's the *Kia P. against McIntyre* case, 235

11 F.3d 749 at 758, Second Circuit, 2000.

12         In order to succeed in a substantive due process

13 claim, the plaintiff must:  Establish the existence of some

14 constitutionally-protected interest and demonstrate that the

15 government's action was so egregious, so outrageous that it may

16 be fairly said to shock the contemporary conscience.  *Kirby*

17 *against Yonkers School District*, 767 F.Supp.2d 452 at 466,

18 Southern District, 2011.

19         When the claim is analyzed under the generalized and

20 broad rubric of substantive due process, it is clear that

21 plaintiff's substantive due process rights were not abridged.

22 Plaintiff alleges that she was placed in the difficult situation

23 of having to chose between testifying at an arbitration and

24 thereby facing potentially criminal exposure, or accepting a

25 settlement offer.  Plaintiff alleges that she was represented by

 1  PEF counsel at the arbitration and was able to speak to another

 2  criminal attorney prior to signing the settlement agreement,

 3  although an adjournment was not permitted.  She was not

 4  terminated in this case.  She resigned.

 5          First, the right to government employment is not a

 6  fundamental right.  *Tessler against Paterson*, 768 F.Supp.2d 661,

 7  670, Southern District 2011 case.  Thus, the Fourteenth

 8  Amendment may not even apply to this fact pattern.  But

 9  separately, where as here, the plaintiff's employment is

10  governed by a Collective Bargaining Agreement, the substantive

11  due process clause of the Fourteenth Amendment is not

12  implicated.  For example, in *Tessler*, Judge Rakoff considered

13  similar claims except that in his case the plaintiff's

14  government position was actually eliminated, and that plaintiff

15  was terminated from employment.  Judge Rakoff explained that

16  "contractual rights are not the type of important interests that

17  have heretofore been accorded the protection of substantive due

18  process.  Indeed, courts in this circuit have consistently held

19  that even where other alleged constitutional rights are

20  implicated, terminating government employment does not 'shock

21  the conscience,' and thus does not constitute a violation of

22  substantive due process."

23          Indeed, the Second Circuit affirmed that decision made

24  by Judge Rakoff and stated "simple state contractual rights,

25  without more, are not worthy of substantive due process

1  protection."  *Tessler*, 451 F. App'x 30 at 33, Second Circuit,

2  2011.

3          Even if I were to assume, *arguendo*, that the

4  plaintiff's right to continued public employment could be

5  considered fundamental, the conduct alleged by plaintiff was not

6  so shocking, arbitrary and egregious, especially in the context

7  here.  Plaintiff could have sought to correct her allegedly

8  forced settlement through an Article 78 proceeding and not by

9  unilaterally deciding to pursue a Fourteenth Amendment

10 substantive due process claim.  Additionally, the voluntariness

11 of plaintiff's agreement to resign her post and accept

12 retirement benefits is a state law issue unrelated in this case

13 to constitutional rights.

14         The contractual rights and disputes over her allegedly

15 forced settlement that she may have had could have been

16 addressed in state court.  The choice to frame this litigation

17 as one seeking to vindicate constitutional rights does not

18 thereby anoint it as such, especially when plaintiff's

19 employment was governed by a Collective Bargaining Agreement.

20         Accordingly, plaintiff's substantive due process

21 claims are dismissed.

22         Based on the foregoing, the defendant's motion to

23 dismiss is granted.  Plaintiff's Third Amended Complaint is

24 hereby dismissed.

25         All right.  Counsel, that's my decision.

1              Is there anything else I can do for either of you

2    today?  Mr. Hill?

3              MR. HILL:  No.  Thank you, Your Honor.

4              THE COURT:  Mr. Ranis?

5              MR. RANIS:  Thank you, Your Honor.

6              THE COURT:  All right.  Counsel, take care.  Hope you

7    are feeling better, Mr. Ranis.

8              MR. RANIS:  Thank you.

9              THE DEPUTY CLERK:  All rise.  Court is in recess.

10             (Time noted:  12:23 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25